**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JARROD TAYLOR,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )     **CIVIL ACTION 14-0439-WS-N** |
| | ) |
| **JEFFERSON S. DUNN, Commissioner,** | ) |
| **Alabama Department of Corrections,** | ) |
| | ) |
| **Respondent.** | ) |

## ORDER

This death-penalty habeas action comes before the Court on petitioner's "Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence" (doc. 25). The respondent has filed a comprehensive Answer (doc. 33), and both sides have submitted additional detailed briefs (docs. 38, 39, 43, 46, 47, 48) setting forth their respective legal positions as to the dozens of grounds for relief presented in the petitioner's § 2254 motion. After careful review of these materials, as well as relevant portions of the 59-volume record of state-court proceedings, the Court finds that the § 2254 Petition is ripe for disposition, without an evidentiary hearing.

**I.     Background.**

**A.     *The Offense Conduct.*[1]**

On the morning of December 12, 1997, Jarrod Taylor and his friend, Kenyatta McMillan, went to Steve Dyas Motors, a used car dealership in Mobile, Alabama, for the purpose of

---

[1]     The Court understands that petitioner disputes many of these facts; indeed, his position as set forth in his § 2254 Petition is that "Jarrod Taylor was convicted of capital murder and sentenced to death for a highly-publicized triple homicide that he did not commit." (Doc. 25, ¶ 1.) The recitation of offense conduct is drawn from the Alabama Court of Criminal Appeals' statement of facts on direct appeal, *Taylor v. State*, 808 So.2d 1148, 1160-61 (Ala.Crim.App 2000), and the trial court's Judgment and Sentence (vol. 53, R-113) for background purposes only, without pretermitting or prejudging Taylor's arguments to the contrary on federal habeas review.

robbing it. As part of their scheme, Taylor feigned interest in purchasing a Ford Mustang. Over the course of several hours, spanning multiple visits to the dealership, Taylor test-drove the vehicle, negotiated a purchase price with Steve Dyas Motors employee Sherry Gaston, and completed paperwork for the sale. Taylor falsely explained to Steve Dyas Motors that his father-in-law in Louisiana was going to pay for the Mustang as an early Christmas gift to him.

Later in the day, most Steve Dyas Motors employees left the dealership to attend the company's annual Christmas party that evening. Sherry Gaston remained at the office, awaiting Taylor's return in order to complete the sale of the Mustang. The only other people on the premises were Sherry Gaston's husband, Bruce Gaston, and the owner and namesake of the business, Steve Dyas. When Taylor and McMillan entered the dealership for the last time, Taylor immediately shot Bruce Gaston in the chest with a .380 caliber pistol. Sherry Gaston and Steve Dyas ran for their lives in a desperate attempt to escape. McMillan stopped Dyas at gunpoint and forced him back to the office, where Taylor and McMillan demanded that he tell them where the money and the safe were. Dyas's answers were not to their liking, so Taylor put the .380 pistol to Dyas's head and pulled the trigger, killing him instantly. As for Sherry Gaston, she had locked herself in a bathroom. Taylor ordered her to come out and she complied, begging for her life; however, Taylor shot her in the head, killing her instantly.

Taylor and McMillan proceeded to take Sherry Gaston's purse and the wallets of Bruce Gaston and Steve Dyas. They also took the paperwork that Sherry Gaston had prepared for the sale of the Mustang, leaving copies on her desk in an effort to make it appear that Taylor had actually completed the purchase of the vehicle. As they prepared to leave the dealership, Taylor noticed Bruce Gaston move, so he walked over to Gaston and shot him in the head, killing him instantly. Taylor and McMillan left the premises, taking the Ford Mustang with them, and fled Mobile that night. They were apprehended in the stolen Mustang the following morning in Selma, Alabama, more than 150 miles away from the scene of the crime.

### B. Indictment, Trial and Death Sentence.

Four months later, on April 17, 1998, Taylor was indicted in Mobile County Circuit Court for four counts of capital murder, one for each of the deaths of Sherry Gaston, Bruce Gaston and Steve Dyas during a first-degree robbery, in violation of Alabama Code § 13A-5-40(a)(2), with the fourth count charging murder of two or more persons pursuant to one scheme or course of conduct, in violation of § 13A-5-40(a)(10). Taylor's counsel of record was Richard

Horne, with Arthur Powell being appointed as co-counsel six days before the trial commenced for the primary purpose of assisting with the penalty phase.

The jury trial commenced on August 3, 1998, with Judge Douglas L. Johnstone presiding. The State presented its case-in-chief beginning on August 5, 1998. Taylor's accomplice, Kenyatta McMillan, was the star witness for the State, testifying to details of the murders and robberies, including that Taylor was the trigger man; however, the State also offered considerable corroborating evidence from multiple independent witnesses, Taylor's own statement, and forensic evidence. After five days of testimony, on August 11, 1998, the jury returned a unanimous verdict finding Taylor guilty of all four charged counts of capital murder. During the ensuing penalty phase conducted on August 11, 1998, the State called no witnesses. The defense put Taylor on the stand to express remorse, and called several other witnesses (including two of Taylor's sisters, his mother, and his minister) to testify in mitigation. The trial court charged the jury on two aggravating circumstances, to-wit: (i) the capital offense was committed in the course of a robbery, pursuant to Ala. Code § 13A-5-49(4); and (ii) the capital offense was especially heinous, atrocious or cruel, pursuant to Ala. Code § 13A-5-49(8). Upon deliberation, the jury recommended, by a vote of 7-5 as to each count, that Taylor be sentenced to life imprisonment without the possibility of parole.

After a sentencing hearing, Judge Johnstone entered a 12-page Judgment and Sentence on August 25, 1998. The trial judge opined that even if accomplice McMillan's testimony were discounted entirely, the corroborating and forensic evidence was sufficient to support Taylor's capital murder convictions. (Vol. 53, R-113, at 4.) Judge Johnstone further concluded beyond a reasonable doubt that the murders of Sherry Gaston, Bruce Gaston and Steve Dyas were heinous, atrocious and cruel, in that (i) "none of the victims offered any resistance whatsoever," (ii) "two of them pleaded for their lives and offered Taylor and McMillan all of the victims' money and property available," and (iii) "Taylor and McMillan deliberately and methodically murdered all three victims in the most certain way imaginable" (*i.e.*, by pressing the .380 pistol against their heads and pulling the trigger). (*Id.* at 5.) The trial court likewise found beyond a reasonable doubt that the aggravating circumstance of capital murder committed in the course of a robbery had been proven beyond a reasonable doubt, given that (i) "the performance of the robbery scheme began before all three murders and continued during and after all three murders," (ii) "Taylor and McMillan consummated the robberies of the victims' money and belongings and the

Ford Mustang immediately after the murders," and (iii) the murders were committed "to exert unauthorized control over the property and to overcome the victims' physical power of resistance to the taking of the property." (*Id.*) As to mitigating circumstances, the trial court considered numerous statutory and non-statutory mitigating circumstances advanced by Taylor's attorneys, and deemed them all to be either non-existent or entitled to little weight. (*Id.* at 6-10.)

Upon weighing the aggravating and mitigating circumstances, and also giving "great respect" to the jury's sentencing recommendation, the trial court concluded as follows:

> "The Court finds that the crime proved against the defendant Jarrod Taylor pursuant to each count of the indictment … was abominably aggravated and, at best, only faintly mitigated. Nothing in the evidence in this case or the demeanor of the defendant could reasonably be construed to warrant sparing the defendant's life under Alabama law as it is written. In terms of the legal test, the Court finds that the aggravating circumstances so outweigh the mitigating circumstances that death by electrocution is the only appropriate sentence. Therefore, this Court declines to follow the recommendation of the jury."

(*Id.* at 11.) Judge Johnstone proceeded to sentence Taylor to death on each of the four counts of capital murder charged in the indictment. (*Id.* at 11-12.)

On September 24, 1998, Taylor, by and through his trial counsel of record, filed a Motion for New Trial, raising as grounds for relief the following: (i) insufficient corroboration of McMillan's testimony that Taylor was the trigger man; (ii) alleged error in allowing jailhouse witness Bryann Scott Clark to recant his trial testimony that McMillan had confessed to Clark that he had murdered the Gastons and Steve Dyas; (iii) McMillan's testimony was "incredible as a matter of law" because his trial testimony purportedly contradicted his previous statement under oath; (iv) alleged error in refusing to allow the State Medical Examiner to testify that the forensic evidence was consistent with victim Dyas lying on the floor when he was murdered, as opposed to "kneeling in prayer" while begging for his life as McMillan had testified; (v) alleged error in allowing Warden Rick Gaston to testify for the State as to jail communications despite having been present in the courtroom (in violation of "The Rule") during the testimony of jailhouse witnesses Clark and Robert Nolin; (vi) objections to certain specific findings in the Judgment and Sentence as relating to corroboration of McMillan's narrative; (vii) objection to the Judgment and Sentence's finding that Taylor was the leader, or at least a full partner, in the robberies and murders because such finding was based solely on McMillan's testimony; (viii) alleged error in the trial court's treatment of nonstatutory mitigating factors; (ix) alleged error by the trial court in rejecting the "lingering doubt" mitigating factor based solely on "rank

speculation" and McMillan's testimony; and (x) alleged error for the trial court to substitute its opinion on penalty for that of the jury, thereby reducing the jury's role in the penalty phase "to a mere sham." (Vol. 1, R-2, at 166-84.) After an evidentiary hearing, Judge Johnstone denied the Motion for New Trial on October 6, 1998. (Vol. 10, R-40, at 1710-16.)[2]

### C.    Direct Appeal.

Attorney Horne (but not attorney Powell) continued to represent Taylor on direct appeal, with the assistance of newly appointed co-counsel, Glenn Davidson. In this appeal, defense counsel raised and litigated more than 60 distinct assignments of error, including the following: (i) the trial court erred in not allowing defense counsel to question the State's forensic pathologist about the position of Dyas's body at the time he was shot; (ii) the trial court erred in denying the defense's *Batson* motion during jury selection; (iii) improper admission into evidence of a blue bag found in Taylor's hotel room in Selma at the time of his arrest, which bag included papers showing that Taylor was in arrears on child support payments; (iv) error in failing to give the jury a limiting instruction on the proper use of evidence of collateral bad acts; (v) improper consideration of sentencing recommendations expressed by the victims' friends and family; (vi) failure to consider McMillan's more lenient sentence as a mitigating circumstance; (vii) erroneous conclusion that the murders were especially heinous, atrocious or cruel; (viii) suggestion that the jury was not functioning properly during the penalty phase; (ix) error in allowing the State to present Clark's recantation as rebuttal evidence; (x) error in denying the Motion for New Trial based on Clark's new testimony that his recantation was coerced; (xi) failure to instruct the jury on the lesser-included offense of robbery; (xii) error by the trial court

---

[2]    In so doing, the trial court made specific findings that Clark, who had testified twice at trial and a third time during the hearing on Motion for New Trial, was not credible when he testified that Warden Gaston had threatened his family unless he recanted his initial trial testimony that McMillan had confessed to Clark that he (McMillan) had been the trigger man. (*Id.* at 1710-13.) The trial court also observed that "the credibility of Clark … was so weak at the trial itself that the likelihood that that testimony, whether recanted or not, would make much difference is remote." (*Id.* at 1714.) More generally, Judge Johnstone indicated on the record that the Motion for New Trial "is just more evidence of splendid representation of the defendant by Mr. Horne and Mr. Powell," in that defense counsel "are leaving absolutely no stone unturned in advancing every really arguable possibility on behalf of their client, exhausting every avenue with regard to the discharge of their duties," even though the trial court found those arguments not to be persuasive. (*Id.* at 1715.)

in failing to conduct thorough voir dire of all jurors after an emotionally unstable juror was sent home; (xiii) lack of corroboration of McMillan's accomplice testimony, as required by Alabama Code § 12-21-222; (xiv) improper limits on the defense's opening statement at trial by restricting counsel from apprising the jury of McMillan's prior bad acts; (xv) due process claim that Taylor and his counsel were absent during a portion of jury selection; (xvi) failure to grant a continuance when Taylor's co-counsel was appointed just six days before jury selection; (xvii) failure to suppress Taylor's statement to law enforcement officers when he was not given a fair opportunity to invoke *Miranda* rights; (xviii) improper admission of a redacted audiotape of Taylor's statement; (xix) error in the trial court's failure to excuse *sua sponte* a veniremember who recognized McMillan and a relative of one of the victims, and who had heard details of the murders; (xx) improper denial of defense motion for veniremembers to complete questionnaires; (xxi) denial of defense motion for individual voir dire examination; (xxii) denial of defense motion to disqualify all potential jurors who were acquainted with victims or victims' family members; (xxiii) harassment and intimidation of jurors by the trial court; (xxiv) prosecutorial misconduct in closing argument by commenting on Taylor's silence; (xxv) improper closing argument by the State in misstating the law; (xxvi) prosecutorial misconduct in accusing defense counsel of lying and suborning perjury; (xxvii) improper impeachment by the State as to a defense witness's previous conviction; (xxviii) prosecutorial misconduct in improperly emphasizing that the murders took place at Christmastime; (xxix) improper argument by the State to sentence Taylor to death based on McMillan's conduct; (xxx) due process and equal protection violations by the trial court in overriding the jury's sentencing recommendation of life without parole; (xxxi) error by the trial court in granting the State's motion for blood samples from Taylor; (xxxii) erroneous admission of multiple State exhibits that were not clearly identified for the record; (xxxiii) assertion that the trial record was incomplete because of omission of certain exhibits and jury questionnaires; (xxxiv) improper admission of bank employee's hearsay statement about what sounded like a gunshot; (xxxv) improper admission of hearsay statements concerning Taylor's and McMillan's assessment of which banks would be suitable to rob; (xxxvi) improper admission of hearsay statement by Taylor about the need to carry a gun to protect himself; (xxxvii) error in allowing Warden Gaston to testify in rebuttal for the State after being present in the courtroom for the testimony of multiple defense witnesses; (xxxviii) improper exclusion of jurors who expressed reservations about the death penalty;

(xxxix) double jeopardy violation in allowing the State to double-count the robbery component of the capital murder offense as an aggravating circumstance; (xl) denial of a fair and representative jury because the trial court bestowed heightened authority on the foreperson; (xli) error in allowing victims' family members to be present in the courtroom during trial; (xlii) death sentence for Taylor disproportional to McMillan's life sentence; (xliii) sufficiency of the evidence, given the State's reliance on uncorroborated accomplice testimony from McMillan; (xliv) improper admission of crime scene photographs of the victims; (xlv) electrocution is cruel and unusual punishment; (xlvi) error in failing to move the trial to another venue because of pretrial publicity; (xlvii) unconstitutional limits on out-of-court expenses for court-appointed attorneys in Alabama; (xlviii) improper jury instructions as to specific intent to kill; (xlix) improper jury instruction as to definition of murder; (l) incorrect jury instruction on reasonable doubt; (li) nonsensical jury instruction on felony murder; (lii) improper jury instruction allowing the jury to transfer McMillan's intent to Taylor; (liii) improper jury instruction as to alibi defense; (liv) improper jury instruction that the State was "entitled" to a conviction; (lv) trial court's summary of indictment destroyed presumption of judicial impartiality; (lvi) implication by the trial court that jury instructions were not individualized, leading the jury to shirk or minimize its responsibility; (lvii) improper jury instruction failing to advise jury that aggravating circumstances must be found beyond a reasonable doubt; (lviii) failure to instruct that each juror may consider mitigating circumstances independently of other jurors; (lix) failure to give defense's proposed instructions on burden of proof, presumption of innocence, reasonable doubt, and penalty-phase matters; (lx) impermissible imposition of four death sentences on Taylor for three murders; and (lxi) cumulative error.

In a comprehensive opinion dated February 4, 2000 and spanning nearly 70 pages in the Southern Reporter, the Alabama Court of Criminal Appeals methodically examined these myriad assignments of error, found them to be without merit, and affirmed Taylor's convictions and death sentences in all respects. *See Taylor v. State*, 808 So.2d 1148, 1148-1215 (Ala.Crim.App. 2000). The Alabama appellate court expressly concluded as follows: "We have searched the record and have found no error in the sentencing proceedings adversely affecting Taylor's rights. … [W]e have searched the entire proceedings under review and found no plain error or defect that has, or probably has, adversely affected any substantial right of Taylor's." *Id.* at 1214. The court also opined that "death is the proper sentence in this case" because "Taylor specifically,

deliberately, methodically, and heartlessly formed the specific and particularized intent to kill Sherry Gaston, Bruce Gaston, and Steve Dyas, and then executed that intent equally deliberately, methodically, and heartlessly." *Id.* at 1215. Taylor's ensuing petition for rehearing was denied on March 24, 2000.

The Alabama Supreme Court granted Taylor's petition for certiorari review and, after hearing oral arguments, affirmed the Court of Criminal Appeals' judgment via a written opinion entered on March 9, 2001. *See Ex parte Taylor*, 808 So.2d 1215 (Ala. 2001). The Alabama Supreme Court noted that Taylor had raised a number of issues, and after consideration, concluded that "[a]ll these issues were fully and correctly addressed in the opinion of the Court of Criminal Appeals." *Id.* at 1217. The Alabama Supreme Court specifically wrote to only two such issues. As to Taylor's objection that the trial court's override of the jury's recommendation of a life sentence violated due process and equal protection, the Alabama Supreme Court held "that Alabama's capital-sentencing procedure does not result in the imposition of the death sentence in an arbitrary and capricious manner in violation of the Fourteenth Amendment" and that the trial court had properly applied that procedure in a manner that "met constitutional requirements and was not arbitrary, discriminatory, or fundamentally unfair." *Id.* at 1219. The Alabama Supreme Court also wrote to and rejected Taylor's argument that Alabama law did not provide a standard for appellate review of a trial judge's override decision in a particular case. *Id.* at 1219-20. Taylor's petition for rehearing was denied on July 6, 2001. The U.S. Supreme Court denied Taylor's petition for writ of certiorari on January 7, 2002. *See Taylor v. Alabama*, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002).

### D. *Rule 32 Proceedings.*

Having completed his direct appeal, Taylor subsequently commenced state post-conviction proceedings.[3] On July 31, 2002, Taylor filed his initial Rule 32 petition in Mobile County Circuit Court. (Vol. 18, R-52, at 16-124.) On August 15, 2002, Taylor filed a Corrected Rule 32 Petition. (Vol. 18-19, R-53 at 150-274.) In May 2003, Taylor was granted leave to file

---

[3] During state collateral review, Taylor was represented by a new legal team, including four attorneys from the New York law firm of Paul, Weiss, Rifkind, Wharton & Garrison. The Paul Weiss firm, as well as local attorney Joshua P. Myrick, are counsel of record for Taylor in his federal habeas corpus proceedings.

two further iterations of his Rule 32 petition, styled his "First Amended Petition" and his "Corrected First Amended Petition," respectively. (Vol. 21-22, at 676-830; vol. 22, R-56.)

The 124-page Corrected First Amended Petition under Rule 32 filed by Taylor identified more than two dozen grounds for post-conviction relief, including the following: (1) Alabama's capital statute violates *Ring/Apprendi*; (2) Alabama's capital statute is arbitrary/capricious because of unfettered discretion afforded sentencing judge; (3) death penalty is unconstitutional because of unreliable application; (4) death by electrocution is cruel and unusual; (5) Taylor may not be executed via electrocution; (6) ineffective assistance of trial counsel for failure to disclose an actual conflict; (7) ineffective assistance of trial counsel at jury selection (inadequate voir dire, failure to challenge/examine jurors exposed to extra-judicial information, failure to challenge/examine jurors whose family members had been victims, failure to question jurors regarding bias); (8) ineffective assistance of trial counsel in failing to make a competent *Batson* objection; (9) ineffective assistance in failure to seek removal of a juror and investigation of juror misconduct; (10) ineffective assistance in failure to present an adequate defense (lack of diligence in pursuing pretrial motions, failure to retain experts and present forensic evidence to impeach State's witnesses, ineffectiveness during McMillan's testimony, failure to seek exclusion of irrelevant/prejudicial evidence, failure to investigate facts, failure to conduct proper cross-examination, failure to point out contradictions in State witnesses' testimony, failure to object to prejudicial comments by State during opening/closing, failure to ensure proper jury charges); (11) ineffective assistance at sentencing phase (failure to call Taylor's brother Jeff to testify, failure to develop mitigation evidence regarding Taylor's son, failure to conduct a mitigation investigation of Taylor's life and background, failure to retain psychiatric expert because of "scheduling issues," failure to hire mitigation expert, failure to object to penalty phase jury charge regarding weighing of aggravating and mitigating circumstances, failure to explain "misprision of a felony" to jurors); (12) ineffective assistance for failure to object to trial errors; (13) ineffective assistance for failure "ardently" to pursue motion for new trial; (14) ineffective assistance for failure to object to trial judge's "partisan participation;" (15) ineffective assistance because of inadequate compensation; (16) ineffective assistance based on cumulative errors; (17) race and gender discrimination in formation of petit jury; (18) "death qualification" of jury violated Taylor's right to impartial jury; (19) juror misconduct (juror Davis answered questions untruthfully and made biased statements before being removed, premature deliberations); (20)

trial judge was legally disqualified for accepting campaign contributions from Taylor's counsel; (21) Taylor's constitutional rights were violated because the trial judge was in the midst of an election campaign at time of trial and sentencing; (22) the trial judge was assigned Taylor's case in a manner that violated due process; (23) double jeopardy in the imposition of a distinct death sentence for killing of three people pursuant to one course of conduct, plus death sentences for each of the three murders; (24) insufficient evidence of "heinous, atrocious or cruel" aggravating circumstance; (25) State "apparently" violated *Brady* because it "may have withheld information regarding Warden Rick Gaston and conversations concerning the recanted testimony of Bryan Scott Clark," "may have withheld information regarding Kenyatta McMillan's statements to the police," and "may also have withheld information regarding interviews with Cherelle Carlton and Tiffany Carlton;" (26) error in failure to allow individual voir dire of venire; and (27) cumulative error. (Vol. 22, R-56, at 831-959.)

The course of Taylor's Rule 32 proceedings will be addressed in considerable detail *infra*, in the context of this Court's procedural default analysis. In summary, however, the State filed motions on May 27, 2003, seeking to dismiss many of the claims presented in Taylor's Corrected First Amended Rule 32 Petition. (Vol. 25, R-61, R-64, R-65, R-71.) Following briefing, on October 23, 2003, the trial court entered a series of four orders granting the State's motions to dismiss and dismissing many aspects of Taylor's Rule 32 petition. (Vol. 53, R-117, R-118, R-119, R-120.) The trial court also entered an order granting the State's motion to prohibit Taylor from making further amendments to his Rule 32 petition. (Vol. 53, R-121.) Following a hearing, the trial court entered a final order on August 1, 2005, summarily dismissing Taylor's Rule 32 petition in its entirety. (Vol. 54, R-122.) After several years of litigation in Alabama's appellate courts, Taylor's Rule 32 proceedings were remanded to the trial court on the grounds that certain claims remained pending after the October 2003 rulings, such that the trial court's summary dismissal of Taylor's entire petition in August 2005 was improper. (Vol. 53, R-128 at 10.) Upon this limited remand to Mobile County Circuit Court, Taylor made multiple attempts to amend his Rule 32 petition further to raise numerous new grounds for relief. (Vol. 34, R-93; vol. 46, R-101.) The trial court disallowed those proposed amendments as impermissible pursuant to Alabama law and procedure. (Vol. 53, R-129.) Taylor's attempts to obtain a writ of mandamus to allow such amendments to his Rule 32 petition were denied by the Alabama appellate courts. (Vol. 53, R-130.) After an evidentiary hearing, the trial court entered

an order dismissing Taylor's Rule 32 petition on May 23, 2012. (Vol. 53, R-131.) Taylor's appeals from that ruling were denied by the Alabama Court of Criminal Appeals on April 23, 2013 and by the Alabama Supreme Court on April 25, 2014. (Vol. 53, R-134, R-135.)

      *E.*      ***Federal Habeas Petition.***

On September 22, 2014, Taylor filed his Petition for Writ of Habeas Corpus (doc. 5) pursuant to 28 U.S.C. § 2254. Nearly three months later, on December 19, 2014, Taylor filed a 283-page Amended Petition for Writ of Habeas Corpus setting forth 11 grounds for federal habeas relief (along with dozens of embedded sub-grounds and sub-issues), under the following headings: (i) the State exercised peremptory challenges in a manner that violated equal protection and due process; (ii) the State's misconduct (in knowingly using false testimony from McMillan and others, and failing to disclose impeachment evidence) violated Taylor's right to a fair trial; (iii) ineffective assistance of trial counsel in myriad respects during jury selection, the guilt phase, the penalty phase, and the motion for new trial; (iv) lack of an impartial tribunal; (v) use of improper and unconstitutional jury instructions during the guilt phase and penalty phase; (vi) insufficient evidence of capital murder; (vii) trial court's reliance on improper evidence to override jury's recommendation of life sentence; (viii) cumulative error; (ix) McMillan's confession requires vacatur of Taylor's convictions and sentences; (x) Alabama courts wrongfully deprived Taylor of his right fully and fairly to litigate his claims; and (xi) the Alabama capital statute is unconstitutional on its face and as applied to Taylor in many respects. (Doc. 25.)

The undersigned has carefully examined Taylor's Amended Petition for Writ of Habeas Corpus (the "§ 2254 Petition"), the State's 134-page Answer (doc. 33), Taylor's 72-page Reply (doc. 43), all relevant portions of the 59-volume record of the underlying proceedings, Taylor's Exhibits A-H appended to his § 2254 Petition, Taylor's Motion for Discovery and Evidentiary Hearing (doc. 38), the State's Response (doc. 39) to same, and the parties' supplemental briefs concerning the implications of *Hurst v. Florida* (docs. 46-48). The Court finds that Taylor's § 2254 Petition is ripe for adjudication at this time.

## II. Standard of Review.

Taylor's federal habeas petition was filed long after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The applicable statutory framework sets forth three distinct standards of review, depending on whether the state court

decided the claim on the merits, whether the state court refused to decide the claim on the merits because it was barred by state procedural rules, or whether the bar on which the state court relied was inadequate to preclude federal review. The Eleventh Circuit has summarized these principles as follows: "[AEDPA] establishes a highly deferential standard of review for federal claims that have been adjudicated on the merits in State court proceedings. … On the other hand, if a state court refused to decide a claim on the merits because the claim was barred by state procedural rules, we are generally, though not always, prevented from reviewing the claim at all. … [R]esting between AEDPA deference and procedural default is a third path. If the state court did not reach the merits of a petitioner's claim based on some ground that is not adequate to bar federal review, we must review the claim *de novo*." *Williams v. Alabama*, 791 F.3d 1267, 1272-73 (11th Cir. 2015).

Under the highly deferential AEDPA standard, a federal court may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's determination "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 100, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) ("Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision was contrary to federal law then clearly established in the holdings of this Court, … or that it involved an unreasonable application of such law, … or that it was based on an unreasonable determination of the facts in light of the record before the state court") (citations and internal quotation marks omitted). It bears emphasis that the deferential standard of review prescribed by § 2254(d) "is limited to claims that have been 'adjudicated on the merits' in state court. A decision that is based on state procedural grounds is not an adjudication on the merits." *Williams*, 791 F.3d at 1273.

Where § 2254(d) applies, "the obstacles that a habeas petitioner faces … are daunting." *Evans v. Secretary, Florida Dep't of Corrections*, 699 F.3d 1249, 1267 (11th Cir. 2012). In that circumstance, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011)

(citation omitted); *see also Evans*, 699 F.3d at 1269 ("The question is not how the [federal habeas] court … would rule if presented with the issue for the first time and not whether we think the state court decision is correct, but whether its decision is contrary to or an unreasonable application of clearly established federal law."); *Hill v. Humphrey*, 662 F.3d 1335, 1355 (11th Cir. 2011) ("A federal court may not grant habeas relief on a claim a state court has rejected on the merits simply because the state court held a view different from its own.").[4]  Rather, "[t]o obtain habeas relief a state prisoner must show that the state court's ruling on the claim being presented in the federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Evans v. Secretary, Dep't of Corrections*, 703 F.3d 1316, 1326 (1th Cir. 2013) (citations omitted).  Under § 2254(d) deference, "only if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents may relief be granted." *Johnson v. Secretary, DOC*, 643 F.3d 907, 910 (11th Cir. 2011) (citation and internal quotation marks omitted); *see also Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) ("if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied") (citation omitted).  "If this standard is difficult to meet, that is because it was meant to be." *Holsey*, 694 F.3d at 1257 (citation omitted); *see also Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011) ("[T]he deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear.").[5]  "Section 2254(d) reflects the view that habeas corpus is a guard against

---

[4]  "Clearly established federal law" for purposes of an AEDPA analysis is confined to extant Supreme Court decisions at the time of the state-court ruling.  *See, e.g., Booker v. Secretary, Florida Dep't of Corrections*, 684 F.3d 1121, 1123 (11th Cir. 2012) ("Clearly established Federal law under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.") (citation and internal marks omitted); *Evans*, 699 F.3d at 1266 ("It is hornbook AEDPA law that the only Supreme Court decisions against which a state court decision is to be measured are those on the books at the time the state court decision was issued.").  Stated differently, "[i]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the Supreme Court.  *Harrington*, 562 U.S. at 101.

[5]  With respect to the state court's findings of fact, the standard of review is narrower and more daunting still.  The statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1); *see also Adkins* (Continued)

extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotation marks omitted).

As noted, when a state court refuses to decide a federal claim on state procedural grounds, the federal habeas court is generally precluded from reviewing the claim at all. *See, e.g., Williams*, 791 F.3d at 1273 ("[I]t is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment.") (citation omitted); *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If, however, the state court's procedural ruling is not adequate to bar federal review, then the federal habeas court must review the claim *de novo*, and is not confined to the state-court record. *See Williams*, 791 F.3d at 1273.

Section 2254 also generally requires petitioners to exhaust all available state-law remedies. In that regard, "[a] petitioner must alert state law courts to any federal claims to allow the state courts an opportunity to review and correct the claimed violations of his federal rights." *Lamarca v. Secretary, Dep't of Corrections*, 568 F.3d 929, 936 (11th Cir. 2009). "[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Lucas v. Secretary, Dep't of Corrections*, 682 F.3d 1342, 1352 (11th Cir. 2012); *see also Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008) (exhaustion requirement not satisfied unless "petitioner presented his claims to the state court such that a reasonable reader would understand each claim's … specific factual foundation") (citation omitted). It is not sufficient "that a somewhat similar state-law claim was made." *Kelley v. Secretary, Dep't of Corrections*, 377 F.3d 1317, 1344-45 (11th Cir. 2004). Nor is it sufficient for a petitioner to present federal claims to the state trial court; rather, "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on

_____

*v. Warden, Holman CF*, 710 F.3d 1241, 1249 (11th Cir. 2013) ("[f]ederal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence") (citation omitted).

direct appeal or on collateral review." *Powell v. Allen*, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted); *see also Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) ("Exhaustion requires that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.") (citations and internal quotation marks omitted). That said, "habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance." *Kelley*, 377 F.3d at 1344.

## III.  Procedural Default Issues.

### A.  *State Courts' Denial of Leave to File Second Amended Rule 32 Petition.*

A critical threshold issue in the adjudication of Taylor's § 2254 Petition is whether this Court may properly hear certain claims that Taylor presented to the state courts solely in the form of a Proposed Second Amended Rule 32 Petition (the "Second Amended R32 Petition"). The state courts disallowed Taylor's Second Amended R32 Petition on state procedural grounds; therefore, the new claims that Taylor sought to raise via that iteration of his Rule 32 petition were never adjudicated on the merits by the state courts.

#### 1.  *The State Court Rulings.*

To recap the state postconviction proceedings, on May 6, 2003, Taylor filed a 124-page, 264-paragraph Corrected First Amended Rule 32 Petition (the "Corrected First Amended R32 Petition") in Mobile County Circuit Court.  (Vol. 22, R-56.)  On October 23, 2003, Mobile County Circuit Judge Herman Thomas entered a batch of four orders summarily dismissing particular aspects of the Corrected First Amended R32 Petition on grounds of Rule 32.2(a) procedural bar (Vol. 53, R-117), untimeliness under Rule 32.2(c) limitations period (Vol. 53, R-118), insufficient pleading under Rules 32.3 and 32.6(b) (Vol. 53, R-119), and failure to present material issues of fact or law under Rule 32.7(d) (Vol. 53, R-120).

Nearly two years later, on August 1, 2005, Judge Thomas entered a three-page "Final Order" in which he found that "all of the claims in Petitioner Taylor's corrected first amended Rule 32 petition have been dismissed" and ordered, adjudged and decreed that such petition was dismissed.  (Vol. 53, R-122.)  After a somewhat circuitous series of appeals, the Alabama Court of Criminal Appeals issued an order on October 1, 2010, in which it concluded that because certain "claims remained pending after the circuit court entered the orders of partial dismissal,

the circuit court erred in entering its August 1, 2005, final order summarily dismissing the petition in its entirety; we therefore remand the cause to the trial court for resolution of the pending claims." (Vol. 53, R-128, at 10.) The state appellate court also considered and rejected each of Taylor's numerous arguments on appeal concerning the claims dismissed by the circuit court via the quartet of October 2003 orders. (*Id.* at 10-19.) Ultimately, the Alabama Court of Criminal Appeals concluded its October 1, 2010 order as follows:

> "[T]his cause is remanded to the circuit court for resolution of those claims that the parties agreed had not been dismissed by the orders of partial dismissal; Taylor is entitled to the opportunity to prove the allegations in those claims and to establish that he is entitled to relief. The circuit court shall take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 90 days of the release of this opinion.

> "We affirm the circuit court's judgment as to remaining issues raised by Taylor in his brief on appeal."

(*Id.* at 19.)[6]

On the heels of this limited remand to the Mobile County Circuit Court, Taylor filed a "Motion for Leave to File the Second Amended Petition for Relief from Judgment Pursuant to Rule 32" (Vol. 34, R-93, at 267-80), on September 19, 2011. Taylor appended to this motion his proposed Second Amended R32 Petition, which numbered 171 pages and 397 paragraphs (an increase of some 47 pages and 133 paragraphs relative to its predecessor, which was itself the third iteration of Taylor's Rule 32 petition). (Vols. 34 & 35, R-93, at 283-460.) In comparison with the First Amended R32 Petition, the proposed Second Amended R32 Petition would have

---

[6]     The claims remanded by the Alabama Court of Criminal Appeals to the circuit court consisted largely of certain ineffective assistance claims, including (a) general allegations of ineffective assistance found in paragraphs 47 through 49 of the Corrected First Amended R32 Petition; (b) allegations of ineffective assistance relating to voir dire, found at paragraph 66; (c) allegations of ineffective assistance relating to failure to retain experts, found at paragraphs 109-15 and 118-25; (d) allegations of ineffective assistance relating to cross-examination of Kenyatta McMillan, found at paragraphs 130-35; (e) allegations of ineffective assistance relating to pretrial investigation, found at paragraphs 141-45; (f) allegations of ineffective assistance relating to a jury instruction, found at paragraphs 174-75; and (g) allegations of cumulative ineffective assistance, found at paragraphs 186-87. Also remanded was Taylor's claim of jury misconduct relating to juror Davis's purported untruthfulness and improper statements, as well as other jurors' premature deliberations, found at paragraphs 214A and 214B. (*Id.* at 9-10.)

injected more than a dozen new (or greatly expanded) claims into Taylor's Rule 32 proceedings.[7]

Via Order dated October 20, 2011, however, Mobile County Circuit Judge Michael Youngpeter

granted the State's motion to strike the proposed Second Amended R32 Petition.  (*See* Vol. 53,

---

[7]        Those proposed new claims consisted of the following: (i) ineffective assistance of trial counsel in failing to investigate certain facts (McMillan's access to murder weapon, Stevee Martin's observations of Mustang's location, Lugene and Barbara Wallace's alibi testimony, discovery from Carrie Booker and Carlton household, McMillan's statements to Robert Lewis), found at Claim IV.B.4.e (paragraphs 147-57); (ii) ineffective assistance of trial counsel in failing to review and object to prejudicial evidence, found at Claim IV.B.4.j., and relating to the contents of Taylor's duffel bag and wallet, as well as Sherry Gaston's purse (¶¶ 174-86); (iii) ineffective assistance of trial counsel in failing to "retain an investigator, consult with a mitigation expert, or meet with any potential mitigation witnesses," and "to engage in the thorough and sifting investigation necessary to uncover compelling mitigation information," including "properly engaging" Taylor himself, found at Claim IV.B.5.a. (¶¶ 193-94); (iv) ineffective assistance of counsel in failing to develop a mitigation strategy including, *inter alia*, failing to contact witnesses to prepare them to testify in the sentencing phase, resulting in mitigation testimony that was "ineffectual and weak," found at Claim IV.B.5.a.i. (¶¶ 199-206); (v) ineffective assistance of counsel in failing to present a mitigation case beyond cursory evidence that Taylor and his family love each other, found at Claim IV.B.5.a.ii. (¶¶ 207-08); (vi) ineffective assistance of counsel in failing to call available, effective mitigation witnesses, including 11 named individuals, plus school teachers, mental health experts, and Taylor's brother Jeff and seven-year old son, found at Claim IV.B.5.b. (¶¶ 209-11); (vii) ineffective assistance for failure to elicit penalty-phase testimony about Taylor's "difficult home life," found at Claim IV.B.5.b.i. (¶¶ 212-17); (viii) ineffective assistance for failure to elicit testimony regarding Taylor's "absentee alcoholic father," found at Claim IV.B.5.b.ii. (¶¶ 218-20); (ix) ineffective assistance for failure to elicit testimony regarding Taylor's "impoverished and dangerous home town" of Prichard, Alabama, found at Claim IV.B.5.b.iii. (¶¶ 221-26); (x) ineffective assistance for failure to elicit testimony regarding Taylor's "cognitive deficits," such as that he had flunked out of eleventh grade and had expressed difficulty understanding homework, found at Claim IV.B.5.b.iv. (¶¶ 227-32); (xi) ineffective assistance for failure to elicit testimony regarding Taylor's "functional deficits," such as not paying bills, not cleaning his room, not living on his own, or not seeming to know how to get or keep a job, found at Claim IV.5.b.v. (¶¶ 233-37); (xii) ineffective assistance for failure to elicit testimony that Taylor was a "kind and loving father, brother, and friend," including that his son's childhood was difficult, that Taylor's father "rarely" saw Taylor, and that two childhood friends thought Taylor was kind and loyal, found at Claim IV.5.b.vi. (¶¶ 238-46); (xiii) prosecutorial misconduct in introducing the duffel bag and wallet evidence of Taylor's criminal history and financial delinquencies, found at Claim VII.A. (¶¶ 316-33); (xiv) prosecutorial misconduct in pressuring McMillan to testify falsely, including threatening him with the death penalty and giving him a "cheat sheet of lies," found in Claim VII.B.1. (¶¶ 337-48); (xv) prosecutorial misconduct in pressuring other witnesses to testify falsely, such as harassing and threatening Tiffany and Cherelle Carlton, found in Claim VII.B.2. (¶¶ 349-57); and (xvi) prosecutorial misconduct in failing to disclose impeachment evidence as to McMillan, in the form of the "list of talking points," found in Claim VII.C. (¶¶ 358-62).

R-129.)  In so doing, Judge Youngpeter relied on *Hyde v. State*, 894 So.2d 808 (Ala.Crim.App. 2004), for the proposition that "the normal rules for freely allowing amendment of a Rule 32 petition before judgment did not apply because the circuit court's jurisdiction was limited on remand to the appellate court's directive."  (Vol. 53, R-129, at 693.)  On the strength of *Hyde* and in light of the specific contours of the appellate court's limited remand in Taylor's case, Judge Youngpeter concluded that he lacked jurisdiction to consider the proposed amendments because "[t]he Court detects no instruction which would allow it to permit amendments to Taylor's petition on remand, either to supplement those specific claims or to add new ones."  (*Id.* at 694.)  Taylor sought mandamus review of this ruling, claiming that it contravened *Ex parte Apicella*, 87 So.3d 1150 (Ala. 2011); however, the Alabama Court of Criminal Appeals affirmed the circuit court, and distinguished *Apicella*.  (Vol. 53, R-130.)[8]

Undaunted, Taylor took one more run at amending his Rule 32 petition in the Mobile County Circuit Court.  On April 9, 2012, he filed a Motion for Leave to File Revised Second Amended Petition (Vol. 46, R-101).  In the Motion, Taylor explained that his proposed Revised Second Amended R32 Petition was identical to the originally proposed Second Amended R32 Petition, except for newly added paragraphs 23-25, 162, 362-70 and 411-20.  (*Id.* at 865.)[9] Taylor maintained that these new paragraphs "arise from facts contained in a written statement

---

[8]     In particular, the appellate court reasoned as follows: "This Court did not reverse and remand the case for further proceedings as was the case in *Apicella*.  We limited the scope of the circuit court's remand to specific claims of ineffective assistance and we affirmed the other claims raised by Taylor on appeal.  This case is not governed by the Supreme Court's decision in *Apicella*. … If Judge Youngpeter allowed Taylor to amend his Rule 32 petition he would be acting beyond the scope of our remand directions.  The circuit court's ruling was consistent with this Court's instructions in our October 1, 2010, opinion."  (*Id.* at 2.)

[9]     Those newly added paragraphs in the Revised Second Amended R32 Petition addressed the following claims: (i) alleged ineffectiveness of trial counsel in failing to cross-examine Bryann Clark in a manner that would have yielded discovery of a coded written statement that McMillan had purportedly provided to Clark, in which McMillan confessed to having shot and killed the three victims without Taylor's prior knowledge (¶ 162); (ii) alleged prosecutorial misconduct in threatening Clark into recanting prior testimony and concealing McMillan's coded written statement (¶¶ 362-70); and added a brand new claim (Claim IX) that "[t]he Fifth, Eighth, and Fourteen Amendments Require that Jarrod Taylor's Convictions and Death Sentences Be Vacated Based Upon Kenyatta McMillan's Confession that He Killed All Three Victims" (¶¶ 411-20).

recently provided to the undersigned counsel by Bryann Scott Clark," and that "[i]t was only on April 5, 2012 that Mr. Clark finally provided the document to one of Mr. Taylor's attorneys." (*Id.* at 867-68.) The circuit court denied the motion, for the same jurisdictional reasons that had prompted him to deny Taylor's predecessor motion to amend. In an ensuing memorandum opinion released on April 26, 2013, the Alabama Court of Criminal Appeals again addressed Taylor's renewed arguments that Judge Youngpeter should have allowed the Second Amended R32 Petition and the Revised Second Amended R32 Petition, as follows:

> "Taylor's interpretation of the remand directions issued by this Court is strained, and it is inaccurate. … [T]he scope of our remand was very limited, and if the circuit court had allowed Taylor to file an amended petition, it would have exceeded the scope of those limited directions. Taylor has presented no legitimate basis for a reconsideration of the analysis or the conclusion in the mandamus order. Our remand instructions in the original opinion were clear, and they provided only for resolution of certain claims filed in the first amended petition. The circuit court correctly interpreted those directions, and it correctly interpreted the order denying Taylor's request for mandamus relief."

(Vol. 53, R-134, at 23-24.)

> 2. *Applicable Legal Principles.*

In his § 2254 Petition, Taylor seeks to pursue as federal habeas claims many (if not all) of the new claims pleaded in the Second Amended R32 Petition and Revised Second Amended R32 Petition that were disallowed by the state courts. The State objects to all such claims on failure-to-exhaust grounds. Technically and as recognized by Taylor (*see* doc. 43, at 8 n.2), the State's objection is properly framed in the terminology of the related doctrine of procedural default, rather than exhaustion.[10] "Under the doctrine of procedural default, a federal habeas court will

---

[10] As the Eleventh Circuit has explained, "procedural default, … while related to exhaustion, is distinct." *McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005); *Hill v. Jones*, 81 F.3d 1015, 1029 (11th Cir. 1996) ("procedural default and exhaustion are distinct concepts within habeas corpus law"). "The teeth of the exhaustion requirement comes from its handmaiden, the procedural default doctrine." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010). "[O]nce [a] federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). By presenting and attempting to litigate new claims, issues, facts and arguments in his proposed Second Amended R32 Petition and Revised Second Amended R32 Petition, Taylor exhausted those claims; however, the state courts refused to hear them on the merits based on their determination that Taylor had failed to satisfy a state procedural rule. The ramifications of that state law ruling are properly distilled via the doctrine of procedural default.

not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Conner*, 645 F.3d at 1287 (citation and internal quotation marks omitted); *see also Boyd v. Commissioner, Alabama Dep't of Corrections*, 697 F.3d 1320, 1335 (11th Cir. 2012) ("As a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are 'independent and adequate' to support the judgment.").[11] Simply put, "if a state court refused to decide a claim 'on the merits' because the claim was barred by state procedural rules, we are generally, though not always, prevented from reviewing the claim at all." *Williams*, 791 F.3d at 1272-73.

To ascertain whether a state court's procedural ruling constitutes an independent and adequate state rule of decision, federal habeas courts examine whether the following three requirements are satisfied: (i) "the last state court rendering a judgment in the case must clearly and expressly say that it is relying on state procedural rules to resolve the federal claim without reaching the merits of the claim;" (ii) "the state court decision must rest solidly on state law grounds;" and (iii) "the state procedural rule must be adequate; *i.e.*, it may not be applied in an arbitrary or unprecedented fashion." *Boyd*, 697 F.3d at 1336 (citations omitted). "We defer to the state court's findings regarding procedural default." *Ferguson v. Secretary for Dep't of Corrections*, 580 F.3d 1183, 1193 (11th Cir. 2009); *see also Ziegler v. Crosby*, 345 F.3d 1300, 1304 (11th Cir. 2003) (similar).

   *3. Discussion.*

The State's position is that all new claims asserted by Taylor in the proposed Second Amended R32 Petition and Revised Second Amended R32 Petition are procedurally defaulted,

---

[11] The Supreme Court has long "recognized the importance of federal habeas corpus principles designed to prevent federal courts from interfering with a State's application of its own firmly established, consistently followed, constitutionally proper procedural rules. … Those principles have long made clear that a conviction that rests upon a defendant's state law 'procedural default' (for example, the defendant's failure to raise a claim of error at the time or in the place that state law requires), normally rests upon 'an independent and adequate state ground.' … And where a conviction rests upon such a ground, a federal habeas court normally cannot consider the defendant's federal constitutional claim." *Trevino v. Thaler*, 133 S.Ct. 1911, 1917, 185 L.Ed.2d 1044 (2013) (citations omitted).

and therefore barred from federal habeas review in these § 2254 proceedings, because the state courts' rejection of those claims was based on an independent and adequate state procedural rule.

Again, the state courts refused to allow or adjudicate the merits of Taylor's Second Amended R32 Petition (or Revised Second Amended R32 Petition) based on their determination that the Mobile County Circuit Court lacked jurisdiction to allow Taylor to amend his Rule 32 petition following the Court of Criminal Appeals' limited remand order dated October 1, 2010. The October 1 ruling had two critical components, to-wit: (i) it remanded Taylor's Rule 32 action to the circuit court "for resolution of those claims that the parties agreed had not been dismissed by the orders of partial dismissal;" and (ii) it "affirm[ed] the circuit court's judgment as to remaining issues raised by Taylor in his brief on appeal." (Vol. 53, R-128, at 19.) The determination that the circuit court lacked jurisdiction to allow Taylor to amend his Rule 32 petition post-remand was firmly rooted in an Alabama procedural rule that "[o]n remand, the issues decided by the appellate court become law of the case and the trial court's duty is to comply with the appellate mandate according to its true intent and meaning, as determined by the directions given by the reviewing court." *Hyde v. State*, 894 So.2d 808, 810 (Ala.Crim.App. 2004) (citation and internal quotation marks omitted). A corollary of that rule is that "any act by a trial court beyond the scope of an appellate court's remand order is void for lack of jurisdiction." *S.A.R. v. State*, 99 So.3d 1260, 1264 (Ala.Crim.App. 2012) (citation omitted).[12]

---

[12]     *See also Jackson v. State*, 177 So.3d 911, 939 (Ala.Crim.App. 2014) ("It is well settled that any act by a trial court beyond the scope of an appellate court's remand order is void for lack of jurisdiction.") (citations and internal quotation marks omitted); *Brown v. State*, 142 So.3d 1269, 1271 (Ala.Crim.App. 2013) ("[T]he circuit court did not have jurisdiction on remand to impose a split sentence. This Court's remand order permitted the circuit court only to make findings of fact. Accordingly, the decision to impose a split sentence was outside the scope of this Court's remand and void."); *Johnson v. State*, --- So.2d ----, 2007 WL 2812234, *17 (Ala.Crim.App. Sept. 28, 2007) ("[A]ny act by a trial court beyond the scope of an appellate court's remand order is void for lack of jurisdiction.") (citation omitted), *vacated on other grounds sub nom. Johnson v. Alabama*, 137 S.Ct. 2292 (2017); *Moore v. State*, 871 So.2d 106, 112 (Ala.Crim.App. 2003) (circuit court "exceeded its jurisdiction on remand" by vacating a five-year enhancement where appellate court's remand opinion instructed circuit court that it could not change sentence); *Calloway v. State*, 860 So.2d 900, 905 (Ala.Crim.App. 2002) ("[O]ur remand order was very limited in scope: the circuit court was directed to resentence Calloway. The circuit court, based on this Court's limited remand order, had no choice but to deny Calloway's motion to withdraw his guilty plea. To do otherwise would have exceeded its (Continued)

Alabama appellate courts have repeatedly applied these principles to hold that a trial court lacks authority to allow an amendment of a Rule 32 petition on limited remand from an Alabama appellate court. *See, e.g., Hyde*, 894 So.2d at 810 ("The circuit court was limited to the scope of our remand order. Here, the circuit court exceeded that scope in directing Hyde to supplement and amend his Rule 32 petition. Therefore, the action taken in the circuit court is void for lack of jurisdiction.").[13] This is precisely what the state courts did in refusing to hear the merits of any new claims in Taylor's proposed Second Amended R32 Petition. Judge Youngpeter specifically relied on *Hyde* and the terms of the appellate court's limited remand in determining that he lacked authority to allow those new claims, and the Alabama Court of Criminal Appeals affirmed that determination, reasoning that had the circuit court allowed such an amendment, "he would be acting beyond the scope of our remand instructions," such that his ruling would have been void. (Vol. 53, R-130 at 2.) The same appellate court echoed those sentiments in affirming Judge Youngpeter's refusal to allow the Revised Second Amended R32

jurisdiction on remand."); *Simmons v. State*, 797 So.2d 1134, 1183 (Ala.Crim.App. 1999) (actions "outside the scope of our remand order [are] void for lack of jurisdiction").

[13] *See also Ward v. State*, --- So.3d ----, 2017 WL 543138, *4 n.2 (Ala.Crim.App. Feb. 10, 2017) (where Alabama Supreme Court "limited the remand proceedings to the issue of equitable tolling …, the circuit court correctly prohibited any amendment to Ward's petition that addressed issues that were outside the scope of the Supreme Court's remand instructions"); *Morrissette v. State*, 183 So.3d 1009, 1012 n.3 (Ala.Crim.App. 2014) ("Morrissette filed a motion to amend his petition, in which he alleged that newly discovered material facts entitled him to a new trial. The circuit court properly did not consider this amended claim on remand. … [T]his Court's remand order did not permit Morrissette to amend his petition on remand. Therefore, the circuit court had no authority to go beyond this Court's remand order and to consider an amendment to Morrissette's petition"); *Bryant v. State*, 181 So.3d 1087, 1136 (Ala.Crim.App. 2014) ("[t]his Court's remand order did not permit Bryant to allege new and additional facts to support those three claims, or to raise new or different claims and, indeed, the circuit court had no authority to go beyond this Court's remand order and to consider additional factual allegations or new claims of ineffective assistance of counsel"); *S.A.R.*, 99 So.3d at 1264 ("[W]e hold that the circuit court acted beyond the scope of remand when it vacated its summary denial of S.A.R.'s Rule 32 petition and provided S.A.R. with 60 days to amend his petition. This Court's order limited the circuit court to 'determin[ing] whether S.A.R. was provided with a copy of his trial transcript, his attorney's briefs, court orders and other court documents to which he would be entitled.' Once the circuit court made that determination, its job concerning this issue was done. … Therefore, the circuit court lacked jurisdiction to vacate its dismissal of the Rule 32 petition; thus, that action was void.").

Petition.  (*See* Vol. 53, R-34, at 23-24.)  The State thus has a compelling argument that the Alabama courts' disallowance of Taylor's September 2011 and April 2012 iterations of his amended R32 petition on procedural grounds falls squarely within the parameters of an independent and adequate state procedural rule, thereby constituting a procedural default from which federal habeas review does not properly lie.

In response, Taylor leans heavily on the third prong of the procedural default test, to-wit: the requirement that "the state procedural rule must be adequate; *i.e.*, it may not be applied in an arbitrary or unprecedented fashion."  *Boyd*, 697 F.3d at 1336 (citation omitted); *see also Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995) ("In order to be 'adequate,' the rule must not have been applied by the state court in an inconsistent or manifestly unfair manner.") (citations and footnote omitted).  What this means is that "a state procedural rule cannot bar federal habeas review of a claim unless the rule is 'firmly established and regularly followed.'"  *Boyd*, 697 F.3d at 1336 (citations omitted).  "The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question."  *Conner*, 645 F.3d at 1287.

The gravamen of Taylor's argument is that the state courts' refusal to allow him to file his Second Amended R32 Petition and Revised Second Amended R32 Petition was "*contrary* to the State's firmly-established and regularly followed procedural rules."  (Doc. 43, at 8.)  Taylor is wrong.  As discussed *supra*, the Alabama courts held that the Mobile County Circuit Court lacked jurisdiction to allow Taylor to amend his Rule 32 petition in September 2011 and April 2012 because (i) the Rule 32 proceedings returned to Mobile County Circuit Court in October 2010 on limited remand from the Alabama Court of Criminal Appeals, which had affirmed the Circuit Court's judgment in many respects but remanded for the narrow purpose of resolving certain specifically enumerated claims; (ii) nothing in the appellate court's remand order would have authorized amendment of Taylor's Rule 32 petition to allow him to inject new and additional claims into the state post-conviction proceedings; and (iii) under well-settled Alabama law, any act by a trial court beyond the scope of an appellate court's remand order is void for lack of jurisdiction.  The Alabama courts' rejection of Taylor's post-remand requests to amend his Rule 32 petition on grounds that the Circuit Court lacked jurisdiction to allow same was fully consistent with a substantial line of Alabama appellate authority in which amendments have been disallowed under similar circumstances for similar reasons.  *See, e.g., Ward v. State*, --- So.3d --- -, 2017 WL 543138, *4 n.2 (Ala.Crim.App. Feb. 10, 2017) (where Alabama Supreme Court

"limited the remand proceedings to the issue of equitable tolling …, the circuit court correctly prohibited any amendment to Ward's petition that addressed issues that were outside the scope of the Supreme Court's remand instructions"); *Morrissette v. State*, 183 So.3d 1009, 1012 n.3 (Ala.Crim.App. 2014); *Bryant v. State*, 181 So.3d 1087, 1136 (Ala.Crim.App. 2014); *S.A.R. v. State*, 99 So.3d 1260, 1264 (Ala.Crim.App. 2012); *Hyde v. State*, 894 So.2d 808, 810 (Ala.Crim.App. 2004).

In view of these authorities, the Court readily concludes that the state procedural bar was "adequate," in the sense that the rule in question was firmly established, regularly followed, and not applied in an arbitrary or unprecedented fashion against Taylor.[14] On limited remand from

---

[14] Taylor's argument to the contrary rests on an interpretation of *Ex parte Apicella*, 87 So.3d 1150, 1154 (Ala. 2011), that has been thoroughly discredited by Alabama courts both in this case and in analogous circumstances. Taylor's theory goes like this: in *Apicella*, the Alabama Supreme Court held that, when an Alabama appellate court reverses a trial court's summary dismissal of a Rule 32 petition and remands for further proceedings, "the Court of Criminal Appeals' decision … returned the parties to their prejudgment positions," and any request to amend the Rule 32 petition thereafter must be reviewed "in light of the principles stated in *Ex parte Rhone*." *Apicella*, 87 So.3d at 1154. *Rhone* in turn provides that "only grounds such as actual prejudice or undue delay will support a trial court's refusal to allow, or to consider, an amendment to a Rule 32 petition." *Ex parte Rhone*, 900 So.2d 455, 458 (Ala. 2004). Taylor maintains that *Rhone* governs here, and that the state courts' denial of his attempts to amend his petition is irreconcilable with *Apicella* (and, by extension, *Rhone*), and therefore cannot be an adequate state procedural ground that bars federal habeas review. The trouble with this line of reasoning is that, as Taylor well knows, Alabama courts have specifically rejected it in this very case, finding *Apicella* to be distinguishable and *Rhone* to be inapplicable. In particular, the Alabama Court of Criminal Appeals determined that "[t]his case is not governed by the Supreme Court's decision in *Apicella*" because, unlike in *Apicella*, the appellate court here "did not reverse and remand the case for further proceedings" but instead "limited the scope of the circuit court's remand to specific claims of ineffective assistance and we affirmed the other claims raised by Taylor on appeal." (Vol. 53, R-130 at 2.) The Alabama Court of Criminal Appeals has distinguished *Apicella* on these same grounds in other cases to deny post-limited remand amendments to Rule 32 petitions. *See, e.g., Bryant*, 181 So.3d at 1135 ("In this case, however, unlike *Ex parte Apicella*, this Court did not reverse the circuit court's judgment summarily dismissing Bryant's first amended petition. Rather, this Court only remanded the case for further proceedings. … Bryant's argument in his reply brief on return to remand that there is no 'meaningful distinction' between remanding a case and reversing and remanding a case … is clearly meritless because it is that very distinction that formed the basis for the Alabama Supreme Court's opinion in *Ex parte Apicella*."). Likewise, Taylor's suggestion that "the procedural posture in Mr. Taylor's case was substantively identical to that in *Apicella*" is counterfactual. (Doc. 43, at 11.) In *Apicella*, the Alabama Court of Criminal Appeals did not affirm any of the trial court's rulings, but instead addressed a single issue, after which it wrote, (Continued)

the Alabama Court of Criminal Appeals, the Mobile County Circuit Court lacked jurisdiction to allow Taylor to amend his Rule 32 petition in late 2011 and early 2012, such that any ruling authorizing such amendments would have been void under Alabama law. Thus, Taylor's new claims presented in the Second Amended R32 Petition and Revised Second Amended R32 Petition are procedurally defaulted, and federal habeas review of same is unavailable.[15]

---

"we reverse the trial court's summary dismissal of Apicella's petition for postconviction relief and we remand the cause for further proceedings." *Apicella v. State*, 945 So.2d 485, 491 (Ala.Crim.App. 2006). By contrast, the Alabama Court of Criminal Appeals in Taylor's case directed as follows: "[T]his cause is remanded to the circuit court for resolution of those claims that the parties agreed had not been dismissed by the orders of partial dismissal. … We affirm the circuit court's judgment as to remaining issues raised by Taylor in his brief on appeal." (Vol. 53, R-128, at 19.) The distinction drawn by Alabama courts between the procedural posture of Taylor's case and *Apicella* is thus legitimate and valid, notwithstanding Taylor's incorrect assertions to the contrary. As such, the Court concurs with the state courts that Taylor's proposed amendments to his Rule 32 petition in 2011 and 2012 were not governed by *Apicella* and *Rhone*, and that the limited-remand rule provided an adequate, independent state procedural ground for the state courts' rejection of the proposed new claims set forth therein.

[15]    The Court likewise rejects Taylor's alternative suggestion that the state courts' use of the limited remand rule to forbid his 2011 and 2012 amendments is "manifestly unfair." It is not. Taylor complains that "Judge Thomas dismissed Mr. Taylor's Corrected First Amended Petition in a wholly unlawful order" (doc. 43, at 14), but that characterization is misleading. In fact, the rulings encapsulated by the circuit court's summary dismissal order were largely affirmed by the Alabama Court of Criminal Appeals. The limited remand occurred only because of confusion as to whether any of Taylor's claims were still in play, confusion for which Taylor himself bore at least partial responsibility because of the convoluted, multilayered Rule 32 petition he presented. Besides, Taylor glosses over the important fact that his Rule 32 proceedings commenced in July 2002, more than three years before Judge Thomas's summary dismissal order of August 2005, during which time Taylor enjoyed virtually unfettered opportunities to amend his Rule 32 petition. Nothing in Alabama procedural rules or federal constitutional law guaranteed to Taylor that his Rule 32 petition would remain active and pending for an unlimited period of years so as to facilitate further amendments at his leisure. *See generally Boyd*, 697 F.3d at 1337 (citing Alabama law for the proposition that a Rule 32 "petitioner does not have an absolute right to amend his petition prior to the entry of judgment") (citation omitted). Accordingly, the Court perceives nothing "manifestly unfair" about the Alabama courts' application of their limited remand rule as a procedural bar to Taylor's efforts to amend his Rule 32 petition in 2011 and 2012, more than eight years after he commenced state post-conviction proceedings. As for Taylor's additional argument that there is no procedural default because the "new claims" in his Second Amended R32 Petition were really just "additional factual support" for existing claims (doc. 43, at 15), the Court will review that assertion on a claim-by-claim basis upon reaching the merits of those claims that Taylor (Continued)

### B.    Rule 28(a)(10).

Another critical, disputed issue of procedural default in this case involves the application of Rule 28(a)(10) of the Alabama Rules of Appellate Procedure to Taylor's claims.  That state procedural rule provides, in relevant part, that an appellant's brief must include "[a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on."  Rule 28(a)(10), Ala.R.App.P.  The State's position is that various of Taylor's habeas claims are barred from federal habeas review because the Alabama courts dismissed them not on the merits, but for noncompliance with Rule 28(a)(10) (*i.e.*, based on the inadequacy of Taylor's appellate brief).

#### 1.    The State Court Rulings.

In its opinion on state post-conviction review entered on October 1, 2010, the Alabama Court of Criminal Appeals paused before addressing the merits, explaining that "we are compelled to address whether a majority of the arguments Taylor presents in his brief on this issue comply with Rule 28(a)(10), Ala. R.App. P."  (Vol. 53, R-128, at 14.)   The appellate court proceeded to make the following determinations, among others, in applying Rule 28(a)(10) to Taylor's appellate brief: (i) "Parts III.C.2. – III.C.5. and portions of Part III.D. of Taylor's brief consist almost entirely of scant summaries of the claims from Taylor's petition that, he says, should not have been summarily dismissed" (Vol. 53, R-128, at 14); (ii) "Making a nonspecific reference to 'extensive legal arguments' in the Rule 32 petition does not comply with Rule 28(a)(10)" (*id.*); (iii) "in many of the arguments in Parts III.C. and III.D. of his brief, Taylor makes only general allegations and refers only to paragraphs of the petition without presenting

---

presented in the First Amended R32 Petition.  At that time, that argument will be evaluated with due regard for the premise that "habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review ***provided that those arguments remain unchanged in substance***."  *Kelley v. Secretary, Dep't of Corrections*, 377 F.3d 1317, 1344 (11th Cir. 2004) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) ("In order to be exhausted, a federal claim must be fairly presented to the state courts. … [W]e do require that a petitioner presented his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.") (citations and internal quotation marks omitted).

any substantive legal or factual argument at all" (*id.*); and (iv) "many 'arguments' in Taylor's brief consist of little more than a cursory summary of the claims from the petition" (*id.* at 15).[16]

After careful examination of the requirements of Rule 28(a)(10), as interpreted by Alabama appellate courts, and the contents of Taylor's brief (referencing specific examples of briefing inadequacies), the Alabama Court of Criminal Appeals ruled that Taylor's appellate briefing fell short of that procedural rule in numerous respects. In particular, the appellate court held as follows:

> "Clearly, Taylor's cursory summary of the allegations of the petition – with a citation only to the paragraphs of the petition in many arguments of the brief, and in other portions of the brief only to paragraphs of the petition and undelineated general principles of law – does not comport with Rule 28(a)(10). For many of the issues raised in the brief, Taylor presents no discussion of the facts or the law in the form of an argument demonstrating why the circuit court's dismissal of the specific claims was in error. Accordingly, we hold that Taylor has waived for purposes of appellate review in this Court those arguments in his brief … that fail to comply with the requirements of Rule 28(a)(10)."

(Vol. 53, R-128, at 16.) In so concluding, the Alabama Court of Criminal Appeals found that the following categories of arguments in Taylor's appellate brief were waived for noncompliance with Rule 28(a)(10): "III.C.1 – death by lethal injection; III.C.2 (a)-(h); III.D.2 (a)-(r); and III.D.3(b) – ineffective assistance of counsel; III.C.3(a); III.D.3(a)-(b) – the jury was not impartial; III.C.4 (a)-(c) – the judge was not impartial; III.C.5 – prosecutorial misconduct;

_____

[16]     The Alabama Court of Criminal Appeals did not make this last observation in conclusory fashion but, rather, bolstered it with verbatim recitation of the entirety of Taylor's "complete arguments" in his appellate brief concerning Claim IV.B.6 (ineffective assistance based on trial counsel's failure to object to numerous trial errors), Claim IV.B.9 (ineffective assistance because of "grossly inadequate compensation"), Claim VI.A. (disqualification of trial judge for accepting campaign contribution from Taylor's trial counsel), Claim VI.B. (constitutional violations because the trial judge tried and sentenced Taylor while in the midst of a contested election campaign), Claim VII.D. (State's failure to comply with discovery obligations under *Brady v. Maryland*), Claim III.C. (unconstitutionality of death penalty because of "unreliable application"), Claim IV.B.7 (ineffective assistance based on trial counsel's "failure to ardently pursue motion for new trial"), and Claim VII.C. (legal sufficiency of evidence of "heinous, atrocious or cruel" aggravating circumstance). (Vol. 53, R-128, at 15-16.) The state appellate court also singled out Taylor's brief's treatment of the portion of Claim IV.B.4.b in which Taylor alleged ineffective assistance based on counsel's failure to retain gunshot residue experts and jury selection experts, reasoning that Taylor's brief violated Rule 28(a)(10) because it "cited only to a circuit court case, which has no precedential value and is not binding on this Court." (*Id.* at 16.)

III.D.1(c) and (e) – constitutionality of the death penalty; and III.D.4(a)-(d) – capital sentencing, voir dire, rulings at trial." (*Id.*)[17]

The result of this determination was that the Alabama Court of Criminal Appeals deemed Taylor's appellate arguments on all of these issues waived, and engaged in no merits analysis or discussion of any of them. At most, the appellate court observed in passing that "having reviewed Taylor's petition thoroughly – along with the circuit court's orders and the record in this case, even if we had addressed what we understand to have been Taylor's arguments in his

---

[17]     Those arguments from Taylor's Rule 32 appellate brief, in turn, correspond to the following claims presented in his First Amended R32 Petition: (i) Claim III.E (Taylor may not be executed by lethal injection); (ii) Claim IV.A (ineffective assistance because trial counsel failed to disclose a conflict of interest); (iii) Claim IV.B.1 (ineffective assistance during jury selection, except for paragraphs 61 (failure to conduct adequate voir dire was product of ignorance, not strategy) and 66 (failure to challenge juror Green for cause based on cousin's murder, or to ask her appropriate voir dire to explore bias)); (iv) Claim IV.B.2 (ineffective assistance for failure to make an effective *Batson* challenge); (v) Claim IV.B.3 (ineffective assistance for failure to move for juror Davis's removal and investigation of her misconduct); (vi) Claim IV.B.4 (ineffective assistance for failure to conduct adequate investigation, but only ¶¶ 100-08, 116-17, 127-29, 136-40, 146-61); (vii) Claim IV.B.5 (ineffective assistance at sentencing phase, except for ¶¶ 174-75); (viii) Claim IV.B.6 (ineffective assistance for failure to object to numerous trial errors); (ix) Claim IV.B.7 (ineffective assistance for failure adequately to pursue a motion for new trial); (x) Claim IV.B.8 (ineffective assistance for failure to object to "trial judge's partisan participation in the proceedings"); (xi) Claim IV.B.9 (ineffective assistance caused by grossly inadequate compensation); (xii) Claim V.A (denial of right to impartial jury because the State struck jurors based on race and gender); (xiii) Claim V.B. (denial of right to impartial jury because jury was "death qualified"); (xiv) Claim VI.A (trial judge was legally disqualified for receipt of campaign contributions from defense counsel); (xv) Claim VI.B (Taylor's constitutional rights were violated because trial judge was in the midst of an election campaign); (xvi) Claim VI.C (due process violation in assignment of trial judge); (xvii) Claim VI.D (prosecutorial misconduct for State's "apparent" failure to comply with *Brady* discovery obligations); (xviii) Claim III.C (unconstitutionality of death penalty in light of unreliable application); (xix) Claim III.E (death by lethal injection would violate separation-of-powers principles); (xx) Claim VII.A (double jeopardy violation because Taylor was convicted and sentenced for separate murders of three individual victims, plus murder of three people pursuant to a single scheme); (xxi) Claim VII.B (double jeopardy violation because aggravating circumstance for three death sentences was identical to an element of the crime); (xxii) Claim VII.C (insufficiency of evidence of "especially heinous, atrocious or cruel" aggravator); (xxiii) Claim VII.E (errors by trial court during voir dire, including group voir dire, failure to sequester venire, and denial of motion for detailed juror questionnaires); and (xxiv) Claim VII.F (trial errors that individually and cumulatively deprived Taylor of a fair trial).

brief to this Court, we would nonetheless affirm the circuit court's dismissal of each of those claims." (Vol. 53, R-128, at 16-17.)[18]

## 2. Applicable Legal Principles.

Again, the basic thrust of Rule 28(a)(10) is its requirement that an appellant's brief must set forth "[a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Rule 28(a)(10), Ala.R.App.P. "The purpose of Rule 28, Ala.R.App.P., outlining the requirements for appellate briefs, is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." *Ex parte Borden*, 60 So.3d 940, 943 (Ala. 2007). After all, the Alabama Supreme Court has explained, "[i]t is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument." *Id.* (citations omitted); *see also Wagner v. State*, --- So.3d ----, 2015 WL 5658730, *2 n.3 (Ala. Sept. 25, 2015) ("It is well settled that it is not the function of this Court to create legal arguments for the parties before us."). As such, "[t]o obtain review of an argument on appeal, an appellant must provide citations to relevant cases or other legal authorities and an analysis of why those cases or other authorities support an argument that an error occurred and that the alleged error should result in reversal." *Alonso v. State*, --- So.3d ----, 2016 WL 661274, *13 (Ala.Crim.App. Feb. 12, 2016) (citations omitted).

Alabama appellate courts have frequently applied Rule 28(a)(10) (and its predecessor, Rule 28(a)(5)) to find a waiver of arguments presented on appeal where an appellant has failed to offer specific legal authority, argument and adequate factual recitation to support the contention that the trial court's ruling was erroneous. *See, e.g., Alonso*, 2016 WL 661274, at *13-15; *C.B.D. v. State*, 90 So.3d 227, 239 (Ala.Crim.App. 2011) ("Failure to comply with Rule 28(a)(10) has been deemed a waiver of the issue presented.").[19] Furthermore, federal habeas courts have

---

[18]     The appellate court elaborated slightly on this conclusion, to-wit: "The circuit court correctly determined that Taylor failed to plead many of the claims with the specificity required by Rule 32, and the remaining allegations were procedurally barred or failed to state a claim for which relief was due to be granted." (*Id.* at 17.)

[19]     *See also White v. State*, 179 So.3d 170, 227-28 (Ala.Crim.App. 2013) ("In this section of his brief, White provides no citations to authority. … White fails to state what law he (Continued)

routinely deemed claims to be procedurally defaulted where the state courts dismissed them pursuant to a Rule 28(a)(10) waiver. *See, e.g., James v. Culliver*, 2014 WL 4926178, *14 (N.D. Ala. Sept. 30, 2014) ("If a petitioner fails to comply with this rule, any issue(s) not briefed will be deemed to have been waived. … Moreover, Rule 28(a)(10), as well as its predecessor Rule 28(a)(1), were firmly established and regularly followed.").[20]

---

believes was violated. Consequently, this section of White's brief fails to comply with Rule 28(a)(10), Ala.R.App.P., and does not entitle White to any relief.") (footnote omitted); *Thomas v. State*, 155 So.3d 270, 275 (Ala.Crim.App. 2013) ("Because Thomas did not provide any citations to the record indicating where the purported stipulation took place, we find that he failed to adequately brief this argument as required by Rule 28(a)(10), Ala.R.Crim.P. Accordingly, it is deemed to be waived."); *Mashburn v. State*, 148 So.3d 1094, 1113 (Ala.Crim.App. 2013) ("Other than merely referencing the fact that his petition was summarily dismissed …, Mashburn makes no argument regarding why he believes this was error, and he cites no authority for the proposition that a circuit court may not summarily dismiss a petition without first receiving from the petitioner a response to the State's answer. Mashburn's failure to comply with Rule 28 constitutes a waiver of this argument."); *Hooks v. State*, 141 So.3d 1119, 1124 (Ala.Crim.App. 2013) ("We conclude by recognizing that arguments that do not comply with Rule 28(a)(10), Ala.R.App.P., are deemed waived."); *Jennings v. State*, 965 So.2d 1112, 1136 (Ala.Crim.App. 2006) ("Because Jennings has failed to present sufficient argument, authority, or citation to the facts in support of this issue, we conclude that he has failed to comply with Rule 28(a)(10) and that this issue is, therefore, deemed to be waived.").

[20] *See id.* at *78 (deeming claim procedurally defaulted where Alabama Court of Criminal Appeals dismissed it for noncompliance with Rule 28(a)(10)); *see also Ferguson v. Allen*, 2014 WL 3689784, *58 (N.D. Ala. July 21, 2014) ("Ferguson's use of a footnote to assert that he was not waiving any guilt-phase ineffective assistance of counsel claims presented in his Rule 32 petition constitutes a prototypical waiver under Rule 28(a)(10). Thus, the Alabama Court of Criminal Appeals did not arbitrarily apply Rule 28(a)(10) to Ferguson's footnote reference to all 141 pages of his Rule 32 petition. … [T]he claim is procedurally defaulted and is due to be dismissed."); *Bester v. Patterson*, 2013 WL 6191520, *11-12 (N.D. Ala. Nov. 26, 2013) (deeming federal habeas claim procedurally barred where Alabama Court of Criminal Appeals had rejected it for noncompliance with Rule 28(a)(10)); *Hamm v. Allen*, 2013 WL 1282129, *20 (N.D. Ala. Mar. 27, 2013) ("Rule 28(a)(5) shows that Alabama courts have found waiver/ abandonment of appellate claims when an appellant listed or assigned error with no argument. These latter defects are the type of errors in Hamm's appellate brief and are the express reasons the Alabama Court of Criminal Appeals found the claims to be abandoned."); *Floyd v. Patterson*, 2012 WL 7746760, *6 (M.D. Ala. Dec. 4, 2012) ("the state appellate court correctly applied a procedural bar principle of state law when it ruled that Floyd had failed to preserve his sufficiency-of-the-evidence claim for appellate review … because Floyd violated Ala.R.App.P. 28(a)(10) by failing to cite to legal authority and relevant portions of the record in arguing this issue on appeal.").

That said, Alabama law specifies that Rule 28(a)(10) is not to be liberally or gratuitously applied in the interests of convenience or expedience to whittle down a voluminous appeal. Indeed, the Alabama Supreme Court has cautioned that "waiver of an argument for failure to comply with Rule 28(a)(10) … has been limited to those cases where there is no argument presented in the brief and there are few, if any, citations to relevant legal authority, resulting in an argument consisting of undelineated general propositions." *Borden*, 60 So.3d at 944.[21]

　　　　3.　　*Discussion.*

As set forth *supra*, the Alabama Court of Criminal Appeals determined that Taylor's arguments on appeal relating to two dozen claims presented his First Amended R32 Petition had been waived by virtue of his non-compliance with Rule 28(a)(10). In these § 2254 proceedings, the State asserts that the Court of Criminal Appeals' application of the Rule 28(a)(10) waiver doctrine to Taylor's claims constitutes an adequate, independent state procedural ruling that bars federal habeas review. For his part, Taylor urges the Court to find no procedural default, reasoning that the Alabama appellate court's reliance on Rule 28(a)(10) in his state post-conviction appeal proceedings flunks the federal requirement that "the state procedural rule must be adequate; *i.e.*, it may not be applied in an arbitrary or unprecedented fashion." *Boyd*, 697 F.3d at 1336 (citation omitted); *see also Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995) ("In order to be 'adequate,' the rule must not have been applied by the state court in an inconsistent or manifestly unfair manner.") (citations and footnote omitted). Again, this requirement means that "a state procedural rule cannot bar federal habeas review of a claim unless the rule is 'firmly established and regularly followed.'" *Boyd*, 697 F.3d at 1336 (citations

---

[21]　　*See also Ex parte Cleghorn*, 993 So.2d 462, 466 (Ala. 2008) (dismissal for noncompliance with Rule 28(a) is inappropriate where "[t]he issues on appeal are clearly discernable, the argument section of Cleghorn's brief contains numerous citations to legal authority to support his arguments, and his brief cites the portions of the record he relies upon"); *Groover v. Johnston*, 39 So.3d 33, 55 (Ala. 2009) (Cobb, J., dissenting) ("This Court does not affirm a summary judgment on Rule 28 grounds where (as here) although a party's brief does not cite an abundance of legal authority, the brief does contain sufficient citations to caselaw to adequately frame the issues, and the brief is sufficient to adequately apprise the Court of a party's contentions with regard to an argument."). In a footnote in a civil case, Alabama's highest court has suggested that "dismissal is not warranted despite noncompliance with Rule 28 when we are able to adequately discern the issue [the appellant] presents, in spite of his failure to present authorities in support of his claim." *Roberts v. NASCO Equipment Co.*, 986 So.2d 379, 383 n.6 (Ala. 2007) (citation and internal quotation marks omitted).

omitted). "The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question." *Conner*, 645 F.3d at 1287.

The centerpiece of Taylor's "adequacy" argument is that Alabama appellate authorities confirm that his Rule 32 appellate brief actually did comport with Rule 28(a)(10). Specifically, Taylor likens his state post-conviction brief to that deemed sufficient in *Ex parte Borden*. (Doc. 43, at 16-18.) In that case, the Alabama Supreme Court found error in the Alabama Court of Criminal Appeals' determination of waiver pursuant to Rule 28(a)(10), where the petitioner's appellate brief "included 22 pages of fact addressing whether the trial court erred in summarily dismissing the ineffective-assistance-of-counsel claims … [and] 11 pages of argument regarding ineffective assistance, including some 25 citations to caselaw, along with explanations and quotations from the cited cases. … Borden's brief is sufficient to apprise the Court of Criminal Appeals of Borden's contentions with regard to his ineffective-assistance-of-counsel claims." *Borden*, 60 So.3d at 944.

A fundamental problem with Taylor's contention that his state post-conviction appellate brief actually did comport with Rule 28(a)(10) is that he presents that assertion only in the most general and conclusory of terms.[22] Petitioner does not identify specific issues presented in his Rule 32 appellate brief and explain why he thinks the Court of Criminal Appeals misapplied Rule 28(a)(10) to find a waiver as to those specific matters as presented in his appellate brief. The result is that Taylor appears to have missed the point as to exactly why the Alabama appellate court deemed those aspects of his Rule 32 appellate brief to be insufficiently presented for purposes of Rule 28(a)(10). Three examples culled from the pages of the Alabama Court of Criminal Appeals' decision will illustrate the point.

First, in Claim IV.B.6 of his Corrected First Amended R32 Petition, Taylor alleged ineffective assistance of trial counsel in "fail[ing] to make contemporaneous objections to throughout [*sic*] the trial to Court errors and numerous acts and omissions of the State and its

---

[22] Taylor addresses this issue in his reply brief in support of his federal habeas petition as follows: "The sections of Mr. Taylor's brief that the CCA dismissed consisted of more than thirty-five pages of legal and factual argument. In each section, Mr. Taylor included an overarching legal argument explaining why dismissal of the Corrected First Amended Petition, as well as subsections applying that argument to each of the relevant claims and including extensive citations to the record and the Corrected First Amended Petition in support." (Doc. 43, at 17.)

witnesses." (Vol. 22, R-56 at 915.)  In October 2003, the circuit judge dismissed Claim IV.B.6 as insufficiently pleaded under Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure.  (Vol. 53, R-119, at 2.)[23]  Taylor appealed that ruling.  In order to satisfy Rule 28(a)(10) as to that particular issue, Taylor was obliged to include in his appellate brief an adequate recitation of facts relied on, citations to relevant legal authorities, and an analysis of why those authorities support an argument of reversible error.  *See, e.g., Alonso*, 2016 WL 661274, at *13.  Instead, Taylor's appellate brief on this claim consisted of a general, minimally supported description of the provisions of Rules 32.3 and 32.6(b) (Vol. 31, R-89, at 39-41), coupled with a vague assertion that "Claim IV.B.6 lists many specific errors to which trial counsel should have objected. (C. 915.)  It alleges in detail grounds for relief and the underlying facts." (*Id.* at 54-55.)  That is all.

Second, in Claim IV.B.9 of his Corrected First Amended R32 Petition, Taylor alleged that "trial counsel was ineffective in part because of grossly inadequate compensation." (Vol. 22, R-56 at 918.)  In October 2003, the circuit judge dismissed Claim IV.B.9 as insufficiently pleaded under Rules 32.3 and 32.6(b).  (Vol. 53, R-119, at 3.)  Taylor appealed.  In order to satisfy Rule 28(a)(10) as to that particular issue, Taylor was obliged to include in his appellate brief an adequate recitation of facts relied on, citations to relevant legal authorities, and an analysis of why those authorities support an argument of reversible error.  Instead, Taylor's appellate brief on this claim consisted of a general, minimally supported description of the provisions of Rules 32.3 and 32.6(b) (Vol. 31, R-89, at 39-41), coupled with a conclusory assertion that "Claim IV.B.9 sets forth the statutory maximum compensation that court-appointed attorneys in capital cases could have earned at the time of Mr. Taylor's trial and then

---

[23]     The latter rule reads as follows:  "Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds.  A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."  Rule 32.6(b), Ala.R.Crim.P.  And the former provision imposes on Rule 32 petitioners "the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."  Rule 32.3, Ala.R.Crim.P.  Alabama appellate courts have recognized that "[t]he burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. … The *full* factual basis for the claim must be included in the petition itself."  *Bryant v. State*, 181 So.3d 1087, 1101-02 (Ala.Crim.App. 2011) (citation omitted).

provides substantial case law to show that this level was inadequate. (C. 918-919.)" (*Id.* at 55.) Petitioner's brief said nothing further on this issue.

Third, in Claim VII.C of his Corrected First Amended R32 Petition, Taylor maintained that "the evidence as to the 'heinous, atrocious or cruel' aggravating circumstance is insufficient as a matter of law." (Vol. 22, R-56 at 949.) In October 2003, the circuit judge dismissed Claim VII.C pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure because it presented "no material issues of fact or law." (Vol. 53, R-120, at 1, 4.)[24] Taylor appealed. In order to satisfy Rule 28(a)(10) as to that particular issue, Taylor was obliged to include in his appellate brief an adequate recitation of facts relied on, citations to relevant legal authorities, and an analysis of why those authorities support an argument of reversible error. What Taylor presented, however, was a conclusory statement that the circuit court's order was erroneous in its entirety because "each and every one of the claims and allegations dismissed presents a material issue of law" (Vol. 31, R-89, at 59), as well as a singular contention that the claim presented in Claim VII.C "is supported by nearly four pages of legal argument supported by facts and presents material questions of law" (*id.* at 74). Taylor's Rule 32 appellate brief lacked any further explanation or argument regarding that claim.

Considered in the context of these three specific examples (which are representative of the kinds of arguments presented in Taylor's Rule 32 appellate brief that the Alabama Court of Criminal Appeals deemed insufficient under Rule 28(a)(10)), the state appellate court's conclusion that Taylor's briefing on these issues flunks Rule 28(a)(10) is reasonable. Recall that the Alabama Court of Criminal Appeals lamented that Taylor made "only general allegations and refer[red] only to paragraphs of the petition without presenting any substantive legal or factual argument at all in an attempt to demonstrate that the circuit court erred when it dismissed those claims." (Vol. 53, R-128, at 14.) That court accurately characterized Taylor's appellate brief as featuring "many 'arguments' … [that] consist of little more than cursory summary of the claims from the petition." (*Id.* at 15.) And it properly remarked that "[f]or many of the issues raised in

---

[24] That rule states, in relevant part, as follows: "If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition." Rule 32.7(d), Ala.R.Crim.P.

the brief, Taylor presents no discussion of the facts or the law in the form of an argument demonstrating why the circuit court's dismissal of the specific claims was in error." (*Id.* at 16.)

Again, the purpose of Rule 28(a)(10) is to require appellants to do their own heavy lifting, and in this manner to obviate the need for state appellate courts to perform an appellant's research for him, to generate and develop an appellant's arguments for him, or to engage in guesswork or speculation as to why – exactly – the appellant believes the lower court got it wrong. The authorities cited in the Alabama Court of Criminal Appeals' ruling in Taylor's case emphasize the point. (Vol. 53, R-128, at 14-15.) It was incumbent on Taylor, as the appellant, to explain in his appellate brief in specific terms (both legally and factually) why he believed it was reversible error for Circuit Judge Thomas to conclude that the enumerated claims flunked Taylor's "heavy pleading burden" under Rules 32.3 and 32.6, and/or failed to present material issues of fact or law under Rule 32.7(d). Rather than explaining in specific terms in his appellate brief which aspects of each claim he felt were sufficient to satisfy the aforementioned procedural rules, or identifying case authorities relating to these procedural rules that might support his theory that the circuit court had misapplied them, Taylor instead elected to present his appellate "arguments" at a high degree of abstraction and in conclusory form, mostly leaving the Alabama Court of Criminal Appeals to its own devices to figure out why, specifically, he contended that each enumerated claim complied with the terms of Rules 32.3, 32.6 and 32.7(d), and why he contended that the circuit judge's ruling to the contrary was incorrect. Under these circumstances, the Court does not find that there was anything arbitrary or manifestly unfair about the Alabama Court of Criminal Appeals' rejection of his appellate arguments on various issues for noncompliance with Rule 28(a)(10).[25]

---

[25]     It might have been helpful for Taylor, in his extensive federal habeas filings, to provide a particularized claim-by-claim explanation for why he believed the appellate briefing on each of his claims deemed procedurally defaulted under Rule 28(a)(10) actually did comply with that state procedural rule; however, he did not do so, instead offering only conclusory generalizations that his brief was sufficiently detailed and specific to satisfy the rule. (Doc. 43, at 17.) Nor does Taylor advance his cause through the misleading characterization of the Court of Criminal Appeals' ruling as being that "Mr. Taylor's brief on appeal was defective because he directed the CCA to arguments in his Corrected First Amended Petition rather than copying and pasting those arguments into his brief verbatim." (*Id.*) The Court of Criminal Appeals' ruling was not that Taylor violated Rule 28(a)(10) by failing to cut and paste his petition into his brief; to the contrary, its ruling was that Taylor violated Rule 28(a)(10) because "[f]or many of the
(Continued)

In the alternative, Taylor posits that the Rule 28(a)(10) waiver is not an adequate, independent state ground barring federal habeas review because "Rule 28(a)(10) is not and was not firmly established and regularly followed." (Doc. 43, at 18.)[26] To support this proposition, Taylor balks that Alabama courts do not strictly enforce Rule 28(a)(10), and cites a half-dozen cases in which he says they did not. (*Id.* at 18-19.) Taylor does not explain, however, why he equates the "firmly established and regularly followed" requirement with the premise that a rule must be stringently applied in every case without exception. Case law is to the contrary. *See, e.g., Walker v. Martin*, 562 U.S. 307, 320, 131 S.Ct. 1120, 179 L.Ed.2d 62 (2011) ("A discretionary rule ought not be disregarded automatically upon a showing of seeming inconsistencies. Discretion enables a court to home in on case-specific considerations and to avoid the harsh results that sometimes attend consistent application of an unyielding rule.") (footnote and citation omitted).[27] "A state ground, no doubt, may be found inadequate when discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law." *Id.* (citations and internal quotation marks omitted).

---

issues in the brief, Taylor, presents no discussion of the facts or the law *in the form of an argument demonstrating why the circuit court's dismissal of the specific claims was in error*," but instead merely presented cold citations "to paragraphs of the petition and undelineated general principles of law." (Vol. 53, R-128, at 16 (emphasis added).)

[26] Petitioner is correct, of course, that a procedural default does not exist where the state procedural rule in question was neither firmly established nor regularly followed. *See, e.g., Boyd*, 697 F.3d at 1336 ("a state procedural rule cannot bar federal habeas review of a claim unless the rule is firmly established and regularly followed") (citations and internal quotation marks omitted).

[27] *See also Beard v. Kindler*, 558 U.S. 53, 60, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009) ("We hold that a discretionary state procedural rule can serve as an adequate ground to bar federal habeas review. Nothing inherent in such a rule renders it inadequate for purposes of the adequate state ground doctrine."); *Stone v. Moore*, 644 F.3d 342, 345 (6th Cir. 2011) ("Extending the precedent it set in *Beard*, in *Walker* the Supreme Court emphasized the practical importance of 'preserving the flexibility' of states' discretionary procedural rules. … Thus, the Supreme Court held in *Walker* that even wholly discretionary state procedural rules may constitute adequate state grounds for foreclosing federal review of a habeas claim."); *Dubon v. Crews*, 2014 WL 3519015, *10 (N.D. Fla. July 16, 2014) ("A discretionary state procedural rule can serve as an adequate ground to bar federal habeas review, even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others.").

Taylor does not, and cannot reasonably, argue that the Alabama Court of Criminal Appeals'
application of Rule 28(a)(10) here was "novel," "unforeseeable" or devoid of "fair or substantial
support in prior state law." Instead, he simply argues that the rule has not been applied in every
single case where it might be, because sometimes Alabama appellate courts exercise their
discretion to overlook technical violations of Rule 28(a)(10) and reach the merits of particular
claims anyway. Under the Supreme Court's holding in *Walker v. Martin*, however, that kind of
purported "inconsistency" does not amount to inadequacy of the procedural rule to constitute
procedural default.[28]

Finally, Taylor balks that the state courts' application of Rule 28(a)(10) to his appellate
brief "was contrary to both Alabama Supreme Court precedent and the stated policy rationale for
Rule 28(a)(10)." (Doc. 43, at 20.) In so arguing, Taylor relies on the Alabama Supreme Court's
decision in *Borden*; however, such reliance is misplaced. The *Borden* Court recognized that
Rule 28(a)(10) is violated where an appellant's brief presents "an argument consisting of
undelineated general propositions," the effect of which is improperly to shift to the appellate
court the function of "mak[ing] and address[ing] legal arguments for a party based on
undelineated general propositions not supported by sufficient authority or argument." *Borden*,
60 So.3d at 943-44. It was entirely reasonable of the Alabama Court of Criminal Appeals to
conclude that Taylor's brief did precisely that as to the enumerated claims. From Taylor's
cursory summaries of his petition and his conclusory, unsupported general assertions that those
claims satisfied the subject procedural rules for noncompliance with which the circuit court had
dismissed them, Taylor furnished no road map for the appeals court and provided no specific,
concrete explanations for why he felt the circuit court was wrong on a claim-by-claim basis.
Instead, the broad, sweeping generalizations advanced in his appellate brief essentially told the
Alabama Court of Criminal Appeals, "If you go read my whole petition and do the research
yourself, you will figure it out and you will see that I actually did follow Rules 32.3, 32.6 and

---

[28]     *See, e.g., West v. Allen*, 868 F. Supp.2d 1224, 1244 (N.D. Ala. 2011) ("firmly
established and regularly followed" test "does not mean that the procedural rule must be rigidly
applied in every instance, or that occasional failure to do so eliminates its adequacy"); *Hamm v.
Allen*, 2013 WL 1282129, *21 (N.D. Ala. Mar. 27, 2013) ("satisfaction of the requirement that a
rule be firmly established and regularly followed does not mean that the procedural rule must be
applied rigidly in every instance, or that occasional failure to do so eliminates its adequacy").

32.7(d) and that the circuit court erred." The whole purpose of Rule 28(a)(10) is to prevent litigants from shifting that kind of workload onto the appellate courts to identify and develop the specific legal and factual predicate for an appellant's claim that the lower court got it wrong.[29] As such, the Court perceives nothing arbitrary or manifestly unfair about the Alabama Court of Criminal Appeals' application of Rule 28(a)(10) as a procedural bar of consideration of various issues presented on appeal in Taylor's state post-conviction proceedings.

In sum, then, the Alabama Court of Criminal Appeals' procedural dismissal of these claims was based on an independent and adequate state ground. Such claims are procedurally defaulted from federal habeas review. *See generally Smith v. Texas*, 550 U.S. 297, 313, 127 S.Ct. 1686, 167 L.Ed.2d 632 (2007) ("As a general matter, and absent some important exceptions, when a state court denies relief because a party failed to comply with a regularly applied and well-established state procedural rule, a federal court will not consider that issue.").

### C.    *Rule 32.2(a)(3) & (5).*

The State has also asserted that various claims presented in Taylor's § 2254 petition are procedurally barred because the Alabama courts rejected them on state post-conviction review pursuant to Rule 32.2(a), Ala.R.Crim.P. That rule provides, in part, that a Rule 32 petitioner "will not be given relief under this rule based upon any ground … [w]hich could have been but was not raised at trial," or "[w]hich could have been but was not raised on appeal," subject to an exception that has no application here. Rule 32.2(a)(3) & (5), Ala.R.Crim.P.

Alabama courts have routinely applied this rule to bar consideration in Rule 32 proceedings of grounds for relief that could have been, but were not, raised at trial and/or on direct appeal. *See, e.g., Moody v. State*, 95 So.3d 827, 843 (Ala.Crim.App. 2011) ("[T]he circuit court correctly found that all of Moody's claims regarding pretrial counsel's effectiveness are

---

[29]    This objective is reinforced by judicial observations that "an appellant must provide citations to relevant cases or other legal authorities and an analysis of why those cases or other authorities support and argument that an error occurred" in order to obtain appellate review of an issue in Alabama courts. *See Alonso*, 2016 WL 661274, at *13. Merely arguing that the lower court was wrong because of some general proposition and expecting the appellate court to fill in the blanks is unacceptable, and constitutes the very abuse to which Rule 28(a)(10) is directed. *See Borden*, 60 So.3d at 933 ("[i]t is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions") (citations omitted).

precluded by Rule 32.2(a)(3) and (a)(5), because they could have been, but were not, raised and addressed at trial and then on appeal. Therefore, summary dismissal of those claims was proper.") (footnote omitted).[30] And binding authorities on federal habeas review have "squarely held that claims barred under Rule 32.2(a)(3) and (a)(5) are procedurally defaulted from federal habeas review." *Boyd v. Commissioner, Alabama Dep't of Corrections*, 697 F.3d 1320, 1335 (11th Cir. 2012); *see also Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) ("The district court correctly determined that the claims regarding the alleged failures to swear Goodgame and transcribe the full trial are procedurally defaulted under Rules 32.2(a)(3) and (5) because they were not raised either at trial or on appeal.").

In Taylor's Rule 32 proceedings, Circuit Judge Thomas dismissed various claims raised in the Corrected First Amended R32 Petition as barred under Rules 32.2(a)(3) and (5). The Alabama Court of Criminal Appeals affirmed some of those dismissals on Rule 32.2(a) grounds, in many instances without identifying the subsections of Rule 32.2(a) on which it was relying. There was not a single claim for which the Alabama appellate court expressly stated it was affirming the dismissal because of Taylor's failure to raise the issue at trial and on direct appeal (*i.e.*, violation of both Rule 32.2(a)(3) and (5)). This creates an obvious problem for application of the adequate state ground doctrine, which requires, *inter alia*, that "the last state court rendering a judgment in the case must clearly and expressly say that it is relying on state procedural rules to resolve the federal claim without reaching the merits of the claim." *Boyd*, 697 F.3d at 1336 (citations omitted). Here, the difficulty is that the appellate court did not specify <u>which</u> state procedural rules it was relying on, other than a generic reference to Rule

---

[30] *See also Mashburn v. State*, 148 So.3d 1094, 1119 (Ala.Crim.App. 2013) ("we do agree with the circuit court that Mashburn could have, but did not, raise this claim on appeal and, thus, that it is precluded by Rule 32.2(a)(5)"); *Washington v. State*, 95 So.3d 26, 57 (Ala.Crim. App. 2012) ("Prosecutorial misconduct claims are procedurally barred in post-conviction proceedings pursuant to Rules 32.2(a)(3) and (a)(5), Ala.R.Crim.P., because they could have been raised at trial or on appeal but were not."); *Bryant v. State*, 181 So.3d 1087, 1134 (Ala.Crim.App. 2011) ("it is clear that Bryant's *Brady* claim was precluded by Rules 32.2(a)(3) and (a)(5) because it could have been, but was not, raised and addressed at trial and on appeal. Therefore, we again conclude that summary dismissal of this claim in Bryant's first amended petition was proper.").

32.2(a), which is not sufficient because some of the subsections of that rule would constitute a federal procedural bar, while others would not.[31]

To compound the confusion and uncertainty, Taylor correctly points out that the State's Answer (doc. 33) to his § 2254 petition does not expressly call for rejection of specific claims in that petition based on the procedural bar created by Rule 32.2(a)(3) and Rule 32.2(a)(5). The closest the State comes is, in the context of Taylor's *Batson* claim predicated on alleged gender-based strikes (Claim I), an argument that "the circuit court properly dismissed this claim because it could have been raised at trial (Rule 32.2(a)). The Court of Criminal Appeals affirmed, holding that this claim was properly dismissed on the basis of Rule 32.2(a)." (Doc. 33, at 29-30.) The State's Answer says nothing about dismissal of the claim for noncompliance with Rule 32.2(a)(5), and does not argue for imposition of a procedural bar based on violations of Rules 32.2(a)(3) and (a)(5).[32]

Because of the murkiness in the Alabama Court of Criminal Appeals treatment of the Rule 32.2(a) issue in this case, coupled with the State's lack of clarity in its Answer in not specifically arguing that any of Taylor's federal habeas claims are procedurally barred under Rules 32.2(a)(3) and (a)(5), this Court will not deem the subject claims procedurally defaulted on that ground for purposes of federal habeas review. *See, e.g., Smith v. Secretary, Dep't of*

---

[31] For example, Rule 32.2(a)(2) provides for preclusion for any ground "[w]hich was raised or addressed at trial." *Id.* A federal habeas claim would not be procedurally barred for having been raised or addressed at trial. The same goes for subsection (4), which generally precludes post-conviction relief on any ground "[w]hich was raised or addressed on appeal or in any previous collateral proceeding." Rule 32.2(a)(4). The generic references to Rule 32.2(a) in the appellate court's ruling and the State's answer are thus insufficient to enable a reasonable determination of whether a procedural bar exists as to those claims, or whether the State is even invoking it here.

[32] The same is true of other portions of the State's Answer that reference Rule 32.2. For example, as to Taylor's claim that the death penalty is applied unreliably (Claim XI.A.ii.), the State's Answer says that "the circuit court correctly dismissed this claim pursuant to Rules 32.2(a)(3) and (5)," but admits that the Court of Criminal Appeals dismissed it for noncompliance with Rule 28(a)(10), and never argues for the Rule 32(a)(3) & (5) procedural bar. (Doc. 33, at 116.) The State addresses Claim XI.C.i. (death qualification of the jury) in similar terms, noting that "[t]he circuit court properly dismissed the claim pursuant to Rules 32.2(a)(3) and (5)" but neither specifying how the appellate court disposed of the claim nor invoking the procedural bar by reference to those particular rules. (*Id.* at 122.)

*Corrections*, 572 F.3d 1327, 1340 (11th Cir. 2009) ("If, on the other hand, the petitioner did raise the claim in the state courts but not at the time or in the manner required by state procedural rules, the resulting procedural bar defense may be waived by the State's failure to assert it."); *Bennett v. Fortner*, 863 F.2d 804, 807 (11th Cir. 1989) ("When a federal court is unable to determine whether or not the state court is applying a procedural bar, this court will reach the merits of the case.").

> **D.      Whether Taylor's Procedural Default May Be Excused.**

The net result of the foregoing discussion is that a significant subset of Taylor's federal habeas claims set forth in his § 2254 petition are procedurally defaulted because those claims were (i) presented to the state courts only via the disallowed Second Amended R32 Petition or Revised Second Amended R32 Petition, and were summarily dismissed for want of jurisdiction as being outside the scope of the appeals court's limited remand; or (ii) summarily dismissed by the Alabama Court of Criminal Appeals for being inadequately briefed pursuant to Rule 28(a)(10), Ala.R.App.P.[33]  In light of the procedural default, these numerous claims can be heard on federal habeas review only if, and insofar as, Taylor overcomes the procedural default.

---

[33]      The claims from Taylor's § 2254 Petition that are implicated, in whole or in part, by the Rule 28(a)(10) procedural default consist of the following:  (i) Claim XI.D.ii.a (executing Taylor by lethal injection would violate separation of powers); (ii) Claim III.A.ii (ineffective assistance in trial counsel's conduct of voir dire and challenges for cause); (iii) Claim III.A.i (ineffective assistance by trial counsel in failing to make a competent *Batson* objection); (iv) Claim III.B.ii.b (ineffective assistance by trial counsel in failing to challenge gruesome crime scene photographs); (v) Claim III.B.ii.c (ineffective assistance by trial counsel in failure to prevent Doneisha Matthews from testifying); (vi) Claim III.B.ii.d (ineffective assistance by trial counsel in failure to object to improper closing argument by the State); (vii) Claim III.B.iv.b (ineffective assistance by trial counsel in failure to elicit testimony from the Carltons regarding pressure by the State); (viii) Claim III.B.iv.c (ineffective assistance by trial counsel in failure to direct jury to testimony by witnesses who had seen McMillan with a gun); (ix) Claim III.B.v (ineffective assistance by trial counsel in failure to cross-examine Clark regarding basis for recantation); (x) Claim III.B.vi (ineffective assistance by trial counsel in failure to advocate for correct jury instruction); (xi) Claim III.C (ineffective assistance at sentencing phase); (xii) Claim III.D (ineffective assistance for failure adequately to litigate motion for new trial); (xiii) Claim III.E (ineffective assistance predicated on inadequate compensation); (xiv) Claim I (gender-based use of peremptory challenges by State, although race discrimination aspect of this claim is not defaulted under Rule 28(a)(10)); (xv) Claim XI.C.i (improper "death qualification" of petit jury); (xvi) Claim IV (trial judge was not impartial because of ongoing election campaign); (xvii) Claim II.B (*Brady* violation by the State in failing to disclose exculpatory evidence); (xviii) Claim XI.A.ii (death penalty unconstitutional because of unreliable application); (xix) Claim (Continued)

*1.    Applicable Legal Principles.*

It is well settled that "[t]he doctrine barring procedurally defaulted claims from being heard is not without exceptions.  A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Trevino v. Thaler*, 133 S.Ct. 1911, 1917, 185 L.Ed.2d 1044 (2013) (citation omitted).  That said, appellate courts "repeatedly have emphasized that circumstances meriting the consideration of procedurally defaulted or barred constitutional claims are 'extremely rare' and apply only in the 'extraordinary case.'" *Rozzelle v. Secretary, Florida Dep't of Corrections*, 672 F.3d 1000, 1015

---

XI.C.iv (double jeopardy violation because trial court relied on same finding of fact as both element of crime and an aggravating circumstance); (xx) Claim XI.C.iii (insufficiency of evidence of "especially heinous, atrocious or cruel" aggravator); and (xxi) Claim VIII (cumulative error at trial and sentencing hearing).  The claims in Taylor's § 2254 Petition that are procedurally defaulted, in whole or in part, as being newly raised and dismissed for want of jurisdiction in the disallowed Second Amended R32 Petition consist of the following: (i) Claim III.B.i.a (ineffective assistance in failing to present evidence from Blake and Stevee Martin); (ii) Claim III.B.i.c (ineffective assistance in failing to present evidence from Lugene and Barbara Wallace regarding alibi); (iii) Claim III.B.ii.a (ineffective assistance in failing to object to contents of duffel bag and wallet); (iv) Claim III.B.v (ineffective assistance for failure to present evidence of McMillan confession to Robert Lewis); (v) Claim III.B.vii (ineffective assistance for failure to follow up on subpoenas of records from Carrie Booker and Carlton household); (vi) Claim III.C.i (ineffective assistance in failure to investigate potential mitigation evidence); (vii) Claim III.C.iii (ineffective assistance in failure to prepare and elicit helpful testimony from mitigation witnesses); (viii) Claim III.C.ii.a (ineffective assistance in failure to present evidence about Taylor's childhood); (ix) Claim III.C.ii.b (ineffective assistance in failure to present evidence about Taylor's mental health and purported impairments); (x) Claim III.C.ii.c (ineffective assistance in failure to present evidence about Taylor's environmental and social background); (xi) Claim III.C.ii.d (ineffective assistance in failure to elicit testimony about Taylor's family and friend relationships); (xii) Claim II.C (prosecutorial misconduct in State's admission into evidence of prejudicial materials in Taylor's duffel bag and wallet); (xiii) Claim II.A.i (prosecutorial misconduct in pressuring McMillan to testify falsely); (xiv) Claim II.A.ii.a (prosecutorial misconduct in pressuring Tiffany Carlton to testify falsely); and (xv) Claim II.B.i (prosecutorial misconduct in failing to disclose "talking points" used with respect to McMillan's trial testimony).  And the claims in Taylor's § 2254 Petition that are procedurally defaulted, in whole or in part, as being newly raised and dismissed for want of jurisdiction in the disallowed Revised Second Amended R32 Petition consist of the following: (i) Claim II.A.ii.b (prosecutorial misconduct in securing false testimony from Bryann Scott Clark); (ii) Claim III.B.v (ineffective assistance of trial counsel in failing to cross-examine Clark in a manner that would have divulged McMillan's purported written confession); and (iii) Claim IX (McMillan's confession requires vacatur of Taylor's convictions and death sentences).

(11th Cir. 2012) (citations omitted). "[A] habeas petitioner may overcome a procedural default if he can show adequate cause and actual prejudice, or, alternatively, if the failure to consider the merits of his claim would result in a fundamental miscarriage of justice." *Borden v. Allen*, 646 F.3d 785, 808 n.26 (11th Cir. 2011); *see also Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258 (11th Cir. 2013). "As a general matter, 'cause' for procedural default exists if the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Bishop*, 726 F.3d at 1258 (citations and internal quotation marks omitted); *see also McCleskey v. Zant*, 499 U.S. 467, 493-94, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) ("Objective factors that constitute cause include interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. … In addition, constitutionally ineffective assistance of counsel is cause.") (citations and internal marks omitted). "To establish 'prejudice,' a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different." *Spencer v. Secretary, Dep't of Corrections*, 609 F.3d 1170, 1180 (11th Cir. 2010) (citation omitted); *see also Lucas v. Warden, Georgia Diagnostic and Classification Prison*, 771 F.3d 785, 801 (11th Cir. 2014) ("For prejudice, Lucas must demonstrate a reasonable probability that his conviction or sentence would have been different ….").

As an alternative to showing cause and prejudice, a prisoner may overcome a procedural default by showing a fundamental miscarriage of justice. "For a state prisoner to establish a fundamental miscarriage of justice, he must prove that he is innocent." *Spencer v. United States*, 773 F.3d 1132, 1139 (11th Cir. 2014) (citations omitted). "To overcome procedural default through a showing of actual innocence, the petitioner must present reliable evidence … not presented at trial such that it is more likely than not that no reasonable juror would have convicted him of the underlying offense." *Rozzelle*, 672 F.3d at 1011 (citations and internal quotation marks omitted); *see also Kuenzel v. Commissioner, Alabama Dep't of Corrections*, 690 F.3d 1311, 1314-15 (11th Cir. 2012) ("To meet the proper standard, the petitioner must show that it is *more likely than not* that *no reasonable juror* would have convicted him in light of the new evidence.") (citation omitted). "[T]he actual innocence exception applies to constitutional errors in capital sentencing only when the constitutional error resulted in the petitioner becoming statutorily eligible for a death sentence that could not otherwise have been imposed." *Magwood*

*v. Warden, Alabama Dep't of Corrections*, 664 F.3d 1340, 1346-47 (11th Cir. 2011) (citations omitted).

Taylor invokes the cause-and-prejudice standard in an effort to overcome his procedural default as to numerous claims presented for the first time in his Second Amended R32 Petition and Revised Second Amended 32 Petition, both of which Alabama courts disallowed on adequate and independent state procedural grounds.[34] Except as noted below, the State has largely remained silent on the questions of cause and prejudice in its Answer (doc. 33), thus depriving the Court of the benefit of the State's position over whether Taylor can or cannot meet his burden of showing cause and prejudice as to each such claim.[35]

> 2.     *Misconduct Claims as to McMillan (Claims II.A.i, II.B.i).*

In Claims II.A.i and II.B.i, Taylor alleges that the State induced Kenyatta McMillan to testify falsely at trial by instructing him to fabricate testimony that victim Steve Dyas got on his knees as if to pray, and that in the course of begging for her life victim Sherry Gaston stated that she needed to take care of her two children.  (Doc. 25, ¶ 62.)[36]  Taylor also alleges that the State

---

[34]     Petitioner is not entitled to an evidentiary hearing on any of these procedurally defaulted habeas claims unless and until he overcomes the procedural bar.  *See, e.g., Hardwick v. Secretary, Fla. Dep't of Corrections*, 803 F.3d 541, 548 n.6 (11th Cir. 2015) ("[A] state habeas petitioner is not entitled to an evidentiary hearing in federal courts on the merits of a procedurally defaulted claim unless he can first overcome the procedural bar.") (citation omitted).  Accordingly, the questions of cause and prejudice must be addressed antecedent to any merits arguments or evidentiary showings concerning the defaulted claims.

[35]     That said, in the Rule 32 proceedings, the State filed a brief on July 31, 2012, in which it asserted in general terms that "Taylor has had continuous access to all of the witnesses mentioned and all trial exhibits.  Accordingly, Taylor could have raised his new claims prior to 2005."  (Vol. 50, R-107, at 6.)

[36]     According to McMillan's testimony at the Rule 32 hearing conducted on December 12, 2011, the truth was that Steve Dyas was on his knees when he was shot, but that the description "praying-like position" was given to McMillan by the State; and that McMillan did not recall Ms. Gaston saying anything before she was shot because McMillan "was on the other side."  (Vol. 47, R-103, at 33-35, 41.)  In a recorded interview with the police on December 16, 1997, however, McMillan testified (without any allegation of coercion or impropriety) that Mr. Dyas had "begged" for them not to shoot him and told them they could take any car they wanted if they let them live, that "they was scared," and that Ms. Gaston "was begging.  That lady was begging for her life.  She was begging and crying and begging.  He shot 'em anyway."  (Doc. 23, Exh. G, at 7, 9.)  There are thus strong similarities between McMillan's purportedly coerced trial testimony and what he said at other times predating any such alleged pressure by
(Continued)

provided McMillan with a written set of "talking points" to use at trial in furtherance of this supposedly falsified testimony, and that the State never turned over any such evidence to Taylor. (*Id.*, ¶¶ 62, 81.) Taylor first presented these claims in his disallowed Second Amended R32 Petition; therefore, they are procedurally defaulted.

Again, to establish cause for the procedural default, Taylor must show that an "external impediment, whether it be government interference or the reasonable unavailability of the factual basis for the claim, must have presented petitioner from raising the claim." *McCleskey*, 499 U.S. at 497 (citations omitted). Assuming without deciding that the State's nondisclosure of the "talking points" and its instructions to McMillan constitutes "government interference" to establish cause,[37] Taylor still could not overcome the procedural default because he has not shown prejudice. To establish prejudice, Taylor "must demonstrate a reasonable probability that his conviction or sentence would have been different." *Lucas*, 771 F.3d at 801; *see also High v. Head*, 209 F.3d 1257, 1267 (11th Cir. 2000) ("the question is whether the favorable evidence could reasonable be taken to put the whole case in such a different light as to undermine confidence in the verdict") (citation omitted).

The record shows that the "coerced" version of McMillan's testimony was that Mr. Dyas had been on his knees as if he were praying at the time he was murdered, and that Ms. Gaston had begged for her life by saying that no one could take care of her two kids like she could. Meanwhile, the "uncoerced" version of McMillan's testimony (as gleaned from McMillan's

---

the State. Incidentally, Taylor has presented evidence of what he says is a third McMillan statement in the form of a coded note given to fellow inmate Bryann Scott Clark. That purported statement attributed to McMillan includes statements that Mr. Dyas "was on his knees begging for his life" and that Ms. Gaston "was begging for us not to kill her she said she was a mother of two kids like that that made a f**k to me." (Vol. 45, R-99, at 606.) While the Court does not consider this purported jailhouse statement in the context of these habeas claims given the procedural default of Taylor's claims relating to same, that alleged statement (if it were to be considered) raises obvious concerns as to the veracity and credibility of McMillan's testimony in the Rule 32 hearing.

[37] It is not at all clear that Taylor has shown cause here. He has not disputed the State's assertion that he had continuous access to McMillan during the direct appeal and state post-conviction processes. He does not say that he had tried to elicit information from McMillan about State coercion or talking points previously, or that McMillan had refused to disclose it until it was too late to raise the issue on Rule 32 review.

recorded statement to police on December 16, 1997 and his Rule 32 hearing testimony) would have been that Mr. Dyas had been on his knees begging for Taylor not to shoot and trying desperately to bargain with the assailants to take any car they wanted, and that Ms. Gaston had been "begging and crying and begging" before Taylor shot her.  While the former version is embellished, the differences in tenor, severity and emotional resonance between the two narratives are not so marked as to reasonably call into question the outcome of either the guilt phase or the penalty phase of trial.[38]  With or without the "prayer like position" and "two kids" accoutrements, McMillan's trial testimony (and all the other evidence presented by the State at trial) painted a vivid picture of horrific, chilling, senseless execution-style murders from which to justify the guilty verdicts and death sentences.

Because Taylor has not shown prejudice, he cannot overcome the procedural default as to Claims II.A.i and II.B.i; therefore, those claims will not be considered on the merits in these federal habeas proceedings.

> ### 3.     *Misconduct Claim as to Tiffany Carlton (Claim II.A.ii.a).*

In Claim II.A.ii.a, Taylor alleges the State threatened and secured false testimony from Tiffany Carlton.[39]  At trial, the defense called Carlton as a witness, at which time she testified

---

[38]     Indeed, the portion of the State's closing argument that Taylor highlights as objectionable in reliance on this testimony consisted of statements that "Steve Dyas on his knees in a prayer like position trying to make his last bargain, take any car that you can. … [Sherry Gaston] was screaming and crying and in her last moments thinking of her children."  (Doc. 25, ¶ 64.)  Even if the "prayer like position" and "thinking of her children" elements are stripped away, the narrative retains an extremely powerful emotional impact.

[39]     In his § 2254 briefing, Taylor asserts that his Second Amended R32 Petition included both a claim that the State pressured Carlton to testify falsely (corresponding to Claim II.A.ii.a in his § 2254 Petition) and a claim that the State failed to disclose material impeachment evidence relating to Carlton (corresponding to Claim II.B.iii in his § 2254 Petition).  Taylor proceeds to attempt to overcome the procedural default as to both claims.  (*See* doc. 43, at 55.)  A fair reading of the Second Amended R32 Petition reveals, however, that it did not assert a *Brady* claim based on the prosecution's failure to disclose material impeachment evidence relating to Carlton.  The paragraphs cited by Taylor for this proposition do not support it, or even hint at a *Brady* claim, but instead assert only that the State pressured Carlton to testify falsely.  (*See* doc. 43, at 55 (citing only to ¶¶ 349-50 of the Second Amended R32 Petition as support for the proposition that Taylor asserted a claim therein for failure to disclose impeachment evidence relating to Carlton's testimony).)  Accordingly, the Court's cause-and-prejudice analysis will relate only to Claim II.A.ii.a (which was presented in the Second Amended R32 Petition) and not the unexhausted Claim II.B.iii (which was not).

that Taylor and Kenyatta McMillan had visited her house on the day of the murders, that Taylor had shown her the murder weapon, and that Taylor had then given it to McMillan, who kept it in his possession most of the time.[40] At the Rule 32 hearing in December 2011, Carlton testified that law enforcement officers had "harassed" her for months, that they came to her house every day, and that they required her to take a polygraph, because they said McMillan had informed them that he gave the murder weapon to Carlton. (Vol. 48, R-103, at 102-05.) In the Rule 32 proceedings, she testified that the harassment took the form of a detective telling her, "I know he gave you the gun." (*Id.* at 104.) Then Carlton testified that she "can't remember [Taylor] with a gun," and that if she testified differently at trial it was because "I probably would have said anything just to make them leave me alone." (*Id.* at 107.) Taylor first presented the prosecutorial misconduct claim relating to Carlton's testimony in the disallowed Second Amended R32 Petition; thus, that claim is procedurally defaulted.

The undersigned finds that petitioner has shown neither cause nor prejudice to overcome the procedural default. With regard to cause, Taylor blames the State for "conceal[ing] its misconduct" (doc. 43, at 55). However, the record confirms that Taylor's trial counsel was well aware of the pressure that Carlton described years later in the Rule 32 hearing. In a bench conference before Carlton began testifying at trial, the prosecutor referenced the State's concern that "she did receive the gun in this case and she is hiding the gun, participating in hiding the gun or keeping it from us." (Doc. 8, R-16 at 1242-43.) And Taylor's lawyer stated in that same bench conference, "She has talked to the state. She has talked to us. She has been given, I understand, a polygraph test." (*Id.* at 1243.)[41] Going back as far as trial, then, defense counsel

---

[40]    Carlton's precise testimony on this point was as follows: "Mr. Taylor showed me the gun, but he gave it to Kenyatta and Kenyatta was like holding the gun or playing with it, babying it, you know, rubbing it, just, you know, holding the gun. He mainly had the gun most of the time." (Vol. 8, R-16 at 1247.)

[41]    In his § 2254 Petition, Taylor sets forth the factual backbone of this claim as being that "[t]he State repeatedly accused Ms. Carlton of hiding information, and also subjected her to a lie detector test." (Doc. 25, ¶ 71.) The trial transcript unequivocally reveals that these facts were well known to defendant going as far back as 1998. Indeed, Taylor always knew that the State believed Carlton was hiding the gun, that the State had questioned her about that, and the State had subjected her to a polygraph examination. Yet, petitioner's habeas counsel represents today that "the State still has not disclosed to Mr. Taylor the fact or results of the lie detector test it administered to Ms. Carlton" (doc. 43, at 56), even though Taylor's own trial (Continued)

was well aware of the intense scrutiny directed at Carlton, the State's suspicion that she had received the murder weapon, and even the fact that the State had given her a polygraph examination. Certainly, defense counsel had enough facts available to make a claim that Carlton's trial testimony may have been colored by the State's intense scrutiny of her long before Taylor filed the disallowed Second Amended R32 Petition. Therefore, Taylor cannot show "cause" predicated on a theory that the factual basis for this claim was not reasonably available to counsel at an earlier time. Of course, "the mere fact that counsel failed to recognize the factual or legal basis for a claim … does not constitute cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 486, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

Nor has Taylor made a showing of prejudice as to this claim. The State did not call Carlton in its case-in-chief. There was substantial other evidence linking Taylor to the firearm used in the murders. Moreover, taken in context, Carlton's testimony about seeing Taylor with the gun was not particularly harmful to the defense. After all, Carlton told the jury that McMillan – not Taylor – "mainly had the gun most of the time" in her observations, and that McMillan – not Taylor – "was playing with it, babying it, you know, rubbing it, just, you know, holding the gun." (Vol. 8, R-16 at 1247.) Such statements bind the firearm far more tightly to McMillan than they do to Taylor, which is (presumably) why defense counsel called Carlton to testify and elicited this line of testimony from her in the first place. Indeed, despite what petitioner now characterizes as prosecutorial misconduct, Tiffany Carlton's testimony was overall quite favorable to the defense. If the State pressured her, then those efforts could not have been very effective. Simply put, there is no reasonable probability that Taylor's convictions or sentences would have been different had the State not allegedly applied improper pressure to cause Carlton to falsify her testimony at trial.

---

counsel referenced that polygraph examination at trial 19 years ago. Likewise, Taylor objects in Claim II.A.ii.a that the State "made demands of Ms. Carlton and threatened to prosecute her if she did not comply." (Doc. 25, ¶ 71.) This was also not newly discovered information; indeed, Taylor's trial counsel testified at the Rule 32 hearing that Carlton had told him that authorities had threatened her with prosecution. (Vol. 48, R-103 at 89.) The point is that Taylor had the key facts concerning the State's alleged misconduct vis a vis Carlton in his possession long before the Second Amended R32 Petition; therefore, he has not shown cause to excuse the procedural default based on the theory that these same facts became newly available to him much later in time.

Taylor having shown neither cause nor prejudice, he cannot overcome the procedural default as to Claim II.A.ii.a; therefore, that claim will not be considered on the merits in these federal habeas proceedings.[42]

### 4. Misconduct Claim as to Clark (Claim II.A.ii.b).

In Claim II.A.ii.b, Taylor claims prosecutorial misconduct in threatening and securing false testimony from Bryann Scott Clark, a "jailhouse snitch" who bore the dubious distinction of testifying twice and in contradictory fashion at Taylor's trial.[43]  During the defense case in chief, Taylor called Clark as a witness, at which time Clark testified that he was incarcerated at the Mobile Metro Jail with Kenyatta McMillan, that he and McMillan were members of a gang called the "Folk Disciples" or "Kinfolk Disciples," that McMillan had confided in him that he (McMillan) had been the triggerman in the Steve Dyas Motors murders, and that McMillan had asked Clark to say that Taylor was bragging about having killed the victims himself.  (Vol. 8, R-16, at 1273-77.)  Two days later, however, the State called Clark back to the stand as a rebuttal

---

[42]     Parenthetically, even if this claim were to be addressed on the merits, it is extraordinarily weak.  Despite extensive questioning from post-conviction counsel on this very point during the Rule 32 hearing, Carlton never said that the State told her to lie about the gun or instructed her to testify falsely in any respect.  Rather, the gist of her testimony was that she was stressed out because a police detective was hounding her about the case (understandably so, since law enforcement had reason to believe that Carlton had received the murder weapon after the killings took place).  Such "tactics" by the State, without more, fall well short of establishing any federal constitutional deprivation that might entitle Taylor to habeas relief.

[43]     In his § 2254 briefing, Taylor also asserts that his Revised Second Amended R32 Petition included both a claim that the State pressured Clark to testify falsely (corresponding to Claim II.A.ii.b in his § 2254 Petition) and a claim that the State failed to disclose material impeachment evidence relating to Clark (corresponding to Claim II.B.ii in his § 2254 Petition).  Taylor proceeds to attempt to overcome the procedural default as to both claims.  (*See* doc. 43, at 57.)  A fair reading of the Revised Second Amended R32 Petition reveals, however, that it did not assert a *Brady* claim based on the prosecution's failure to disclose material impeachment evidence relating to Clark.  The paragraphs cited by Taylor for this proposition do not support it, or even hint at a *Brady* claim, but instead assert only that the State pressured Clark to testify falsely and caused Clark to conceal the existence of the purported written confession.  (*See* doc. 43, at 57 (citing only to ¶¶ 362-63 of the Revised Second Amended R32 Petition as support for the proposition that Taylor asserted a claim therein that the State had failed to disclose impeachment evidence relating to Clark's testimony).)  Accordingly, the Court's cause-and-prejudice analysis will focus only on Claim II.A.ii.b (which was presented in the Revised Second Amended R32 Petition) and not the unexhausted Claim II.B.ii (which was not).

witness.  (Vol. 8, R-18, at 1384.)  At that time, Clark testified that his prior testimony concerning McMillan's statements to him was "not the truth."  (*Id.* at 1386.)  Clark further testified that Robert Nolin (another jailhouse snitch who had testified for the defense in similar fashion to Clark) had told Clark that "[h]e would help J.T.," meaning Taylor.  (*Id.*)

The gravamen of Claim II.A.ii.b is that Clark's recantation was the product of undue pressure imposed by the Warden of the Mobile Metro Jail during the intervening days, thereby supporting a claim for prosecutorial misconduct.[44]  Claim II.A.ii.b is procedurally defaulted because Taylor first raised it in the disallowed Revised Second Amended R32 Petition.  To show cause for this default, Taylor insists that he "did not know and could not have known at the time the Corrected [First] Amended [R32] Petition was filed that the State had threatened Mr. Clark to secure the recantation of his truthful trial testimony."  (Doc. 43, at 58.)  The problem for Taylor is that the record unequivocally refutes such a contention.  On October 6, 1998, the Mobile County Circuit Court conducted a hearing on Taylor's Motion for New Trial.  During that hearing, Clark testified that after his original trial testimony, the Warden met with him and said "he knew that I was telling a lie and that, if I didn't … say he was telling a lie, he would put me in … the thunder dorm," a "fighting dorm" where McMillan was housed.  (Vol. 10, R-40, at 1662.)  Clark also testified at the October 6, 1998 hearing that the Warden had shown Clark a photo of Clark's wife, and had said that if Clark did not want her to be "involved in anything," Clark would say that Taylor (not McMillan) was the one sending him notes.  (*Id.* at 1663.)  Clark's testimony at the hearing on Motion for New Trial was that he had lied under the oath the second time he testified at Taylor's trial "[b]ecause to keep my wife out of anything, involved in anything."  (*Id.* at 1664.)  These allegations match exactly the purported threats that form the basis of Claim II.A.ii.b.  (*Compare* Vol. 10, R-40, at 1662-63 *with* doc. 25, ¶ 74.)

---

[44]     Taylor's support for this allegation takes the form of an Affidavit signed by Clark on March 27, 2012, wherein he stated that following his initial trial testimony, Warden Rick Gaston asked why Clark was trying to help Taylor, and indicated that he would place Clark in "Thunderdome Wedge" (a section of the jail housing violent prisoners, including McMillan) unless he told the truth.  (Vol. 44, R-98 at 591 ¶ 12.)  During that meeting, Clark averred, the Warden opened a folder that contained a picture of Clark's wife.  (*Id.* at ¶ 13.)  Perceiving these events as threats of punishment to him and harm to his family, Clark agreed to recant.  (*Id.* at ¶ 14.)  Clark concluded by indicating that his second round of testimony at Taylor's trial was false, and that "I lied on the stand because I was afraid of the Warden's threats."  (*Id.* at 592 ¶ 16.)

Because the defense had actual knowledge of the factual predicate of Claim II.A.ii.b many years before the Revised Second Amended R32 Petition was filed, Taylor cannot show cause to excuse his procedural default, and that claim is barred from federal habeas review.[45]

>    5.    *Claim that Purported McMillan Confession Requires Vacatur of Taylor's Convictions and Death Sentences (Claim IX).*

In Claim IX of his § 2254 Petition, Taylor asserts a due process claim predicated on evidence that McMillan made a coded written confession to Bryann Scott Clark that McMillan was the shooter at Steve Dyas Motors and that Taylor had no advance knowledge that McMillan planned to murder the three victims.  (Doc. 25, ¶ 452.)[46]  This evidence contradicts the State's theory of prosecution and the evidence presented at trial through various witnesses (including McMillan himself) that Taylor had shot all three victims and that McMillan did not know why he

---

[45]    Even if this claim could be considered on the merits, it would fail.  After all, Judge Johnstone made specific findings of fact after hearing testimony from both Clark and Warden Gaston on Taylor's Motion for New Trial.  Those findings of fact included express determinations that Clark was not credible (because of serious enumerated conflicts in his testimony, his status as a convicted attempted murderer, and his gang affiliation) and that Warden Gaston was credible in his unqualified denial that he "brow beat or frightened Clark into recanting."  (Vol. 10, R-40, at 1712-13.)  Based on his finding that Warden Gaston "as between the two witnesses, appears to be by far the more credible," Judge Johnstone "[did] find as a fact that the conflict in testimony should be resolved in favor of the position taken by Warden Gaston that he did not precipitate the recantation."  (*Id.* at 1713.)  Taylor does not meet his heavy burden of showing that rejecting the trial court's finding of fact that Warden Gaston did not pressure Clark into changing his story at Taylor's trial would be warranted on deferential habeas review. *See, e.g., Conner v. GDCP Warden*, 784 F.3d 752, 761 (11th Cir. 2015) ("State court fact-findings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence."); *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011) ("Our review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review.") (citation omitted).

[46]    The purported written confession is a two-page handwritten document consisting of a lengthy unbroken sequence of numerals.  (Vol. 44, R-98 at 590 ¶ 6 & 594-95.)  According to Clark, the document is written in a rudimentary code used by members of the Folk Disciples gang, pursuant to which each number corresponds a certain letter (1=A, 2=B and so on until 26=Z).  (*Id.* at 590 ¶ 7.)  Translating this document in accordance with this code key yields the following statements, among others:  "I talked JT [Taylor] into going to Steve Dyas car lot to make out look like he was going to buy a Mustang … JT did not know that I was going to kill them all … JT … ass had a bb gun I had a I gun … I shoot first man in the chest with my 380 … I put my 380 to his head and shot him … I put my 380 to her head and shot her … I saw the man that I shot first move so I shot him in the head … Kenyatta."  (Vol. 45, R-99 at 606.)

had done it.  Taylor never raised this claim until the disallowed Revised Second Amended R32 Petition, so it is procedurally defaulted.

The undersigned finds that Taylor has shown cause to overcome the procedural default. Specifically, Clark avers that McMillan gave the written confession to him in late 1997 or early 1998, but that for unspecified reasons, Clark "was unwilling to provide this written statement to anyone until" March 2012.  (Vol. 44, R-98 at 590, ¶¶ 5-6.)  Clark further avers that, in connection with his testimony at Taylor's trial, he "did not give Jarrod or his trial lawyers the written statement that Kenyatta had given me." (*Id.* at 591, ¶ 11.)  And Taylor's counsel say the document was first given to them by Clark in late March 2012.  (Vol. 44, R-99 at 598 ¶ 4.) Taylor's counsel assert that they had unsuccessfully engaged in "numerous attempts" to obtain such a document previously.  (Vol. 46, R-101 at 868.)  Clark's concealment of the purported written confession of McMillan until long after Taylor filed his First Amended R32 Petition constitutes an objective factor external to the defense that impeded counsel's efforts to plead and present the claim to the Alabama courts before the dismissal of his Rule 32 petition, judgment and appeal back in 2005; therefore, it satisfies the "cause" portion of the cause-and-prejudice inquiry for procedural default.[47]

Where Claim IX founders, however, is with respect to the prejudice requirement.  Again, to overcome the procedural default, Taylor must show at least a reasonable probability that the result of his guilt phase or penalty phase would have been different had McMillan's purported written confession been unearthed and presented at trial.  He cannot do so for several reasons. First, Taylor evidently contemplates introducing McMillan's written statement into evidence through witness Bryann Scott Clark, the jailhouse snitch who testified twice at Taylor's trial in fundamentally inconsistent ways, then recanted his previous recantation when called to testify at

---

[47]      In so concluding, the Court does not accept at face value Taylor's repeated assertions that "***because of the State's threats***, Mr. Clark concealed the written confession that Mr. McMillan had provided." (Doc. 43, at 58 (emphasis added).)  The alleged threats occurred <u>after</u> Clark met with Taylor's counsel and <u>after</u> Clark testified on Taylor's behalf at trial the first time.  Whatever Clark's reason was for concealing this document, it could not have been the Warden's alleged threats because no such threats had happened yet.  What's more, Taylor points to no statement, affidavit or allegation by Clark linking his reticence to disclose the written confession in the years after Taylor's trial with any threats made by the Warden of the Mobile Metro Jail in the summer of 1998; therefore, such apparent speculative embellishment by Taylor cannot support a finding of cause to excuse the procedural default.

the October 1998 hearing on Taylor's motion for new trial. As Judge Johnstone found in August 1998, Clark's credibility was essentially destroyed by this pattern of drastically flip-flopping testimony, particularly given his gang affiliation and his status as a convicted violent felon.[48] Accordingly, as Judge Johnstone found, there appears to be no reasonable probability that a finder of fact would believe anything Clark had to say (nearly two decades after the fact) about his jailhouse interactions with Kenyatta McMillan in 1998.

Second, aside from Clark's general credibility gap, there are huge obstacles to the believability of his story concerning the written statement. According to an Affidavit prepared by Taylor's counsel and signed by Clark on March 27, 2012, McMillan told Clark "the story of the crime at Dyas Motors both orally, and in a written statement he gave to [Clark]" while they were housed together in Mobile Metro Jail in late 1997 or early 1998. (Vol. 44, R-98, ¶¶ 1-2, 5.) As discussed at length *supra*, Clark cooperated with Taylor's lawyers in 1998, informing them of the content of McMillan's oral statements and testifying on Taylor's behalf (and against McMillan) at trial in the defense's case in chief.[49] Yet Clark would now have the finder of fact believe that, even after he reached out to Taylor's counsel to assist Taylor's defense, and even after he volunteered information to them that McMillan had orally admitted being the triggerman, Clark had withheld from Taylor's counsel a coded written statement that McMillan

---

[48]    In particular, Judge Johnstone found as a factual matter at the hearing on motion for new trial that Clark's "testimony was sometimes conflicting in fairly serious ways and has been today. … That sort of characteristic in his testimony made it weak at trial and makes it weak here in this hearing. Other things that detract from the credibility of Mr. Clark's testimony both at trial and in this hearing are his status as a convicted attempted murderer and his gang affiliation. … My impression is that that really is a big negative with regard to whether somebody is telling the truth. … So I will say his testimony seems awfully weak. … [W]hat the defendant relies on is a recantation of the recantation and the defendant's desire to have this same witness Clark go and say to some other jury that having told one story, having recanted that story, having recanted the recantation that here is the truth all over again and the defendant is taking the position that that would likely affect the outcome of a new trial …. That position seems not well taken to the court …. [T]he credibility of Clark is so weak or was so weak at the trial itself that the likelihood that that testimony, whether recanted or not, would make much difference is remote." (Vol. 10, R-40, at 1711-14.)

[49]    Indeed, Taylor's counsel represented on the record during the trial that Clark "got in contact with us" and provided the defense with both "a long statement" and "a letter." (Vol. 8, R-18, at 1373.)

had given him confirming the same sequence of events he had told him orally.  Nowhere in the record or briefing does Taylor offer any colorable explanation why Clark would have chosen to withhold that written statement when he was voluntarily assisting Taylor and testifying against McMillan anyway.  The icing on the cake is that Clark ostensibly maintained this written coded statement from McMillan in his jail cell in total secrecy for more than 14 years without "providing this written statement to anyone," until experiencing a change of heart in March 2012 for no apparent reason and furnishing the original document to Taylor's habeas counsel.  (Vol. 44, R-98, ¶ 6.)  The story strains credulity beyond the breaking point.  Even if Clark's credibility in this matter were not a shambles in general (which it is), the likelihood of any finder of fact believing (much less giving dispositive weight to) Clark's story as Taylor has presented it to this Court on federal habeas review (*i.e.*, that Clark received McMillan's written statement, kept it a secret even when he affirmatively sought out Taylor's counsel and testified as a defense witness at Taylor's trial in a manner consistent with the written statement's contents, retained and hid the original document for 14 years while incarcerated in Alabama prisons, then abruptly turned it over to Taylor's habeas counsel on a whim in March 2012) appears highly remote.

Third, even if, notwithstanding these considerable defects in Clark's credibility both generally and with regard to the specific subject of his testimony concerning the written statement, a finder of fact were to believe his story and find that the coded written statement was actually given to Clark by Kenyatta McMillan in Mobile Metro Jail in late 1997 or early 1998, there is no reasonable probability that Taylor's convictions or sentences would have been different.  To see why, suppose the McMillan statement is accepted at face value as a truthful, honest jailhouse confession, using the very "translation" of the numerals proposed by Taylor's counsel.[50]  In other words, suppose the finder of fact believed every word of that written

---

[50]        That, in itself, is also a stretch.  There are, of course, many reasons why an inmate in jail would brag to a fellow gang member (McMillan and Clark were both members of the same "Kinfolk Disciples" gang) in a way that exaggerated his deeds and role in the offense to make him appear tougher, more dangerous, more notorious, and altogether more formidable than he really was.  It is far from a sure thing that a jury would believe the contents of this statement, given the circumstances under which it was prepared and its intended recipient, even if the jury did believe (against all odds and reason) that Clark had received the statement from McMillan and secreted it without a word to anyone for 14 years before deciding to provide it to Taylor's attorneys.

statement as setting forth the true events on the day in question. That account of the Steve Dyas Motors murders is largely unhelpful to Taylor. Specifically, the statement (i) alludes to Taylor and McMillan's plans to rob the dealership; (ii) reflects that after McMillan shot Bruce Gaston in the chest and Steve Dyas tried to escape, Taylor "stopped him and brought back to the office" where he was "begging for his life" while "we was asking him where the money and safe was" before McMillan killed him; and (iii) specifies that after the first two killings, Taylor "went to the bathroom said made the hoe come out she [Sherry Gaston] was begging for us not to kill her … so I put my 380 to her head and shot her we got her purse and two wallets from the men." (Vol. 45, R-99, at 606.)

That version of the facts unambiguously portrays Taylor as an accomplice to capital murder. According to that narrative, Taylor had the intent to rob and he knowingly, intentionally participated in the intentional killing by forcibly bringing two of the victims to their executioner, McMillan, even as they screamed and begged for their lives and even when Taylor knew that McMillan intended to kill them (as evidenced by his having already shot Bruce Gaston in the chest). Under such a scenario, Taylor's culpability for the offenses of capital murder would remain unchanged. *See, e.g., Kuenzel v. State*, 577 So.2d 474, 490-91 (Ala.Crim.App. 1990) ("[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony.") (citation omitted). Nor would his non-triggerman role exempt or insulate Taylor from the death penalty. *See, e.g., Doster v. State*, 72 So.3d 50, 118 (Ala.Crim.App. 2010) ("We have repeatedly held that a nontriggerman may be convicted of capital murder and sentenced to death.").[51] To be sure, if proven, Taylor's role as a non-triggerman would be a non-statutory mitigating circumstance. "Of course, the weight to attach to this nonstatutory mitigating circumstance is within the discretion of the trial court." *Hodges v.*

---

[51]     *See also Pilley v. State*, 930 So.2d 550, 570 (Ala.Crim.App. 2005) ("Pilley ***either murdered or was an accomplice in the murder*** of five individuals pursuant to a common scheme or plan. Similar crimes have been punished by death on numerous occasions.") (citations omitted and emphasis added); *Gamble v. State*, 791 So.2d 409, 446-47 (Ala.Crim.App. 2000) ("[B]ecause the evidence was sufficient to allow the jury to reasonably conclude that Gamble aided and abetted Presley in the commission of the murders, ***whether Gamble pulled the trigger is of no legal consequence***. Thus, his death sentence was proper, and this claim is meritless.") (emphasis added).

*State*, 856 So.2d 875, 893 (Ala.Crim.App. 2001).  Here, in all likelihood the weight of that non-statutory mitigating circumstance would have been quite low.  Alabama appellate courts "specifically hold that an accomplice may be held vicariously liable for the manner in which his codefendant commits a murder.  Thus, a court may properly apply the aggravating circumstance that a murder was especially heinous, atrocious, or cruel to a nontriggerman." *Sneed v. State*, 1 So.3d 104, 118 (Ala.Crim.App. 2007).  Taylor would thus bear responsibility, in the weighing of aggravating and mitigating circumstances, for the manner in which McMillan committed the murders.  Furthermore, the written statement reflects that Taylor played a central role in the murders, irrespective of whether he actually pulled the trigger or not.  Without Taylor chasing down Mr. Dyas and Ms. Gaston as they tried to flee for their lives, and without Taylor forcing them back to McMillan as they begged for mercy, those murders would likely not have occurred.[52]  Even under that version of the facts, any suggestion that Taylor lacked the requisite intent to be guilty of capital murder would be extremely weak and irreconcilable with his own conduct as described therein.  (The statement in the coded note about what Taylor knew or did not know would appear to be improper, inadmissible speculation as to Taylor's state of mind, in any event.)  Accordingly, the Court is of the opinion that there is no reasonable likelihood that the McMillan written statement would have materially altered the decision-making calculus or the result at either the guilt/innocence phase or the penalty/sentencing phase of the proceedings.[53]

---

[52]  This point is one that the State hammered home during its closing argument in the guilt phase of Taylor's trial, as follows: "Let's play out the scenario the defense would have you believe.  One man comes in the front door, shoots a man over here to the left.  One of the victims runs to the back and one runs here.  If it is a one man job, does one man go back here in the back to get the other while the other person runs out the front door.  *You can't do it with one person*.  Someone has to guard the front door and another person has to go to the back and pull people out of the back.  *It is not a one man job by any stretch of the imagination*." (Vol. 9, R-21 at 1429 (emphasis added).)  Given the critical roles played by both participants in the Steve Dyas Motors robbery / triple-murder, as described in both the State's closing argument and the coded written statement that Taylor seeks to litigate in his § 2254 Petition, there is no reasonable probability that either individual's culpability would be heightened or reduced by their status as triggerman or not.  Either way, both participants were necessary to complete the crime and carry out the murders.  As the State correctly observed, it was not a one-man job, by any stretch of the imagination, even under the coded written statement on which Taylor relies as a cornerstone of his claims for federal habeas relief.

[53]  In arguing otherwise, Taylor asserts that "the Trial Judge relied upon the evidence that Mr. Taylor was the shooter in deciding to override the jury's verdict and to instead sentence
(Continued)

For each of these reasons, Taylor has not shown a reasonable probability that his convictions or death sentences would have been different had the McMillan written statement been presented to the jury and sentencing judge at trial. Because he has not shown prejudice to overcome the procedural default, Claim IX is not properly before the federal habeas court and will not be considered on the merits in these § 2254 proceedings.

### 6.    *Misconduct Claim as to Duffel Bag and Wallet (Claim II.C).*

In Claim II.C of his § 2254 Petition, Taylor asserts a claim of prosecutorial misconduct based on the contents of a blue duffel bag admitted at trial as State's Exhibit 58, and the contents of Taylor's wallet admitted as State's Exhibit 71. Taylor posits that the duffel bag contained prejudicial, inadmissible information about his criminal history, including (i) a document showing that Taylor had been charged with misprision of a felony in the U.S. District Court for the Western District of Louisiana in November 1993; (ii) that the same federal court ordered Taylor arrested in March 1994 for a hearing on the Government's motion for revocation of his supervised release on that charge; (iii) that a warrant of arrest was in fact issued for Taylor in March 1994; (iv) that the misprision case was set for trial in September 1994; (v) that the U.S. Probation Office discharged Taylor from supervision on September 30, 1997, for a sentence that had expired one day earlier. (Doc. 23, Exh. E.) According to Taylor, the duffel bag also contained various other prejudicial items, such as documents showing Taylor's overdue loan payments and medical bills, as well as the suspension of his driver's license. (Doc. 25, ¶ 93.) Taylor indicates that the wallet included a document showing a charge against him for unlawful breaking and entering a vehicle. (*Id.*) Claim II.C was first raised in the disallowed Second Amended R32 Petition, and is therefore procedurally defaulted.

---

Mr. Taylor to death." (Doc. 25, ¶ 454.) This is not an accurate characterization of the Judgment and Sentence (Vol. 53, R-113). Nowhere in that document did Judge Johnstone purport to be conditioning Taylor's death sentences on his status as triggerman. To the contrary, the sentencing order states in the section on aggravating circumstances that "Taylor and McMillan deliberately and methodically murdered all three victims in the most certain way conceivable" (*id.* at 158), without drawing any distinction between their respective roles in the killings. For aught that appears in the sentencing order, whether Taylor or McMillan pulled the trigger was of no consequence to the trial judge's sentencing decision. Taylor's argument to the contrary amounts to pure speculation, untethered to record facts.

In an attempt to establish cause to overcome the procedural default, Taylor posits that he "did not learn of the State's misconduct in this regard until years after he filed the Corrected First Amended [R32] Petition" and that his "habeas counsel was not permitted access to the exhibits … until after the case was remanded to the Circuit Court." (Doc. 43, at 60.) The defect in this argument is that "cause" is not confined to what defendant and his counsel actually knew, but also extends to facts that could reasonably have been discovered. *See, e.g., Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008) (for purposes of showing an objective external factor impeding compliance with the state procedural rule, "[s]uch external impediments include evidence that could not reasonably have been discovered in time to comply with the rule") (citation omitted); *Routly v. Singletary*, 33 F.3d 1279, 1290 (11th Cir. 1994) ("objective factors that constitute cause include … a showing that the factual or legal basis for a claim was not reasonably available to counsel"). The record demonstrates that the factual basis of this claim was reasonably available to Taylor's counsel as far back as 1998.

In particular, in his Amended Motion for New Trial filed in October 1998, Taylor moved for relief on the grounds that on August 13 and 14, 1998, a juror had stated "on the air" that "the jury was made aware of the prior criminal record of Jarrod Taylor through evidence and/or personal effects purportedly belonging to the defendant Taylor." (Vol. 1, R-2 at 178.) At a hearing on October 5, 1998, Taylor's counsel explained to Judge Johnstone that a female juror (whose identity was known to them) had appeared on a radio talk show airing on the Thursday and Friday after the August 1998 sentencing hearing, and that the juror "was discussing the fact that they had seen evidence during the guilt phase that Jarrod Taylor had a prior conviction and I don't know what that might have been." (Vol. 10, R-39, at 1647.) In response, Judge Johnstone commented that "for the sake of getting as good a record as we can we ought to try to get the lady here, if she can be brought here." (*Id.*) Yet defendants did not bring the juror in to testify at the hearing on the motion for new trial.[54] Nor is there any indication that defense counsel (including trial counsel, direct appeal counsel, or state post-conviction counsel) attempted to contact that juror (or any other juror) to identify what evidence of Taylor's criminal history the

---

[54]     By all appearances, such testimony would have been proper and admissible under the Alabama Rules of Evidence. *See* Rule 606(b), Ala.R.Evid. ("Upon an inquiry into the validity of a verdict or indictment, … a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention.").

jury had seen in its deliberations. Such inquiries (which are not forbidden under Alabama law) would in all likelihood have led Taylor's counsel directly to the duffel bag and wallet, providing them with the very factual predicate for Claim II.C that they now contend was unavailable to them until 2011.[55]

The point is straightforward. Taylor's counsel have known – or have had good reason to believe – since no later than October 1998 that the jury had seen something they should not have seen relating to Taylor's criminal history. Had Taylor performed reasonable follow-up between then and 2005, he would have learned about the contents of the duffel bag in advance of the final judgment entered by Judge Thomas in the Rule 32 proceedings, and therefore could have pleaded Claim II.C in the state post-conviction proceedings in a timely manner that complied with the state procedural rule. Yet Taylor has made no showing that he ever conducted such inquiries in a reasonably diligent manner. Because the Court finds that the factual basis for Claim II.C was reasonably available to Taylor many years before he actually attempted to raise the claim, such that he readily could have avoided the state procedural bar, he has not shown cause to overcome the procedural default. Accordingly, Claim II.C will not be considered on federal habeas review.

      7.    *Ineffective Assistance Claim as to Duffel Bag and Wallet (Claim III.B.ii.a).*

In Claim III.B.ii.a of his § 2254 Petition, Taylor alleges that his trial counsel provided ineffective assistance in failing to challenge the admission of the blue duffel bag (State's Exhibit 58), the wallet (Exhibit 71) and Sherry Gaston's purse (Exhibit 47), which contained such prejudicial items as family photos and her children's Christmas wish lists. Taylor maintains that "[e]ven a mere cursory review of these items would have uncovered flagrantly prejudicial and

---

[55]     Indeed, Taylor complains in his § 2254 Petition that, following the trial, State investigators visited the jury foreperson, who told them that the duffel bag was the source of the jury's knowledge of Taylor's criminal history. (Doc. 25, ¶ 99.) There is no evidence, and no reason to believe, that the foreperson would not have told defense investigators the very same thing had they contacted her at any time after the August 1998 trial. At the conclusion of Taylor's trial, Judge Johnstone expressly informed the jurors that "there is no restriction on you, if you wish to talk about [this case]. You can talk with lawyers, family, friends, anybody under the sun and it is perfectly all right." (Vol. 10, R-36, at 1605.) Taylor does not indicate that any juror, much less the foreperson and the juror who appeared on the radio program, ever declined to speak with petitioner's attorneys or investigators.

facially inadmissible information." (Doc. 25, ¶ 182.) This claim was first presented by Taylor in his disallowed Second Amended R32 Petition and is therefore procedurally barred.

Taylor's showing of cause to overcome the procedural default as to this Claim III.B.ii.a fails for precisely the same reason that it failed as to Claim II.C, *supra*. Once again, Taylor attributes his failure timely to assert this claim in state post-conviction proceedings to "the refusal of the Circuit Court and the Circuit Clerk's office to grant Mr. Taylor's habeas counsel access to the trial exhibits," such that he "was not aware of that certain of the exhibits contained inadmissible and prejudicial materials." (Doc. 43, at 62.) As discussed in the Claim II.C cause-and-prejudice analysis, however, Taylor has been aware for many years that the jurors had reviewed evidence of his criminal history during the deliberations. The sources of that evidence (*i.e.*, Taylor's duffel bag and wallet) could readily have been ascertained about reasonable follow-up inquiry by Taylor's counsel after the trial, during the direct appeal, or during state post-conviction proceedings prior to the 2005 judgment. Because the factual basis of Claim III.B.ii.a (*i.e.*, the prejudicial materials in the duffel bag and wallet) was reasonably available to Taylor beginning no later than August 27-28, 1998, when he was first placed on direct notice that the jurors had reviewed improper materials, he has not shown cause to excuse his failure timely to raise this claim in the state courts antecedent to the 2005 judgment on Rule 32 review.[56]

---

[56] Although petitioner has not advanced such a contention to satisfy his burden of showing "cause" for the procedural default, it could be argued, perhaps, that Taylor's counsel's knowledge that the jurors had viewed evidence of his criminal history would not have put them on notice of any concerns relating to State's Exhibit 47, which was Sherry Gaston's purse. After all, the purse did not contain any documents pertaining to Taylor's criminal history, so inquiring of jurors as to how they learned about his prior convictions would not necessarily have led counsel to discover improprieties as to the purse's contents. Assuming that Taylor has made an adequate showing of cause as to Exhibit 47, he still could not overcome the procedural default as to that aspect of Claim III.B.ii.a because he cannot show prejudice. Again, the test for prejudice is whether there is a reasonable probability that his conviction or sentence would have been different had his counsel objected to the admission of Gaston's purse at trial. Taylor has failed to make such a showing here. As an initial matter, there is no indication that the jury examined the contents of Gaston's purse, nor was there really any reason for them to do so, given that the only testimony they heard about the purse was that it contained Sherry Gaston's driver's license, plus credit cards, "[a]ssorted change, some jewelry, keys, wallet, pager, a novel, a checkbook register" with no name, and "[a]ssorted health items." (Vol. 5, R-15 at 663.) The State did not appear to highlight the purse or encourage the jurors to examine its contents during closing arguments. Even if the jury did look at the purse, the damaging items in that purse (family photos, children's birth certificates and Christmas wish lists, shopping receipts) were not so (Continued)

-60-

In light of Taylor's failure to establish cause for his failure to present this claim to the state courts in a timely manner, he cannot overcome the procedural default. For that reason, Claim III.B.ii.a is not properly before this Court and will not be considered on the merits in this federal habeas proceeding.

8. *Ineffective Assistance Claims Relating to Mitigation (Claim III.C).*

In Claim III.C of his § 2254 petition, Taylor identifies numerous respects in which he contends trial counsel rendered ineffective assistance in connection with the penalty phase of his trial. The many subclaims encompassed within the boundaries of Claim III.C include Claim III.C.i (failure to investigate potential mitigation evidence), Claim III.C.ii.a (failure to present evidence about Taylor's difficult childhood), Claim III.C.ii.b (failure to present evidence about Taylor's mental health and functional/cognitive impairments), Claim III.C.ii.c (failure to present evidence about Taylor's environmental and social background, such as his neighborhood, mother and father), Claim III.C.ii.d (failure to elicit testimony about Taylor's son, and his relationships with friends and co-workers), and Claim III.C.iii (failure to prepare and obtain helpful testimony from witnesses who testified for the defense during penalty phase). Most aspects of these specific claims were first presented in Taylor's disallowed Second Amended R32 Petition; therefore, to the extent these claims (and the numerous subclaims they contain) are not sufficiently embodied in his First Amended R32 Petition, they are procedurally defaulted.[57]

---

prejudicial that there was a reasonable probability the outcome would have been different had Taylor's lawyers objected and the evidence been excluded. The jury had already heard that the murders occurred at Christmastime, and that Sherry Gaston had been a mother of young children at the time she was shot to death. The contents of the purse merely confirmed what the jury already knew; therefore, counsel's failure to object to admission of these items cannot and does not constitute prejudice sufficient to overcome the procedural default.

[57] The critical distinction to be drawn here is that Taylor purported to assert a claim of ineffective assistance of counsel as to the penalty phase in his Corrected First Amended R32 Petition. (Vol. 22, R-56 at ¶¶ 162-75.) In that petition, Taylor asserted that his counsel was "grossly ineffective at the penalty phase" because counsel "called only four witnesses" (*id.*, ¶ 164), failed to call Taylor's brother Jeff Taylor (*id.*, ¶ 165), "failed to establish mitigating facts relating to Mr. Taylor's relationship with his young son" (*id.*, ¶ 166), failed to interview family members or other witnesses and "failed to procure necessary records documenting Mr. Taylor's life" (*id.*, ¶ 168), failed "to obtain the services of a psychiatric expert" (*id.*, ¶ 169), and failed to hire a mitigation expert to conduct a psychosocial assessment (*id.*, ¶ 171). To the extent the federal claims set forth above are adequately embodied in these claims actually presented in (Continued)

To show cause for the procedural default as to his failure to present these claims to state courts on post-conviction review prior to the entry of the 2005 judgment, Taylor lays the blame squarely at trial counsel's feet. Taylor explains the reason why he could not present these claims in his original or first amended Rule 32 petitions was "the ineffectiveness of his Trial Counsel," which, Taylor says, created a situation in which "habeas counsel needed to do far more work (and devote far more time) to investigate potential mitigation evidence than would have been necessary had Trial Counsel done even a bare minimum of work." (Doc. 43, at 63-64.) This argument is unpersuasive. To be sure, the Court recognizes that constitutionally ineffective assistance of counsel may be an objective factor that constitutes cause. *See, e.g., Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) ("an ineffective-assistance-of-counsel claim, if both exhausted and not procedurally defaulted, may constitute cause"). Here's the rub: Present habeas counsel have represented Taylor at least as far back as July 2002, when they filed Taylor's original Rule 32 petition. (Vol. 18, R-52 at 16-124.) In that Rule 32 petition, habeas counsel devoted 15 paragraphs and 6½ pages to arguing that "Trial Counsel Failed to Provide Effective Assistance at Sentencing Phase." (*Id.* at ¶¶ 158-72.) Thus, habeas counsel was on notice of trial counsel's alleged infirmities at the sentencing phase and had more than three full years to investigate, develop and flesh out those claims prior to the Circuit Court's entry of a final order of dismissal on August 1, 2005. (Vol. 53, R-122.) Although Taylor failed to do so, his omissions in that regard cannot reasonably be pinned on trial counsel, and he provides no explanation for any contention that he could not have investigated and fully presented his mitigation claims during the 2002-2005 period. Petitioner thus has not satisfactorily shown that his failure to present all his claims of ineffective assistance at sentencing prior to the August 2005 judgment was the product of ineffective assistance by Taylor's trial counsel, much less that the factual or legal bases for those claims were not reasonably available to habeas counsel until sometime after August 2005.

---

Taylor's Corrected First Amended R32 Petition, they would not be subject to the procedural bar stemming from Taylor's failure to assert such claims to the state courts prior to the 2005 judgment. Those aspects of Claim III.C will be addressed on the merits *infra*, unless they lie within the ambit of the Rule 28(a)(10) procedural bar.

Inasmuch as Taylor has failed to show cause to excuse the procedural default, the ineffective assistance claims embedded within Claim III.C of his § 2254 Petition cannot be heard herein to the extent the state courts deemed them procedurally barred as having been presented for the first time in his Second Amended R32 Petition.

### 9.   *Summary.*

In light of the foregoing cause-and-prejudice analysis, none of Taylor's claims that were procedurally defaulted by the state courts for noncompliance with Rule 28(a)(10) or for not being raised until the disallowed Second Amended R32 Petition or Revised Second Amended R32 Petition may be heard in these federal habeas proceedings.[58]  All claims (and portions of claims) subject to those procedural defaults are barred and will not be considered on the merits here.  The Court will now address the merits (along with any exhaustion issues) relating to Taylor's remaining claims on a claim-by-claim basis.

## IV.   MERITS AND EXHAUSTION ISSUES FOR REMAINING CLAIMS.

In light of the foregoing determinations as to procedural default, many of the claims presented in Taylor's § 2254 Petition cannot and will not be addressed on the merits.  That said, various claims (in whole or in part) withstand the procedural bars arising from the Rule 28(a)(10) waiver of certain of Taylor's claims, as determined by the Alabama Court of Criminal Appeals, and the disallowance of Taylor's Second Amended R32 Petition and Revised Second Amended R32 Petition by the Alabama courts.  Of the remainder, certain claims were plainly exhausted

---

[58]     A particularly observant reader may perceive that the Court has not addressed petitioner's cause-and-prejudice arguments presented in Section III.G of his reply brief.  (Doc. 43, at 66-68.)  The omission is intentional.  In that section of his brief, Taylor set forth a cause-and-prejudice argument to overcome a procedural default as to Claim XI.A.i (death penalty unconstitutional because it is cruel and unusual punishment) and Claim XI.A.iii (death penalty unconstitutional because it does not further penological goals) from his § 2254 Petition.  Neither of these claims was ever presented to the state courts in Taylor's Rule 32 proceedings.  Taylor does not suggest otherwise in his cause-and-prejudice discussion.  (*See* doc. 43, at 66.)  As such, these claims are not properly addressed in the section of Taylor's § 2254 briefing concerning claims presented in his Second Amended R32 Petition or Revised Second Amended R32 Petition, but that the state courts declined to allow him to litigate for state-law procedural reasons.  Again, neither Claim XI.A.i nor Claim XI.A.iii were presented in Taylor's Second Amended R32 Petition or Revised Second Amended R32 Petition; therefore, the Court's cause-and-prejudice analysis will not reach them at this time.  Rather, the undersigned will address those claims *infra* in the context of the merits/exhaustion discussion.

and addressed on the merits, in whole or in part, by Alabama courts either on direct appeal or in Rule 32 proceedings. Other claims were not raised until the disallowed Second Amended R32 Petition, or were never raised to the state courts at all, but Taylor maintains they merely provide additional factual support for previously asserted claims, or that they otherwise comport with baseline exhaustion requirements, such that they should be considered on the merits now. Those claims and issues will be addressed one by one.

The remaining claims (or portions of claims) requiring individualized analysis of merits and/or exhaustion issues consist of the following: (i) Claim I (*Batson* claim alleging racially biased use of peremptory strikes by the State); (ii) Claims II.A.i, II.A.ii.a, II.B.i, II.B.ii, II.B.iii and II.C (prosecutorial misconduct); (iii) Claim II.A.ii.b (prosecutorial misconduct in securing false testimony from Clark); (iv) Claim II.D (cumulative error as to prosecutorial misconduct); (v) Claim III.B.i (ineffective assistance of counsel in failing to present evidence that Taylor was not present at the time of the murders); (vi) Claim III.B.iii.a (ineffective assistance of counsel in impeaching McMillan about events at Steve Dyas Motors); (vii) Claim III.B.iii.b (ineffective assistance of counsel in impeaching McMillan via other witnesses' accounts); (viii) Claim III.B.iii.c (ineffective assistance of counsel in impeaching McMillan using physical evidence at the scene); (ix) Claim III.B.iv.a (ineffective assistance of counsel in failing to present evidence concerning McMillan's access to murder weapon); (x) Claim III.B.iv.b (ineffective assistance of counsel in failing to present evidence concerning pressure on the Carlton sisters); (xi) Claim III.B.v (ineffective assistance of counsel in failing to elicit testimony from Clark and Lewis regarding McMillan confessions); (xii) Claim III.C (ineffective assistance of counsel during penalty phase); (xiii) Claim III.D (ineffective assistance of counsel as to motion for new trial); (xiv) Claim III.F (cumulative ineffective assistance of counsel); (xv) Claim V.A (improper jury instructions during guilt phase); (xvi) Claim V.B (improper jury instructions during penalty phase); (xvii) Claim VI (sufficiency of the evidence); (xviii) Claim VII (consideration of improper evidence at sentencing); (xix) Claim X (alleged improprieties in Rule 32 proceedings); (xx) Claim XI.A.i (death penalty is cruel and unusual punishment); (xxi) Claim XI.A.iii (death penalty does not further penological goals); (xxii) Claim XI.B.i (constitutionality of Alabama's judicial override provision); (xxiii) Claim XI.B.ii (*Ring/Apprendi/Hurst v. Florida*); (xxiv) Claim XI.C.ii. (override in this case violated *Ring/Apprendi/Hurst*); and (xxv) Claim XI.D

(constitutionality of Alabama's method of execution). Each claim or subclaim will be analyzed in turn.

### A. Claim I (Race Discrimination in State's Peremptory Strikes).

Taylor claims that the State exercised its peremptory challenges in a racially discriminatory manner, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In so arguing, Taylor maintains that "[t]he State's exercise of seven of its first eight peremptory challenges to remove black venire members ... itself established a *prima facie Batson* violation." (Doc. 25, ¶ 45.) Taylor further argues that the *prima facie* case for a *Batson* violation is bolstered by the State having "struck those black venire members in sequential ascending order by their assigned jury number," and because "the Mobile County District Attorney's Office had a history of exercising unconstitutional peremptory challenges." (*Id.*, ¶¶ 50-51.)

The trial record reflects that each side was afforded 12 peremptory strikes during jury selection. (Vol. 4, R-9 at 518.) By Judge Johnstone's count (corroborated by counsel for both sides), approximately 19 of the 60 original venirepersons (or 31.7%) were African-American. (*Id.* at 522-23.) After the parties utilized all of their peremptory challenges (with the State using 7 of its allotted 12 on African-American jurors, and the defense using all 12 of its challenges to strike white jurors), the jury of 12 that was ultimately seated for trial included five African-Americans (or 41.7%). (*Id.* at 524-26.) Defense counsel then asserted a *Batson* objection on the grounds that the State used seven of its first eight peremptory challenges to strike African-Americans from the venire. (*Id.* at 524-25.) In articulating this *Batson* objection, Taylor's attorneys repeatedly acknowledged that "according to the numbers it doesn't meet the predicate proof which would require the state to show race neutral reasons." (*Id.* at 523-24.) Indeed, defense counsel conceded to the trial judge that their *Batson* argument lacked even a *prima facie* predicate showing that might obligate the State to articulate race-neutral reasons, to-wit:

> "I believe we have to make a predicate showing that representation of blacks on the jury that is selected underrepresents the total number of blacks that were on the venire. That is simply not the case. In fact, the black representation on the jury is more than the percentage of the total black ... potential jury members when we started this .... [W]e can't make, according to my numbers, the predicate showing that would then shift the burden."

(*Id.* at 526.) The trial judge then ruled, "I don't see a trace of racism in this case and, therefore, I am overruling the *Batson* challenge." (*Id.* at 527.)

In deciding the *Batson* issue in this manner, the trial court concluded that Taylor had not made a *prima facie* showing of race-based use of peremptory challenges, as required to shift the burden to the State to present race-neutral explanations for its strikes.[59]  On direct appeal, the Alabama Court of Criminal Appeals found no error in the trial court's ruling, given that (i) "Defense counsel admitted four times that he did not believe he had presented a *prima facie* case of racial discrimination;" and (ii) "[t]he fact that the prosecution used 7 of its 12 strikes against black veniremembers was not alone sufficient to require the prosecution to provide race-neutral reasons for its strikes."  *Taylor v. State*, 802 So.2d 1148, 1163 (Ala.Crim.App. 2000).  The appellate court was not swayed by evidence that the State had used seven of its first eight strikes on African-American venire members, reasoning that "[t]his does not overcome the fact that, according to the numbers offered by the defense at trial, the prosecution struck only 7 of the 13 black jurors on the venire."  *Id.* at 1164.

Under the deferential § 2254(d) standard of review, the Court finds that Taylor is not entitled to habeas relief on his *Batson* claim of racially discriminatory strikes.  In evaluating whether a *prima facie* case has been made, the Eleventh Circuit has cautioned that "courts must consider all relevant circumstances," that "no particular number of strikes against blacks automatically indicates the existence of a *prima facie* case," and that statistical evidence must be placed in context (including "the racial composition of the venire" and "the race of others struck").  *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044 (11th Cir. 2005) (citations

---

[59]  "*Batson* requires a court to undertake a three-step analysis to evaluate equal protection challenges to a prosecutor's use of peremptory challenges."  *McGahee v. Alabama Dep't of Corrections*, 560 F.3d 1252, 1256 (11th Cir. 2009).  "First, the trial court must determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race. ... Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. ... Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination."  *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (20060 (citations omitted).  Judge Johnstone's ruling was that defense counsel failed to satisfy the first step of that analysis; therefore, under applicable law, there was no need to proceed further.  *See, e.g., United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1038 (11th Cir. 2005) ("Our precedent makes clear that the establishment of a *prima facie* case is an absolute precondition to further inquiry into the motivation behind the challenged strike.") (citation and internal quotation marks omitted).

omitted).[60]  For purposes of this inquiry, important considerations include "whether members of the relevant racial or ethnic group served unchallenged," "whether the striker struck all of the relevant racial or ethnic group from the venire," "whether there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire," and "whether there is a substantial disparity between the percentage of jurors of one race … struck and the percentage of their representation on the jury." *Id.* at 1044-45 (citations omitted).  Also, appellate courts "give great deference to a district court's finding of whether a *prima facie* case of impermissible discrimination has been established."  *Id.* at 1039 (citation omitted).

Here, the undisputed evidence is that five African-Americans served on the jury unchallenged by the State, that the State used only seven of its 12 peremptory strikes on African-Americans, and that the ratio of African-Americans seated on the final jury (41.7%) was higher than the ratio of African-American veniremembers in the initial pool of 60 (31.7%).  In light of these circumstances, as well as defense counsel's contemporaneous acknowledgment that no *prima facie* case of racially discriminatory strikes had been made, the Court does not find that the Alabama courts' denial of Taylor's *Batson* claim based on race discrimination was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  No habeas relief is warranted on this claim.[61]

---

[60]  *See also United States v. Walker*, 490 F.3d 1282, 1292 (11th Cir. 2007) ("striking members of only one race does not always create an inference of purposeful discrimination"); *Presley v. Allen*, 2008 WL 1776570, *4 (11th Cir. Apr. 21, 2008) ("Although the statistics presented are suggestive of discrimination, in that the state struck all but one of the black members of the venire and used 78% of its strikes against females, the Alabama Supreme Court's determination that the statistics were not enough given the facts of this case was not objectively unreasonable.").

[61]  Four additional observations are appropriate at this time.  First, while Taylor makes much of the fact that the State exercised seven of its first eight strikes on African-American veniremembers, he identifies no authority for the proposition that cherry-picking the most favorable extracts from the data, while ignoring the remainder, is analytically appropriate.  As a matter of well-settled law, it is not the case that only the most favorable subset of the State's peremptory strikes should be scrutinized in a *Batson* statistical analysis; to the contrary, doing so would run afoul of the admonition that "[w]hile statistical evidence may support an inference of discrimination, it can do so only when placed in context."  *Ochoa-Vasquez*, 428 F.3d at 1044 (citations and internal quotation marks omitted).  The Court of Criminal Appeals considered that fact in context, correctly pointing out that the State's stretch of seven of eight strikes used against (Continued)

**B. Claims II.A.i, II.A.ii.a, II.B.i, II.B.ii, II.B.iii, and II.C (Prosecutorial Misconduct).**

As his second category of grounds for habeas relief, Taylor brings a spate of claims of prosecutorial misconduct. Among the subclaims under this heading are the following: (i) Claim II.A.i, which is a claim that "[t]he State pressured Mr. McMillan to distort his testimony" by "threatening Mr. McMillan with the death penalty if he did not cooperate by perjuring himself" (doc. 25, ¶ 61); (ii) Claim II.A.ii.a, which is a claim that the State "harassed and intimidated" Tiffany Carlton into testifying that she saw Taylor with a gun on the day of the murders (*id.*, ¶¶

---

African-Americans did not overcome the broader narrative, which was that the State only used seven peremptory challenges (out of 12 total) to strike black venirepersons, and that there were five blacks on the final jury. The Court cannot say that the state appellate court's reasoning in applying *Batson* principles to these circumstances was so lacking in justification that it was beyond any possibility for fairminded disagreement. Second, in his § 2254 petition, Taylor raises what appears to be a new *Batson* argument that "at the time of Mr. Taylor's trial, the Mobile County District Attorney's Office had a history of exercising unconstitutional peremptory challenges." (Doc. 25, ¶ 51.) To the extent that Taylor never presented this ground for his *Batson* claim to the state courts, it is improperly raised in his federal habeas proceedings. *See, e.g., Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008) (to satisfy exhaustion and fair presentation requirements, "we do require that a petition presented his claims to the state courts such that *a reasonable reader would understand each claim's* particular legal basis *and specific factual foundation*") (citation omitted and emphasis added). A § 2254 petition is not the appropriate time to present a new, previously available factual predicate in support of a federal constitutional claim for the first time. Third, even if this argument that the District Attorney's Office had a history of *Batson* violations were properly made, it is wholly unpersuasive. Taylor cites two cases noting a pattern of jury strikes against black venire members in Mobile County in the late 1980s and early 1990s. Taylor's jury selection occurred in August 1998, under the authority of a different Mobile County District Attorney than was in office at the times referenced in the opinions on which Taylor relies. Petitioner identifies no evidence linking any of the particular prosecutors involved in his jury selection to any pattern of racially discriminatory challenges at any time. That someone in the Mobile County District Attorney's Office may have been accused of racially biased jury strikes many years earlier says nothing about whether a *prima facie* case of a *Batson* violation existed in Taylor's case. *See Whatley v. State*, 146 So.3d 437, 457 (Ala.Crim.App. 2010) (finding no error in circuit court's observation "that the current Mobile County District Attorney's Office did not have a history of violating *Batson* and that the cases cited by the defense for this proposition were cases tried under a former administration"). Fourth, insofar as Taylor would point to the State's use of peremptory challenges to strike female veniremembers as evidence of a general discriminatory intent to prop up his race discrimination theory, the record unequivocally rebuts any such inference, inasmuch as 12 of the 14 jurors (including alternates) who served in Taylor's trial were women.

70-71); (iii) Claim II.B.i, which is a claim that the State suppressed critical impeachment evidence of McMillan's credibility by neither producing the "talking points" to the defense nor apprising the defense that such talking points had been given to McMillan (*id.*, ¶ 81); (iv) Claim II.B.ii, which is a claim that "[t]he State never disclosed to Mr. Taylor the pressure it exerted upon Mr. Clark to recant his truthful testimony" (*id.*, ¶ 86); (v) Claim II.B.iii, which is a claim that "[t]he State never disclosed to Mr. Taylor the fact or results of the lie detector test it administered to Tiffany Carlton, nor its numerous visits to the Carlton sisters and attempts to pressure them to testify falsely" (*id.*, ¶ 89); and (vi) Claim II.C, which is a claim of prosecutorial misconduct relating to the State's introduction into evidence of the duffel bag and wallet containing documents evidencing Taylor's prior bad acts (*id.*, ¶¶ 92-102).

This Court has already held, *supra*, that insofar as these claims were presented to the state courts only through Taylor's Second Amended R32 Petition or Revised Second Amended R32 Petition, they are procedurally barred from consideration in these § 2254 proceedings. In his Reply, however, Taylor insists that "[t]he allegations in the Federal Petition detailed in Claims II.A.i, II.A.ii.a., II.B.i, II.B.ii, II.B.iii, and II.C fall squarely within" the scope his Corrected First Amended R32 Petition. (Doc. 43, at 26.)[62] This assertion requires scrutiny. If, in fact, petitioner adequately raised and fairly presented those claims in his Corrected First Amended R32 Petition, then such claims would fall outside the scope of the procedural bar resulting from the state courts' disallowance of the Second Amended R32 Petition or Revised Second Amended R32 Petition. In other words, if Taylor is correct, then these enumerated claims of prosecutorial misconduct actually were presented in iterations of his Rule 32 Petition that the state courts allowed, such that they were not procedurally defaulted and are properly considered on the merits in federal habeas review.

According to Taylor, these claims of prosecutorial misconduct are found "within the claim alleged in the Corrected First Amended Petition that the State failed to comply with its *Brady* and *Giglio* obligations." (Doc. 43, at 26.) In that petition, which was filed in state post-conviction proceedings in May 2003 (nearly five years after Taylor's trial, conviction and

---

[62] Later in his Reply, petitioner reiterates his argument that "Mr. Taylor's claim that the State failed to close material impeachment evidence relating to Mr. Clark's testimony (Claim II.B.ii) was exhausted during Rule 32 proceedings." (Doc. 43, at 49.) In repeating this argument, however, Taylor does not expound on it in any meaningful way.

sentence), Taylor asserted a claim captioned, "The State Apparently Failed To Comply With Its Discovery Obligations Under *Brady v. Maryland*" (vol. 22, R-56 at 952). In that claim, Taylor generically pleaded *Brady / Giglio* principles, then recited potential, unspecified violations based on unidentified information the State "may have withheld," including the following:

> "[T]he State may have withheld information regarding Warden Rick Gaston and conversations concerning the recanted testimony of Bryann Scott Clark. Further, the State may have withheld information regarding Kenyatta McMillan's statements to the police. The State may also have withheld information regarding interviews with Cherelle Carlton and Tiffany Carlton."

(Vol. 22, R-56, at 952 ¶ 239.) No further details or clarifications were set out. Thus, in this Corrected First Amended R32 Petition, Taylor offered only vague, shadowy allegations about potential or apparent or possible or hypothetical *Brady* or *Giglio* issues concerning Clark, McMillan and Carlton. He failed to identify what those issues were, or even affirmatively to plead the existence of undisclosed exculpatory information. Instead, in what was nothing more than an obvious placeholder, Taylor simply pleaded that "the State may have withheld" something at some time related in some ambiguous and unstated way to those witnesses' testimony. And he said nothing about the duffel bag and wallet.

As pleaded in his Corrected First Amended R32 Petition, Taylor was essentially asking the state courts to read his mind, rule on the basis of mere innuendo and speculation, and foretell the future for what he might someday allege the State had done wrong. Such a "maybe-the-State-didn't-tell-us-something" claim in Taylor's Rule 32 petition falls well short of satisfying fundamental principles of fair presentment and exhaustion. As noted, "[f]or a federal claim to be exhausted, the petitioner must have fairly presented it to the state courts." *Lucas v. Secretary Dep't of Corrections*, 682 F.3d 1342, 1351 (11th Cir. 2012) (citation and internal marks omitted). Thus, a state petitioner must "fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Raleigh v. Secretary, Florida Dep't of Corrections*, 827 F.3d 938, 956 (11th Cir. 2016) (citation omitted). "Fair presentment" does not mean reciting an oblique reference to Supreme Court precedent and suggesting in the vaguest of terms that the State "may have" violated it in some unspecified way. Rather, what is required is that the petitioner "present his claims to the state court such that a reasonable reader would understand each claim's particular legal basis ***and specific factual foundation***. … Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick." *French v. Warden, Wilcox State Prison*, 790 F.3d 1259,

1270-71 (11th Cir. 2015) (citations omitted and emphasis added); *see also Gray v. Netherland*, 518 U.S. 152, 163, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) ("for purposes of exhausting state remedies, a claim for relief in habeas corpus must include … a statement of the facts that entitle the petitioner to relief").

Claims II.A.i, II.A.ii.a, II.B.i., II.B.ii, II.B.iii and II.C. were not fairly presented to the Alabama courts in the Corrected First Amended R32 Petition because no factual predicate was provided. Taylor submitted no facts to the state courts that, if proven, might entitle him to relief. Indeed, he did not give them any factual foundation for these *Brady / Giglio* claims at all, but merely suggested in the vaguest of terms that the State "may have" violated disclosure requirements. The net result, of course, is that these hollow, conclusory claims as submitted in the Corrected First Amended R32 Petition did not give the Alabama courts a fair opportunity to pass on them and correct any *Brady / Giglio* violations that may have occurred. Taylor did not fairly present the substance of these claims to the state courts on Rule 32 review in any allowed petition; therefore, those claims are not exhausted because they do not satisfy threshold "fair presentment" requirements to being adjudicated in federal habeas proceedings.

### C.     Claim II.A.ii.b (Prosecutorial Misconduct as to Clark's False Testimony).

In Claim II.A.ii.b, Taylor alleges that the State engaged in prosecutorial misconduct by "threaten[ing] Mr. Clark in order to obtain a perjured recantation of his truthful trial testimony." (Doc. 25, ¶ 76.) The Court has already found, *supra*, that this claim is procedurally barred insofar as Taylor raised it for the first time in his disallowed Revised Second Amended R32 Petition.

In his Reply, Taylor maintains that he fairly presented this claim to Alabama state courts prior to the Revised Second Amended R32 Petition. Specifically, he says he "raised the claim on direct appeal" (doc. 43, at 49), such that it is not procedurally barred. The record does not support Taylor's contention of fair presentment. On direct appeal, Taylor delineated the following assignment of error: "The trial court reversibly erred to allow the State to reopen its case and present perjured testimony, and further erred." (Vol. 12, R-42 at 49.) Taylor's brief on direct appeal went on to argue that Judge Johnstone abused his discretion under Alabama law in reopening the case to allow the State to call Clark back to the stand to testify a second time at trial. (*Id.* at 55-57.) In the same brief, Taylor also argued that Judge Johnstone had erred under Alabama law in denying Taylor's motion for new trial based on perjured testimony by Clark.

(*Id.* at 58-61.) Taylor now maintains that, based on these arguments on direct appeal, the state courts had a "full opportunity" to resolve his *Giglio* claim for prosecutorial misconduct based on the State's knowing use of perjured testimony by Clark, as set forth as Claim II.A.ii.b in his § 2254 petition.

The Court finds that Taylor is not entitled to relief on Claim II.A.ii.b for at least three independent reasons. First, the claim is procedurally barred because petitioner did not raise it on direct appeal, but presented it for the first time in his disallowed Revised Second Amended R32 Petition. Taylor's contention that he fairly presented this claim on direct appeal is counterfactual. A fair reading of his brief on direct appeal would not have placed the Alabama Court of Criminal Appeals on notice that Taylor was pursuing a *Giglio* claim of misconduct by the State in knowingly presenting perjured testimony;[63] rather, the brief identifies Taylor as bringing state-law claims for abuse of discretion by the trial court in reopening the case to allow Clark to testify a second time and denying his motion for new trial. Under well-settled law, "[t]he ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." *French*, 790 F.3d at 1271 (citation omitted); *see also Lucas*, 682 F.3d at 1352 ("to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues") (citation omitted). Taylor's direct appeal did not squarely, plainly define any *Giglio* claim relating to Clark's testimony; rather, he merely advanced a "somewhat similar state-law claim," *Lucas*, 682 F.3d at 1352 (citation omitted), which is not good enough.[64] Claim II.A.ii.b was not fairly presented on direct appeal.

---

[63] Not surprisingly, given the manner in which Taylor presented these claims on direct appeal, the Court of Criminal Appeals' opinion confirms that it never appreciated any *Giglio* claim being presented by Taylor on direct appeal. *See Taylor*, 808 So.2d at 1170-71 (examining Taylor's claims of error by the trial court in allowing the State to reopen the case and denying the motion for new trial based on Clark's testimony, and relying solely on Alabama authorities and Alabama legal principles, without recognizing any *Giglio* component).

[64] It is no effective response to argue, as Taylor does, that sufficient notice of the character of these claims was conferred because, buried in the 12-page analysis and argument of what Taylor said were Judge Johnstone's errors under Alabama law in reopening the case and denying the motion for new trial, defense counsel included a conclusory statement that reopener of the case to allow Clark to testify again "denied Mr. Taylor his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United State Constitution, the equivalent portions of the Alabama Constitution, and Alabama law." (Vol. 12, R-42 at 57-58.) A string-cite to five constitutional amendments does not amount to "plainly defining" a federal (Continued)

Second, even if Claim II.A.ii.b had been properly exhausted on direct appeal (which it was not), this claim would fail on the merits because it suffers from a faulty factual premise. Again, Claim II.A.ii.b is that "The State Threatened and Secured False Testimony From Bryann Scott Clark." (Doc. 25, at 27.) Upon hearing testimony from both Clark himself and Warden Gaston (the State agent who purportedly threatened Clark and Clark's family unless he recanted), Judge Johnstone made specific credibility determinations and findings of fact on the record, including the following: (i) Clark's testimony suffered from "a real credibility problem," lacked corroboration, "was sometimes conflicting in fairly serious ways," was undermined by his "status as a convicted attempted murderer and his gang affiliation," and "seems awfully weak;" (ii) the trial judge was "inclined to believe Warden Gaston's testimony," inasmuch as "Warden Gaston …, as between the two witnesses, appears to be by far the more credible;" and (iii) "the conflict in testimony should be resolved in favor of the position taken by Warden Gaston that he did not precipitate the recantation." (Vol. 10, R-40 at 1710-13.) Those credibility determinations and findings of fact are presumed correct on federal habeas review, unless rebutted by the petitioner via clear and convincing evidence, which Taylor has not submitted. *See Daniel v. Commissioner, Alabama Dep't of Corrections*, 822 F.3d 1248, 1259 (11th Cir. 2016) ("We also presume findings of fact made by state courts are correct, unless a petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1)."). Thus, Claim II.A.ii.b fails on the merits based on the AEDPA deference accorded to the state court's findings of fact and the absence of clear and convincing evidence to the contrary.

Third, separate and independent from the foregoing, the elements of a *Giglio* violation simply are not shown on this record. "To establish a *Giglio* claim, a habeas petitioner must prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there is any reasonable likelihood that the false testimony could … have affected the judgment." *Guzman v.*

---

constitutional claim for exhaustion purposes. *See, e.g., Pope v. Secretary v. Dep't of Corrections*, 680 F.3d 1271, 1286 (11th Cir. 2012) (noting that a "general allegation of ineffective assistance" will not immunize a petitioner from procedural default) (citation omitted); *McNair*, 416 F.3d at 1303 (cursory "references to federal law in his state habeas proceedings are exactly the type of needles in the haystack that we have previously held are insufficient to satisfy the exhaustion requirement").

*Secretary, Dep't of Corrections*, 663 F.3d 1336, 1348 (11th Cir. 2011) (citation and internal quotation marks omitted). Taylor has shown neither of these elements. He has identified no facts or law that might connect any undue pressure exerted by Warden Gaston back to the State's attorneys, much less any indication that the prosecutors were ever aware that Clark's recantation was false. Nor has Taylor made any showing of materiality; indeed, that element would appear to be squarely defeated by Judge Johnstone's observations that Clark's original testimony was mostly cumulative of that of another testifying witness (Robert Nolin) and that "the credibility of Clark … was so weak at the trial itself that the likelihood that that testimony, whether recanted or not, would make much difference is remote." (Vol. 10, R-40 at 1714.)[65] Thus, even if Claim II.A.ii.b were not procedurally barred (which it is), and even if Taylor had come forward with clear and convincing evidence to rebut the presumption of correctness attached to the trial court's factual findings (which he did not), the elements of a *Giglio* claim still would not be satisfied and Taylor would not be entitled to habeas relief on Claim II.A.ii.b.

> **D.** **Claim II.D (Cumulative Error as to Prosecutorial Misconduct).**

In Claim II.D of his § 2254 Petition, Taylor argues that "the cumulative effect of the State's misconduct certainly rises to the level of depriving Mr. Taylor of a fair trial." (Doc. 25, ¶ 103.) The fundamental problem with this claim is that the Court has already concluded that every single claim in Claim II.A, II.B and II.C is procedurally barred. Taylor may not circumvent the procedural bar by repackaging these improper claims under the heading of "cumulative error." If the underlying claims are procedurally barred (which they are), then the cumulative error claim based on those underlying claims likewise fails as a matter of law. *See, e.g., Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005) (finding that "Petitioner's cumulative

---

[65] The Alabama Court of Criminal Appeals echoed these sentiments on direct appeal, reasoning that "[t]he jury had already heard both versions of Clark's testimony at trial and was in the best position to determine which version to believe," and "his original testimony was cumulative with his fellow prisoner, Nolin, who also testified at trial." *Taylor*, 808 So.2d at 1171. Neither the trial judge nor the Alabama appellate courts thought much of Clark's testimony, whether recanted or not; thus, there is no reasonable likelihood that Taylor's convictions or sentences would have turned out differently even if Clark's third version of the truth had been given to the jury.

error claim is barred from federal habeas review" because "claims that are procedurally barred … cannot be cumulated") (citation and internal marks omitted).[66]

At any rate, even if Taylor had asserted claims of prosecutorial misconduct that were exhausted and not procedurally defaulted, none of those claims have any merit; therefore, his cumulative error claim fails, as a matter of law. *See, e.g., Morris v. Secretary, Dep't of Corrections*, 677 F.3d 1117, 1132 (11th Cir. 2012) ("Plainly, Morris's cumulative error claim must fail. … [N]one of Morris's individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate."); *United States v. Taylor*, 417 F.3d 1176, 1182 (11th Cir. 2005) ("There being no error in any of the district court's rulings, the argument that cumulative trial error requires that this Court reverse Taylor's convictions is without merit.").

Petitioner is not entitled to habeas relief on Claim II.D.

### E.     Claim III.B.i (Ineffective Assistance in Failing to Present Evidence that Taylor Was Not Present at Time of Murders or that McMillan Acted Alone).

Moving into the realm of ineffective assistance of trial counsel, Taylor's § 2254 Petition alleges that "Trial Counsel Failed to Investigate and Present Evidence That Mr. Taylor Was Not Present at Steve Dyas Motors During the Murders and That Mr. McMillan Had the Opportunity to Commit the Murders Without Mr. Taylor." (Doc. 25, at 63.) This claim, in turn, may be disaggregated into four distinct subclaims, to-wit: (i) Claim III.B.i.a (failure to elicit testimony from Blake and Stevee Martin that the Ford Mustang which Taylor stole from the dealership was not present at Steve Dyas Motors at 6:50 p.m., the time of the gunshots); (ii) Claim III.B.i.b (failure to present evidence from Steve "Blue" Blackmon and a man named "Black" placing Taylor miles away from Steve Dyas Motors minutes after gunshots were heard and separating

---

[66]     *See also Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) (rejecting habeas petitioner's claim of cumulative error on the ground that "[b]ecause he has pointed to no errors that involve matters of constitutional dimension and that are procedurally preserved for review, he has presented nothing to cumulate"); *Ray v. Simmons*, 125 Fed.Appx. 943, 946-47 (10th Cir. Feb. 7, 2005) ("in a cumulative error analysis, a court … may not consider claims that are procedurally defaulted"); *Hannon v. Secretary, Dep't of Corrections*, 622 F. Supp.2d 1169, 1239 (M.D. Fla. 2007) ("As all of Hannon's individual claims are either procedurally barred or without merit, his cumulative error claim must fail."); *Womack v. United States*, 2012 WL 3206458, *11 (S.D. Ala. June 6, 2012) ("having found … (1) that all the non-ineffective-assistance-of-counsel claims asserted in the petitioner's motion are procedurally barred; and (2) that none of those claims are grounds for the petitioner's ineffective-assistance-of-counsel claim, his claim of cumulative error must also fail") (citations and internal quotation marks omitted).

Taylor from McMillan for a key 30-45 minute window); (iii) Claim III.B.i.c (failure to present evidence from Lugene and Barbara Wallace, Taylor's father and stepmother, that Taylor visited them alone that evening driving a new car, leaving McMillan alone at Steve Dyas Motors to commit the murders); and (iv) Claim III.B.i.d (failure to utilize the above evidence to present a theory that Taylor was not present at Steve Dyas Motors and that McMillan had the opportunity to commit the murders and dispose of the murder weapon in Taylor's absence). Claims III.B.i.a and III.B.i.c were raised for the first time in Taylor's Second Amended R32 Petition (Vol. 34, R-93, ¶¶ 141, 153, 154). Taylor has not contended that he raised them earlier; therefore, those claims are procedurally defaulted pursuant to the analysis set forth in Section III.A., *supra*, of this Order.

With respect to Claim III.B.i.b, Taylor maintains that "[t]his claim, in fact, was raised in … the Corrected First Amended [R32] Petition." (Doc. 43, at 35.) A fair reading of that Petition does not support petitioner's argument. At best, Taylor's Corrected First Amended R32 Petition cited trial testimony in which a State's witness named Doneshia Matthews testified that Taylor arrived at her home alone in the Mustang between 6:00 and 6:10 p.m. and that "[a] guy we call Blue" was outside looking at the vehicle. (Vol. 6, R-15 at 845, 856.) In his Corrected First Amended R32 Petition, Taylor argued only that "trial counsel made no effort to locate and interview 'Blue' to verify Matthews's version of the events." (Vol. 22, R-56 at ¶ 143.) That scant one-sentence statement falls well short of comporting with principles of fair presentment and exhaustion as to Claim III.B.i.b from Taylor's § 2254 Petition.[67] Taylor did not identify for the state courts what Blue's name really was, whether Blue could have been located, what Blue would have said if counsel had found and interviewed him before trial, and so on. Nor did Taylor's Rule 32 petition make even the slightest mention of "Black," who features prominently in Claim III.B.i.b. Taylor furnished no specific factual foundation to the state courts that might

---

[67]     By contrast, in Claim III.B.i.b in his § 2254 Petition, Taylor includes detailed factual allegations (never provided to the state courts in his Corrected First Amended R32 Petition) about what Blue's real name is, what the substance of Blue's testimony would have been (*i.e.*, what time and for how long he saw Taylor, whether he saw McMillan too), and the existence of another individual, "Black," who was also allegedly present that evening. (Doc. 25, ¶¶ 155-56.) The substance of the claim pleaded as Claim III.B.i.b was not reasonably, fairly presented to the state courts in Taylor's Corrected First Amended R32 Petition; therefore, this claim is not exhausted.

have enabled them fairly to pass on the ineffective assistance claim that Taylor now asserts as Claim III.B.i.b in federal habeas proceedings; instead, Taylor offered only an offhand, oblique reference to "Blue" and mentioned that trial counsel failed to locate and interview "Blue" to "verify" Matthews' testimony.[68]  As this claim was pleaded in the Corrected First Amended R32 Petition, the state courts could not reasonably have understood the specific factual foundation of any claim that trial counsel performed deficiently under *Strickland* by not interviewing "Blue" and "Black," much less that Taylor was prejudiced under *Strickland* by such omissions.[69]

---

[68]     In point of fact, Blackmon's testimony would not have corroborated Matthews' testimony as to timing, which was the whole reason Taylor claimed in his Corrected First Amended R32 Petition it was ineffective assistance for trial counsel not to interview him.  In recognition of that reality, Taylor substantially revamped his theory of the significance of Blackmon's testimony as argued in Rule 32 proceedings versus § 2254 proceedings, which simply reinforces the undersigned's determination that the fair presentment requirement was not satisfied as to Claim III.B.i.b.

[69]     Alternatively, to the extent that Claim III.B.i.b is exhausted, it would fail on the merits.  The Alabama Court of Criminal Appeals rejected any claim of ineffective assistance based on trial counsel's failure to interview "Blue," reasoning as follows: "Blackmon's testimony at the evidentiary hearing was a 'mixed bag.'  In fact, Blackmon's testimony that Taylor arrived at his apartment complex after 7:00 p.m. directly contradicted Taylor's defense at trial – that he left the dealership before 7:00 p.m. and that McMillan remained there and committed the murders by himself.  Defense counsel's failure to elicit testimony that contradicted Taylor's defense would not have prejudiced Taylor; even if Taylor had established that trial counsel were deficient because they failed to locate Blackmon and present his testimony at trial, Taylor failed to prove any prejudice."  (Vol. 53, R-134 at 12-13.)  Additionally, the Court of Criminal Appeals credited the trial court's finding of fact "that Taylor failed to prove that no one from the defense contacted Blackmon before trial" (*id.* at 12), thereby negating any inference of deficient performance on this claim.  The Court finds that the Alabama courts did not apply *Strickland* principles to this "Blue" claim in an objectively unreasonable manner, and that their conclusions that defense counsel neither performed deficiently in this regard nor prejudiced the defense by not interviewing "Blue" before trial are not erroneous under the deferential standard of *Strickland* and § 2254(d)(1).  Indeed, Taylor vastly overstates the likely significance of Blackmon's testimony.  Given the geographic proximity between Blackmon's apartment complex and Steve Dyas Motors, Blackmon testifying that Taylor arrived after 7:00 p.m. would in no way have been inconsistent with the State's evidence that Taylor committed the murders at 6:50 p.m.  And a post-murder window of 30-45 minutes in which Taylor and McMillan were separated could not have advanced the defense theory that McMillan actually committed the murders alone during that window.  Taylor is not entitled to habeas relief on Claim III.B.i.b even if that claim is viewed as properly exhausted, in whole or in part, because the state courts did not err in applying *Strickland* to the facts of this case.

In Claim III.B.i.d, Taylor essentially presents a summation of Claims III.B.i.a, III.B.i.b and III.B.i.c, arguing that trial counsel's failure to present all this evidence (the Blake and Stevee Martin statements from Claim III.B.i.a, the "Blue" and "Black" evidence from Claim III.B.i.b and the Lugene and Barbara Wallace statements from Claim III.B.i.c) was constitutionally ineffective. However, because all three of those subclaims are procedurally barred (not presented until the disallowed Second Amended R32 Petition), Claim III.B.i.d is likewise procedurally barred as a repackaging / restatement of other procedurally barred claims.[70]

### F.    Claim III.B.iii.a (Ineffective Assistance in Impeaching McMillan about Events at Steve Dyas Motors).

As Claim III.B.iii.a in his Amended § 2254 Petition, Taylor asserts that trial counsel were constitutionally ineffective because they "failed to adequately impeach Mr. McMillan's obvious embellishment of the events …, such as his testimony that … Mrs. Gaston begged for her life, crying that nobody would care for her children as she would … and that Mr. Dyas got down on his knees as though he … was praying." (Doc. 25, ¶ 214.) Taylor posits that his counsel's impeachment efforts were deficient because they failed to point out the discrepancies between this testimony and McMillan's prior statements to police, and because they "failed to seek an adjournment to pursue discovery of prosecutorial materials related to Mr. McMillan's various statements" that might have assisted their cross-examination of McMillan. (*Id.*, ¶¶ 214, 218, 220-21.) This claim is exhausted, insofar as Taylor fairly presented it to state courts in Rule 32 proceedings.[71]

---

[70]    In arguing otherwise, Taylor states in the most cursory of terms that Claim III.B.i.d is not procedurally barred because (i) the new claims presented in the Second Amended R32 Petition and the Revised Second Amended R32 Petition are not procedurally barred; (ii) the claims presented in the Second Amended R32 Petition and the Revised Second Amended R32 Petition merely provided additional facts for claims properly presented in the Corrected First Amended R32 Petition; and (iii) Claim III.B.i.b was not procedurally barred because it was adequately raised in the Corrected First Amended R32 Petition. (Doc. 43, at 36-37.) The Court has previously considered and rejected all of these arguments, *supra*. Moreover, to the extent that Claim III.B.i.b is not procedurally barred, the state courts' adjudication of it on the merits was not so erroneous as to authorize federal habeas relief; therefore, Count III.B.i.d cannot prevail on the merits to the extent it rests on Claim III.B.i.b, the only constituent subclaim that is even arguably not procedurally barred.

[71]    Indeed, Taylor's Corrected First Amended R32 Petition alleged that trial counsel "failed to adequately impeach McMillan's obvious embellishment of the events in Dyas Motors, (Continued)

-78-

To the extent that it has been properly exhausted, Claim III.B.iii.a, like all of Taylor's ineffective assistance of counsel claims reviewed on the merits, will be evaluated through the familiar standard promulgated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish an ineffective assistance claim under the Sixth Amendment, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Haliburton v. Secretary for Dep't of Corrections*, 342 F.3d 1233, 1243 (11th Cir. 2003).

To satisfy *Strickland*'s "deficient performance" prong, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *Williams v. Allen*, 598 F.3d 778, 788 (11th Cir. 2010) (citation omitted). "This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Haliburton*, 342 F.3d at 1243. Given the "strong presumption in favor of competence," a petitioner bears the heavy burden of showing "that no competent counsel would have taken the action that his counsel did take." *Williams*, 598 F.3d at 790 (citation and internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (citation and internal quotation marks omitted).

As for *Strickland*'s "prejudice" prong, "the petitioner is required to prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams*, 598 F.3d at 789 (citation and internal quotation marks omitted). "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Halliburton*, 342 F.3d at 1343. "The

_____

such as his incredible story that Steve Dyas was on his knees as 'if he was praying' when he was shot;" that McMillan's testimony "was also inconsistent with his prior statements to the police;" that "[t]here were similar inconsistencies with respect to McMillan's role in Sherry Gaston's death;" that trial counsel failed sufficiently to draw out and emphasize these inconsistencies; and that trial counsel failed to seek an adjournment in order to pursue prosecutorial materials related to McMillan's police interviews. (Vol. 22, R-56, at ¶¶ 131, 134.)

likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010); *see also Harrington*, 562 U.S. at 105 (cautioning that "the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the very adversary process the right to counsel is meant to serve"). However, it is even more daunting in the habeas context where state courts have adjudicated the ineffective assistance claims on the merits in post-conviction proceedings, thereby triggering the § 2254(d) limitations. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. As to those ineffective-assistance claims to which § 2254(d) applies, then, Taylor "not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State court applied *Strickland* to the facts of his case in an *objectively unreasonable manner*." *Williams*, 598 F.3d at 789 (citations and internal quotation marks omitted). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (citation and internal quotation marks omitted); *see also Bell v. Cone*, 535 U.S. 685, 698-99, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) ("For respondent to succeed, however, he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.").

These burdens rest squarely on Taylor's shoulders. After all, "[t]o give trial counsel proper deference, this circuit presumes that trial counsel provided effective assistance. … And it is the petitioner's burden to persuade us otherwise." *Harvey v. Warden, Union Correctional Institution*, 629 F.3d 1228, 1245 (11th Cir. 2011).

In deciding Taylor's claims of ineffective assistance predicated on trial counsel's failure to cross-examine McMillan about inconsistencies in his police statements or to seek adjournment for discovery of information relating to McMillan's police interviews, the Court of Criminal Appeals wrote as follows: "Taylor failed to prove that his counsel rendered deficient performance when they failed to request an adjournment, and he failed to establish that the

request would have been granted; he failed to prove that an adjournment would have yielded any additional information or that the additional information would have changed the outcome of the trial; and, finally, Taylor failed to prove deficient performance or prejudice with regard to defense counsel's cross-examination of McMillan. Taylor is not entitled to relief on this issue." (Doc. 53, R-134, at 19-20.)

There was no deficient performance under *Strickland* regarding the adjournment issue. At the time the State called McMillan to testify, the prosecutor explained to Judge Johnstone that McMillan had given three prior statements to law enforcement, all of which had been furnished to the defense. (Vol. 6, R-15 at 881.) The prosecutor further indicated that McMillan's trial testimony was expected to be in line with his third statement. (*Id.* at 882.) In response, defense counsel asked to be furnished with "a final statement or statement number four," if one existed, or "written memoranda of what he said in that statement." (*Id.* at 883-84.) Defense counsel also pushed for disclosure of "a final version that somehow reconciles the prior inconsistencies" in McMillan's statements. (*Id.* at 890.) Shortly thereafter, defense counsel expressly "request[ed] that if his testimony or any memoranda of interviews have been used in the subsequent robbery indictments against him, that that be furnished to us." (*Id.* at 892.) The State acknowledged that those "robbery files are in the office." (*Id.* at 893.) Judge Johnstone took a lunch recess, giving the State clear instructions, to-wit: "What I want you to look for is any piece of paper reflecting anything that this man, McMillan, has ever said." (*Id.* at 894.)[72] After a 100-minute lunch break, the State informed the judge and the defense that certain limited responsive materials had been located, and were being provided to the defense. (*Id.* at 897.)[73] Those materials were "unrelated to this particular case" but were provided to the defense in compliance with Judge Johnstone's directives. (*Id.* at 897-98.)

---

[72] The trial judge re-emphasized the point, instructing the State that "[w]e are looking for any transcript, memorandum, tape recording or any other material at all that would in any wise evidence anything Kenyatta McMillan has ever said to anyone connected with the law enforcement authorities." (*Id.* at 895.)

[73] Based on the trial transcript, it would be inaccurate to conclude, as Taylor suggests, that the State suspended its search for responsive materials once the lunch break concluded. Later that afternoon, Judge Johnstone inquired of the State, "How are we coming getting the various pieces of paper? Have you had any luck?" (*Id.* at 927.)

Taylor is correct that his lawyers never requested an adjournment of the trial to allow for the State to conduct additional searches of their offices for materials related to any statements ever made by McMillan in connection with subsequent robbery indictments against him. But the State never indicated that it needed additional time to complete its search. Moreover, Judge Johnstone strongly suggested that he had no intention of delaying the trial while the State hunted for responsive materials.[74] And even in his § 2254 Petition, Taylor does not specify any particular documents, items or materials likely to have been produced if such an adjournment had been requested and granted, much less that any of those materials would have been reasonably likely to make any difference at all in Taylor's trial. For all of these reasons, the Court finds no error in the state courts' assessment that it was not *Strickland* deficient performance for defense counsel to fail to request an adjournment, and that no *Strickland* prejudice resulted from that omission, in any event.

The Court reaches a similar conclusion as to Taylor's assertion that the Rule 32 courts erred in finding neither deficient performance nor prejudice in defense counsel's questioning of McMillan on the witness stand at trial. During extensive cross-examination, Taylor's counsel elicited detailed testimony from McMillan about his prior statements to law enforcement, including numerous specific discrepancies, pursuant to which McMillan repeatedly admitted he had been untruthful in those prior statements. (*Id.* at 992-99; vol. 7, R-15 at 1001-06, 1022-23, 1049-50.) Notably, there was cross-examination specifically about what McMillan had witnessed as to the murders of Steve Dyas and Sherry Gaston, which yielded significant admissions from McMillan about inconsistencies or discrepancies in his testimony.[75] In his §

---

[74] In particular, the trial judge observed to defense counsel, "I believe what I asked for was pretty broad, wasn't it?" (*Id.* at 901.) Defense counsel responded affirmatively, at which point the trial judge elaborated, "I don't know that I am going to stop the whole trial to get it." (*Id.*) Had defense counsel sought an adjournment of the trial on that basis, such a request would almost certainly have been denied.

[75] In particular, Taylor's counsel cross-examined McMillan about the position of Dyas's body when he was shot and elicited an admission that McMillan had neglected to tell police in at least one of his prior statements that Dyas was kneeling at the time he was shot. (Vol. 6, R-15 at 995-96.) Taylor's counsel also secured an admission from McMillan that, as to Sherry Gaston's murder, McMillan "only heard the shot" and was not "there when it happened." (*Id.* at 997.) Extraction of such inconsistencies by the witness is indicative of competent cross-examination by defense counsel.

2254 Petition, Taylor maintains that his lawyers should have carried out this cross-examination in a different way.  However, the trial record clearly shows that defense counsel successfully impeached McMillan's trial testimony about Dyas being on his knees (by showing that McMillan had previously told police that Dyas lay down on the floor before Taylor shot him) and about Sherry Gaston's conduct (by showing that McMillan was in a different area when Taylor shot her).  Second-guessing and Monday-morning quarterbacking of counsel's handling of a particular witness (who was exposed on cross-examination as having told many untruths previously) is not the stuff of a Sixth Amendment violation.  The state courts' findings of neither *Strickland* deficient performance nor *Strickland* prejudice as to defense counsel's cross-examination of McMillan on these points were not objectively unreasonable.  No habeas relief is warranted on this claim.

### G. Claim III.B.iii.b (Ineffective Assistance in Impeaching McMillan Using Discrepancies of Other Witness Accounts).

As Claim III.B.iii.b, Taylor alleges that his trial counsel rendered ineffective assistance by failing to "highlight[] … the significant discrepancies between Mr. McMillan's account … and the accounts of other witnesses" in certain enumerated respects.  (Doc. 25, ¶ 222.)  In particular, Taylor criticizes his lawyers for failing to elicit testimony from Blake and Stevee Martin that the Mustang was not at the dealership at 6:50 p.m., for failing to elicit testimony from Leon Saafir that McMillan had access to Saafir's gun, for failing to cross-examine McMillan about his relationship with the Carlton sisters, and for failing to ask McMillan whether he had spoken with the State about his testimony during a lunch break.  (*Id.* at ¶¶ 222-25.)  The portion of this claim concerning the Martin statements is redundant of Claim III.B.i.a, and will not be addressed separately here.  The portion of this claim concerning Saafir is redundant of Claim III.B.iv.a, and will not be addressed separately here.

As for the Carlton sisters, on direct examination, McMillan testified at trial that he did know Tiffany and Cherelle Carlton, that he and Taylor went to their house and talked to them for about 20 minutes on the morning of the murders, that Cherelle Carlton wanted to talk to Taylor because "she was saying he is a handsome dude" and "trying to find out who he was," that he did not know Tiffany Carlton's last name "for sure," that Taylor gave the murder weapon to Tiffany shortly after the murders occurred, and that McMillan instructed her to keep it and not mess with it.  (Vol. 6, R-15 at 955, 956-57, 970.)  In his § 2254 Petition, Taylor faults trial counsel for not taking McMillan to task for "tr[ying] to disassociate himself from the Carlton sisters" and for

"suggesting that Mr. Taylor was closer to them than he was." (Doc. 25, ¶ 224.) This criticism is unfounded. McMillan readily acknowledged in his direct examination that Cherelle Carlton did not know Taylor's identity on the morning of the murders, but that she was trying to find out who he was because she deemed him a "handsome dude." And McMillan's familiarity with Tiffany Carlton was evident from his testimony that he called her over to the car and told her not to mess with the gun that Taylor gave her. Simply put, there was nothing to impeach in McMillan's direct-examination testimony concerning his and Taylor's relationship with the Carlton sisters. It was certainly not constitutionally ineffective assistance for defense counsel not to devote a portion of cross-examination to suggesting that McMillan had somehow distorted or inappropriately downplayed his relationship with the Carlton sisters on direct examination, when he had done nothing of the sort. The Rule 32 courts did not err on this point.

Finally, on the morning of the second day of his direct examination at trial, McMillan revisited some of his testimony from the previous day.[76] On the first day of his direct examination, McMillan testified that he and Taylor had gone to the Carlton sisters' house on the morning of the murders "before we got the pistols [*sic*]." (Vol. 6, R-15 at 955.) The following day, McMillan testified that his testimony on that point had been incorrect because "[w]e went and got the .380 first before we went to Tiffany's house because I remember Tiffany's sister comparing her .380 with the .380 we had." (*Id.* at 981.) Taylor now says trial counsel rendered ineffective assistance by failing to ask McMillan on cross-examination whether the change in his testimony had been prompted by coaching by the State during the overnight break in the trial. That omission by defense counsel was not tantamount to incompetence under prevailing professional norms or an unprofessional error so serious as to deprive Taylor of a fair trial. Particularly given the context of defense counsel's effective, in-depth cross-examination of McMillan, exposing his history of lying and giving inconsistent statements, the Court finds that Alabama courts did not err in failing to find a constitutional deprivation merely because trial counsel did not pursue every angle on cross-examination of McMillan that Taylor now thinks he

---

[76]     In his § 2254 Petition, Taylor incorrectly characterizes the change in McMillan's testimony as occurring "after a lunch break." (Doc. 25, ¶ 225.) In fact, the revised testimony took place after an evening break on the night of August 6, 1998.

could or should have done.[77]  Defense counsel effectively challenged McMillan's credibility to the jury, even if he did not ask every single question of McMillan that Taylor (with the benefit of hindsight and many years of contemplation and second-guessing by post-conviction counsel) now thinks might have been prudent to ask.  Besides, Taylor offers no indication how McMillan would have answered such a question had it been posed.  For all we know, he might have testified that he had simply realized his mistake on his own upon further reflection, with no "coaching" whatsoever.  Therefore, there was no prejudice to Taylor from counsel's failure to pursue this line of questioning.[78]  The reasons for McMillan correcting this fragment of the timeline on the second day of his testimony are not of such earthshattering significance that Taylor was deprived of a fair trial without his lawyer grilling McMillan about it on the witness stand.  Neither *Strickland* deficient performance nor *Strickland* prejudice exists here, so no § 2254 relief is warranted on this subclaim.

### H. Claim III.B.iii.c (Ineffective Assistance in Not Impeaching McMillan Using Physical Evidence at Crime Scene).

In Claim III.B.iii.c, Taylor presents an argument that trial counsel rendered ineffective assistance by not using physical evidence to impeach McMillan's testimony about the position of

---

[77]  *See, e.g., Fugate v. Head*, 261 F.3d 1206, 1220 (11th Cir. 2001) ("Ineffective assistance … will not be found merely because other testimony might have been elicited from those who testified.") (citations and internal quotation marks omitted); *Johnson v. Alabama*, 256 F.3d 1156, 1186 (11th Cir. 2001) ("Claims that an attorney should have cross-examined further on inconsequential matters do not establish constitutionally deficient performance."); *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985) (decision whether to cross-examine a witness at all "was a tactical one well within the discretion of a defense attorney").

[78]  To understand the extent to which McMillan's trial testimony portrayed him as one who had a substantial history of lying, one need only consider defense counsel's closing argument at trial.  Citing numerous specific examples of discrepancies and dishonesty in his testimony at trial, defense counsel argued that "there is no way on this planet you can believe that man or anything he says." (Vol. 9, R-20 at 1413.)  Defense counsel went on to cite a laundry list of untruths or discrepancies by McMillan on topics such as what happened to the wallet and purse stolen from the victims, what happened to the murder weapon, his criminal history, whether he had gotten blood on himself, the position of Steve Dyas's body when he was shot, the discrepancies with the testimony of Clark and Nolin, and so on.  (*Id.* at 1413-24.)  To suggest that trial counsel was constitutionally deficient for not impugning McMillan's credibility on one other collateral point, much less that there is a reasonable probability the outcome of Taylor's trial would have been different had defense counsel done so, would be to misapply and unreasonably distort the principles of *Strickland*.

Steve Dyas's body at the time he was murdered. Taylor says his lawyers should have directed the jury to evidence that the bullet traveled upward through Dyas's head, that blood was on the floor and not on the wall, and that the bullet was lodged in the floor, all of which Taylor says discredit McMillan's account that Dyas was kneeling at the time he was shot. (Doc. 25, ¶ 226.)

Although Taylor raised this claim in his state post-conviction proceedings, he failed to offer any evidence in support of it at the Rule 32 hearing. On that basis, the Alabama courts deemed the claim abandoned. (Vol. 53, R-131 at 10 ("Taylor presented no expert testimony at the evidentiary hearing and abandoned this claim."); vol. 53, R-134 at 17 (observing that in his appellate brief in Rule 32 proceedings, Taylor "has not made any specific argument about the trial court's resolution of" that claim, such that the Court of Criminal Appeals "agree[s] with the circuit court that Taylor abandoned" that claim).) Such a determination is well-supported by Alabama law. *See, e.g., Brooks v. State*, 929 So.2d 491, 497 (Ala.Crim.App. 2005) ("We have held that a petitioner is deemed to have abandoned a claim if he fails to present any evidence to support the claim at the evidentiary hearing.").[79] In his federal habeas filings, Taylor does not address the Alabama courts' abandonment ruling, nor does he interpose any argument whatsoever that might support a conclusion that this claim is exhausted, or that this procedural ruling does not constitute an adequate and independent state ground precluding federal habeas review of this claim. *See, e.g., Baker v. Dep't of Corrections, Secretary*, 634 Fed.Appx. 689, 693 (11th Cir. Dec. 14, 2015) (opining that petitioner's "claim was not exhausted in state court because Baker abandoned it on appeal and, thus, did not raise the claim throughout one round of Florida's established appellate review process"); *Doorbal v. Dep't of Corrections*, 572 F.3d 1222, 1228 (11th Cir. 2009) (state court's finding that claim was waived when petitioner "failed to present an argument about the merits of that issue on appeal" is an "independent and adequate ground under state law" for procedural default purposes). Therefore, Claim III.B.iii.c is procedurally defaulted.

---

[79]     *See also Brownlee v. State*, 666 So.2d 91, 93 (Ala.Crim.App. 1995) ("[A]llegations … not expressly argued on … appeal … are deemed by us to be abandoned.") (citations omitted); *Burks v. State*, 600 So.2d 374, 380 (Ala.Crim.App. 1991) ("Errors assigned and not argued will be treated as abandoned. … Issues listed in brief but not argued will not be reviewed on appeal.") (citations omitted).

Even if this claim were properly considered on the merits, there is no constitutional deprivation here. During the trial, the State called a forensic pathologist, Julia Goodin, M.D., who performed autopsies on the three victims of the Steve Dyas Motors murders. On cross-examination, defense counsel sought to elicit testimony from Dr. Goodin about bullet trajectories and the position of Steve Dyas's body at the time he was shot. (Vol. 7, R-15 at 1176-78.) Judge Johnstone sustained the State's objection to such questioning because Dr. Goodin lacked training or expertise in that area, and testified, "I cannot determine the position the body was in at the time the shot was fired." (*Id.* at 1178, 1181-84.) Nonetheless, Taylor now says his trial counsel were constitutionally ineffective because they failed to cobble together certain ambiguous facts (*i.e.*, that the bullet traveled slightly upward through Dyas's head, that the bullet was found lodged in the floor, that there was a pool of blood underneath him) to argue to the jury that McMillan must have testified falsely when he said Dyas was kneeling when Taylor pulled the trigger. (Doc. 25, ¶ 226.) Perhaps those ambiguous facts are consistent with a defense theory that Dyas was lying down on the floor when Taylor murdered him. Perhaps they are equally consistent with McMillan's narrative that Dyas was kneeling as if in prayer (*i.e.*, with his head bowed down) when Taylor put the .380 pistol to the back of his head and pulled the trigger.[80] There was no expert testimony to connect these facts to either conclusion. Like Dr. Goodin, Taylor's lawyers undoubtedly lacked the scientific training and expertise to determine the position of McMillan's body at the time the shot was fired based on such equivocal record facts. As such, the Court does not find that it was unprofessional and incompetent for Taylor's trial lawyers not to stitch together a speculative, factually dubious argument to the jury about how Dyas's body must have been positioned at the time he was murdered, all in a likely unhelpful attempt to discredit McMillan further in their closing argument. Such a tenuous tactic would have been risky and potentially counterproductive in jeopardizing defense counsel's own

---

[80] After all, Dr. Goodin also testified, without objection from defense counsel, that she observed abrasions on Dyas's forehead and nose that were consistent with being shot from behind and falling forward. (Vol. 7, R-15 at 1170-71.) Taylor's Claim III.B.iii.c would simply ignore this testimony, faulting his trial counsel for not cherry-picking record facts that might support his theory as to the position of Dyas's body, while ignoring other record facts that undercut it.

credibility with the jury.  This assignment of error lacks merit and does not warrant federal habeas relief.

> ### I.  Claim III.B.iv.a (Ineffective Assistance in Failing to Investigate and Elicit Testimony Concerning McMillan's Access to Murder Weapon).

In Claim III.B.iv.a of his § 2254 Petition, Taylor asserts that trial counsel rendered ineffective assistance by failing "to investigate and elicit testimony that Mr. McMillan had access to Leon Saafir's gun … prior to the murders."  (Doc. 25, ¶ 229.)  At trial, McMillan testified that on the day of the murders he and Taylor went to Saafir's apartment, that they used a key and went inside, that McMillan did not "know where exactly the pistol was," and that Taylor "went down the hall and came back with the pistol and we left on from there."  (Vol. 6, R-15 at 947.)  Taylor posits that if defense counsel had ever asked, Saafir would have impeached McMillan's testimony denying knowledge of "where exactly" Saafir kept the pistol.[81]

As an initial matter, Claim III.B.iv.a faces a significant exhaustion problem.  In his Corrected First Amended R32 Petition, Taylor framed his ineffective assistance claim relating to Saafir as follows: "McMillan tried to down play his association with Leon Saafir, … when in fact McMillan had known Saafir for four years and had stayed with Saafir in his home for a period of time – facts within which McMillan could have been confronted."  (Vol. 22, R-56 at ¶ 133.)  Nowhere in that petition did Taylor present argument or suggestion that trial counsel were deficient for not asking Saafir if McMillan knew where he kept the .380 pistol.  That issue, of course, is the gravamen of Claim III.B.iv.a.  Taylor did not fairly present this issue to the state courts in his Corrected First Amended R32 Petition; indeed, he offered no specific factual foundation or exposition in Rule 32 proceedings that he faulted his lawyers for not asking Saafir

---

[81]     During the Rule 32 hearing, Saafir testified that Taylor and McMillan had come to his home in December 1997, that Taylor had asked to see his gun, that Saafir had gone into his bedroom and brought out the gun to show them, that Saafir then had taken the gun back into his room, and that based on where McMillan was standing, he could "see the room into which [Saafir was] placing that object."  (Vol. 47, R-103, at 43-44, 48-49.)  Saafir did not testify, however, that McMillan accompanied Saafir into the bedroom; rather, his testimony was clear that McMillan was standing "[r]ight outside my door, my front door," inside the apartment, while Saafir went down the hall and to the left to go in the bedroom.  (*Id.* at 44, 48.)  Saafir kept the pistol in his bedroom on his dresser "inside of a box."  (*Id.* at 43.)  There was no testimony at the Rule 32 hearing that McMillan accompanied Saafir into the bedroom, or that he was even standing in a location that gave him a clear view of Saafir placing the gun back inside the box.

about McMillan's access to the gun.  Therefore, Claim III.B.iv.a is unexhausted and is not properly considered on the merits in these federal habeas proceedings.

Even if Claim III.B.iv.a were to be considered on the merits, § 2254 relief would remain unavailable to Taylor.  Saafir's testimony at the Rule 32 hearing showed only that McMillan know generally that Saafir kept the .380 pistol in his bedroom.  Saafir did not testify that McMillan had ever seen the gun in that location, or that McMillan had any knowledge of where in the bedroom Saafir kept that weapon.  Thus, Saafir's testimony on this point would not have effectively impeached McMillan's testimony at trial that he did not know "where exactly the pistol was" in Saafir's home or that Taylor went down the hall and retrieved the weapon on the day of the murders.  It was not constitutionally deficient performance for defense counsel to fail to ask Saafir about McMillan's knowledge of the location of the gun, and Taylor was not prejudiced by the omission of this extremely weak purported "impeachment" testimony.[82]

### J.  Claim III.B.iv.b (Ineffective Assistance in Failing to Investigate and Elicit Testimony Concerning Pressure on Carlton Sisters).

In Claim III.B.iv.b, Taylor presents six pages of allegations and argument under the heading that his trial counsel were constitutionally ineffective because they "failed to investigate and elicit testimony regarding pressure placed upon Cherelle and Tiffany Carlton to testify they saw Mr. Taylor with a gun on the day of the murders."  (Doc. 25, at 101.)  At trial, each of the Carlton sisters testified that she saw Taylor in possession of a gun on the day of the Steve Dyas

---

[82]    Taylor's theory that this "impeachment" evidence might reasonably have convinced the jury that "Mr. McMillan committed the murders without Mr. Taylor's participation or knowledge" is wholly unpersuasive.  (Doc. 25, ¶ 232.)  At trial, Saafir testified that when Taylor (who was his cousin) and McMillan visited his apartment in December 1997, Taylor asked Saafir to show McMillan the gun.  (Vol. 7, R-15 at 1121.)  Then Saafir went with them to somebody else's residence.  A short time later, Taylor asked Saafir to borrow his coat so he could "sport it," or "show it off."  (*Id.* at 1123.)  Saafir allowed him to do so; however, Saafir left his apartment keys in the jacket.  (*Id.*)  Taylor (who was then in possession of Saafir's apartment keys) and McMillan then left for awhile, and sometime later Saafir noticed his gun was missing.  (*Id.* at 1124-25.)  These facts raise a clear inference that Taylor took Saafir's gun, whether or not McMillan was aware of its precise location in Saafir's apartment.  Given that context, nothing about the purported "impeachment" evidence would have undermined these facts or would have been reasonably likely to persuade the jury that McMillan committed the murders without Taylor's participation or knowledge.

Motors murders.[83]  As part of Claim III.B.iv.b, Taylor asserts that his trial counsel (i) "failed to investigate allegations that the Carlton sisters testified under pressure from State officials" (*id.*, ¶ 235); (ii) did not investigate or point out discrepancies with the Carltons' testimony, such as that witnesses James Boteler, Jr., and McMillan placed Taylor elsewhere at the time the Carlton sisters said he showed them the gun (*id.*, ¶¶ 236-37); (iii) failed to engage in "[p]roper inquiry" to elicit testimony from Tiffany Carlton that she never saw Taylor with a gun (*id.*, ¶¶ 238, 241); and (iv) "failed to investigate the witnesses' conflicting accounts" about where Taylor and McMillan were between 1:00 and 2:00 p.m. on the day of the murders (*id.*, ¶ 242).

A significant portion of Claim III.B.iv.b is procedurally defaulted.  In his Corrected First Amended R32 Petition, Taylor asserted ineffective assistance claims based on allegations that "[t]rial counsel failed to confront … the Carlton sisters regarding their whereabouts between 1:00 and 2:00 p.m." (vol. 22, R-56 at ¶ 148) and "unreasonably failed to cross-examine Cherelle and Tiffany Carlton regarding any pressure upon them to testify for the State" (*id.* at ¶ 151) as part of R32 Claim IV.B.4.f; and that "trial counsel failed to cast into sharp relief the contradictions between the testimony, on the one hand, of McMillan and Matthews, and, on the other hand, of the Carlton sisters, which call into question the Carlton sisters' claim that they saw Mr. Taylor with a gun on the day of the murders" (*id.* at ¶ 154), as part of R32 Claim IV.B.4.g. The Alabama Court of Criminal Appeals found that R32 Claim IV.B.4.f and R32 Claim IV.B.4.g had been waived for purposes of appellate review by application of Rule 28(a)(10).  (Vol. 53, R-128 at *10-11.)[84]  Therefore, those aspects of Claim III.B.iv.b in Taylor's § 2254 Petition are

_____

[83]    In particular, Tiffany Carlton testified that at approximately 1:00 p.m. on the day of the murders, Taylor and McMillan "took me over to my boyfriend's house where Mr. Taylor showed me the gun."  (Vol. 8, R-16 at 1247; *id.* at 1254, 1257.)  Cherelle Carlton testified that Taylor told her on the day of the murders that "you have to have a gun in order to protect yourself," then "[h]e showed me his gun and I showed him mine."  (Vol. 6, R-15 at 869-70.)

[84]    In so doing, the Alabama appellate court referred to the waived arguments by reference to sections of Taylor's Rule 32 appellate brief, rather than by reference to the corresponding numbered claims in the Corrected First Amended R32 Petition.  In section III.C.2.e of his Rule 32 appellate brief, Taylor argued for reversal of the trial court's dismissal of R32 Claims IV.B.4.f and IV.B.4.g by advancing arguments regarding paragraphs 147 through 160 of his Corrected First Amended R32 Petition.  (Vol. 31, R-90 at 52-53.)  Thus, section III.C.2.e of Taylor's Rule 32 appellate brief corresponds to R32 Claims IV.B.4.f and IV.B.4.g. (Vol. 22, R-56 at ¶¶ 147-60.)  The Alabama Court of Criminal Appeals ruled that all arguments presented in section "III.C.2(a)-(h)" of Taylor's Rule 32 appellate brief were waived for (Continued)

procedurally defaulted for noncompliance with Rule 28(a)(10), as discussed *supra* in section III.B. of this Order.

The portion of Claim III.B.iv.b that is not procedurally defaulted is that which corresponds to R32 Claim IV.B.4.e, in which Taylor had alleged that "trial counsel failed to investigate several discrepancies" that might have contradicted the Carltons' testimony as timing, such as that "McMillan and Mr. Taylor could not have been both with Matthews and with the Carlton sisters miles apart at the same time;" and further alleged that trial counsel never investigated "allegations that the Carltons testified under pressure by threats from State officials." (Vol. 22, R-56 ¶ 142.) The Alabama courts addressed these arguments on the merits in Rule 32 proceedings.

As to counsel's failure to investigate alleged "pressure" or "threats" by the State, the Alabama Court of Criminal Appeals concluded that "Taylor did not sustain his burden of proof on this claim" for either deficient performance or prejudice. (Vol. 53, R-134 at 7.) Finding no deficient performance under *Strickland*, the Alabama appellate court reasoned as follows:

> "Carlton's testimony at trial that Taylor passed the gun to McMillan was consistent with the statement she gave to trial counsel. Taylor presented nothing to show that reasonable counsel would have conducted additional investigation into the alleged harassment, nor did he present evidence to show what additional steps counsel should have taken. Taylor also failed to establish that, if counsel had taken those additional steps, they would have learned that Carlton intended to testify falsely about seeing Taylor with a gun."

(*Id.*)[85] The Court agrees that, on this record, it was not unreasonable, much less incompetent, for Taylor's trial counsel not to investigate alleged State pressure or intimidation against the Carlton

---

noncompliance with Rule 28(a)(10). (Vol. 53, R-128 at *10-11.) That waiver – and the procedural bar created thereby – would necessarily encompass section III.C.2.e of that brief, in which Taylor presented his appellate arguments in favor of R32 Claims IV.B.4.f and IV.b.4.g; therefore, those claims (which equate to portions of § 2254 Claim III.B.iv.b) are procedurally defaulted.

[85] The Court of Criminal Appeals elaborated that, "In spite of the perceived pressure from law enforcement officers Carlton never indicated that Taylor planned or participated in the murders, and she stated only that Taylor had passed the gun to McMillan, whom she said was never without a weapon, so there was no indication before trial that the pressure caused Carlton to lie." (*Id.* at 8.) Also, it bears noting that the references to "Carlton" in the appellate court decision are to Tiffany Carlton. For reasons not apparent in the record, Taylor never called (Continued)

sisters. The Court further agrees with the Alabama Court of Appeals' conclusion that there was no *Strickland* prejudice, reasoning that "Taylor failed to prove that the outcome of his case would have been different if counsel had 'adequately' investigated Carlton's account of the threats." (*Id.*) Simply put, trial counsel had no reason to think that the Carlton sisters were lying in their statements and testimony that they had seen Taylor possessing a gun. Even if they doubted the Carltons' veracity on this point, there is no reason to believe that additional investigation of "pressure" or "threats" would have revealed any additional evidence at the time. Even if there were, there is no reason to conclude that it is reasonably probable the result of Taylor's trial would have been different had such an investigation been conducted. The Alabama courts' application of *Strickland* principles to this aspect of Claim III.B.iv.b was not objectively unreasonable.

As to counsel's failure to investigate the discrepancies between the Carltons' testimony and those of other witnesses as to Taylor's whereabouts between 1:00 and 2:00 p.m. on the day of the murders, Alabama courts likewise rejected this ineffective assistance claim in state post-conviction proceedings. In finding neither deficient performance nor prejudice under *Strickland*, the Alabama Court of Criminal Appeals wrote the following:

> "Postconviction counsel did not ask trial counsel any questions about the discrepancies in the timelines given by various witnesses. [Taylor] failed to prove what additional investigation trial counsel should have performed, or what evidence would have been produced by that additional investigation. Furthermore, the jury heard the witnesses' testimony and was made aware of the discrepancies in the timelines, and the jury resolved the conflicts against Taylor. Finally, Taylor failed to prove that it was reasonably likely that the result of the proceeding would have been different if counsel had conducted additional investigation into the discrepancies regarding the timelines witnesses gave."

(Vol. 53, R-134 at 9-10.)

In his § 2254 Petition, Taylor argues that "proper investigation" about these timelines "could have uncovered evidence … that would have contradicted the Carlton sisters' incriminating testimony" and also "could have … investigated and possibly disproved" Tiffany

---

Cherelle Carlton to testify at the Rule 32 hearing; therefore, he has laid no evidentiary foundation for his ineffective assistance claims related to trial counsel's failure to investigate State pressure as it might have affected Cherelle Carlton's trial testimony.

Carlton's testimony that Taylor and McMillan drove her to her boyfriend's house between 1:00 and 2:00 p.m. (Doc. 25, ¶ 242.) Taylor does not identify what that evidence was or how it might have been uncovered, but simply speculates about what might have been "possibly disproved." Besides, Taylor acknowledges (as he must) that the jury heard conflicting evidence about where Taylor was at 1:00 p.m., with a Steve Dyas Motors employee testifying that Taylor was present at the dealership at around 1:00 – 1:15 p.m. (*Id.*) The jury resolved those discrepancies adversely to Taylor. The Court agrees with the Alabama Court of Criminal Appeals that Taylor has not shown that further investigation into conflicting evidence about timelines was necessary as a constitutional minimum for effective defense representation, much less that such investigation was reasonably likely to yield a different result.[86] The Alabama courts' application

---

[86] Implicit throughout Taylor's presentation of Claim III.B.iv.b is the premise that defense counsel should have performed whatever investigation was necessary to discredit Tiffany Carlton on cross-examination at all costs. Closer scrutiny of her trial testimony reveals that Tiffany Carlton actually said much that was helpful to Taylor's defense. Indeed, she was called as a defense witness, not a State witness. For example, Tiffany Carlton testified at trial that (i) McMillan bragged to her on the day of the murders that "he was going to make a lick for three million dollars" and "[h]e can get away with it;" (ii) McMillan, not Taylor, "mainly had the gun most of the time" that day, and she saw him "holding the gun, or playing with it, babying it, you know, rubbing it;" (iii) Taylor simply told Tiffany Carlton that "he was going to buy a car," without saying anything about "licks," which is a slang term for robberies; (iv) Taylor was not even within earshot when McMillan bragged to Carlton about the "lick" he intended to perpetrate; (v) Carlton had seen McMillan going into other people's houses and come out with guns before; and (vi) "if you didn't see Kenyatta with a gun, then it was strange because he kept a gun wherever he went mainly." (Vol. 8, R-16 at 1243-53.) In light of these facts, Taylor's § 2254 argument that his trial lawyers were ineffective for failing to conduct further investigation calculated to attack Tiffany Carlton's credibility is curious, indeed. Given this record, it was certainly not incompetent for defense counsel not to devote scarce pretrial resources to investigating means of undermining the credibility of a helpful defense witness whose trial testimony included a great many points that were favorable to Taylor and to the defense theory that McMillan committed the Steve Dyas Motors murders alone, without Taylor's knowledge or participation. To investigate and attempt to expose Tiffany Carlton as an untruthful witness – as Taylor now says his trial counsel were constitutionally required to do – would have been to harm the entire defense strategy by eliminating a key defense witness from the realms of credibility. More fundamentally, Taylor's current theory that Carlton's trial testimony was coerced by the State makes little sense, particularly given that the overwhelming bulk of her testimony was favorable to the defense. It was not ineffective assistance for defense counsel to refrain from tearing down the credibility of their own helpful witness.

of *Strickland* to these facts was not objectively unreasonable; therefore, federal habeas relief will not be granted on this aspect of Claim III.B.iv.b.

**K.**      ***Claim III.B.v (Ineffective Assistance in Failing to Investigate and Elicit Testimony from Clark and Lewis Regarding McMillan Confessions).***

In Claim III.B.v of his § 2254 Petition, Taylor asserts another claim for ineffective assistance of counsel, this time arguing that "[t]rial counsel failed to competently investigate evidence that Mr. McMillan confessed to shooting the three victims." (Doc. 25, ¶ 246.) As pleaded, this claim has two subparts. First, Taylor points to the testimony of Bryann Scott Clark, a jailhouse witness who first testified for the defense that McMillan had confessed to shooting the Steve Dyas Motors victims himself, then returned to the stand two days later as a rebuttal witness for the State to recant his previous testimony. Taylor maintains that "[t]rial counsel unreasonably failed to investigate and elicit testimony regarding the basis for … Clark's recantation during the trial." (*Id.*, ¶ 247.) Second, Taylor says that trial counsel were ineffective because they "failed to investigate Mr. McMillan's statements regarding the crimes to Robert 'Detroit' Lewis, who was Mr. McMillan's cellmate in 1998, prior to Mr. Taylor's trial." (*Id.*, ¶ 251.) McMillan's statements to Lewis ostensibly included that McMillan "was keeping the gun hidden because it had his fingerprints on it, and would therefore reveal that he had committed the murders," and that McMillan "saw Mr. Taylor count the money at Steve Dyas Motors and pay for the car." (*Id.*) The procedural and legal posture of these subclaims differs; therefore, each will be addressed separately.

With respect to Lewis, the State asserts (with no response from petitioner) that Taylor first raised a claim concerning Robert "Detroit" Lewis in his disallowed Second Amended R32 Petition. The Court has searched the Corrected First Amended R32 Petition in vain for any reference to Lewis or any suggestion that Taylor's trial counsel provided ineffective assistance as to that witness. Thus, the only information before the Court is that Taylor raised the issue of ineffective assistance pertaining to Lewis for the first time in his disallowed Second Amended R32 Petition.[87] This portion of Claim III.B.v is, therefore, procedurally barred.

---

[87]      The claim was presented in the Second Amended R32 Petition, where Taylor alleged that "trial counsel failed to adequately investigate statements made by McMillan to Robert 'Detroit' Lewis." (Vol. 34, R-93 at ¶ 157.) By the plain allegations of that petition, Taylor had been aware of Lewis's purported knowledge and interaction with McMillan since before Taylor's 1998 trial; therefore, this was not a new claim based on newly obtained (Continued)

With respect to Taylor's ineffective-assistance claim directed at trial counsel's purported failure to "investigate[] or more competently cross examine[] Mr. Clark regarding the basis for his recantation" (doc. 25, ¶ 248), that portion of Claim III.B.v was (at least in part) presented in Taylor's Corrected First Amended R32 Petition. In that pleading, Taylor asserted that "trial counsel unreasonably failed to cross-examine Brian [*sic*] Clark as to what caused him to recant his testimony during the trial." (Vol. 22, R-56 at ¶ 152.) But the Court of Criminal Appeals found this claim to be insufficiently pleaded on appeal and therefore waived for noncompliance with Rule 28(a)(10).[88] Even if the claim were properly considered on the merits here (which it is not), the Court readily concludes that no *Strickland* violation took place. By all appearances, defense counsel's cross-examination of Clark was vigorous and effective. Taylor identifies no questions that should have been asked, no investigation that should have been done, that would have magically "revealed that the State pressured [Clark] to recant his testimony." (Doc. 25, at ¶ 248.) This theory of ineffective assistance cannot be reconciled with the facts.[89]

---

evidence. Petitioner has identified no facts or circumstances that might conceivably excuse his procedural default of this issue.

[88]  Specifically, the Alabama Court of Criminal Appeals found that the arguments found in Taylor's post-conviction appellate brief at "III.C.2(a)-(h)" failed to comply with Rule 28(a)(10). (Vol. 53, R-128 at *11.) Taylor's argument as to the claim that trial counsel were ineffective in cross-examining Clark was found at section III.C.2(e) of his appellate brief. (Vol. 31, R-90 at 52-53.) Thus, this portion of Claim III.B.v from his § 2254 Petition is squarely within the Rule 28(a)(10) procedural bar found by the Alabama Court of Criminal Appeals.

[89]  Three further observations are warranted. First, over defense counsel's objections, the trial court imposed strict limits on both sides on the topics on which Clark could be examined in his rebuttal testimony. (Vol. 8, R-18 at 1377-82.) The court specifically precluded the parties from eliciting testimony regarding why Clark was changing his testimony on the grounds that such testimony would be "terrifically prejudicial." (*Id.* at 1371-72.) Defense counsel expressed a desire "to impeach him with a tape recording" of a prior out-of-court statement; however, the trial court did not allow it. (*Id.* at 1379, 1387-88.) It could not be constitutionally ineffective assistance for defense counsel to comply with Judge Johnstone's objected-to rulings about the limits of Clark's rebuttal testimony. Second, during cross-examination, defense counsel highlighted the fact that on multiple previous occasions Clark had given statements defense counsel or defense investigators that were substantially similar to the trial testimony he was now recanting. (*Id.* at 1386-88.) Such cross-examination was not constitutionally deficient as a strategy for discrediting Clark's abrupt recantation. Third, Clark's credibility was so badly compromised by his sudden reversal that there could be no prejudice to (Continued)

-95-

## L. Claim III.C (Ineffective Assistance During Penalty Phase).

Taylor devotes a significant chunk of his § 2254 Petition to Claim III.C, which alleges ineffective assistance of trial counsel during the penalty phase. (Doc. 25, ¶¶ 263-354.) As pleaded in the § 2254 Petition, Claim III.C includes at least 16 subclaims, to-wit: (i) trial counsel failed to conduct "a professionally reasonable mitigation investigation" (Claim III.C.i); (ii) trial counsel failed to investigate and present evidence that Taylor was raised in a poor household with little adult supervision (Claim III.C.ii.a.i); (iii) trial counsel failed to investigate and present evidence that Taylor's mother attempted to safeguard her children from the risks of drugs, violence and molestation, that she held high expectations for her children, that she did not recall Taylor's poor academic record, and that she told Taylor that his father (who did not live with them and with whom she had never had any meaningful relationship) was stupid and worthless (Claim III.C.ii.a.ii); (iv) trial counsel failed to consult a mental health expert who would have discovered that Taylor was unable to appreciate consequences, had delusions of grandeur, had intellectual deficits, possessed poor reasoning and judgment skills, was unable to engage in routine tasks, displayed inability to plan long-term, and had hyperactivity (Claim III.C.ii.b.i); (v) trial counsel failed to investigate and present evidence that Taylor was unable to hold a job for more than a few months, could not perform basic tasks assigned to him at work, could not engage in long-term planning, and was unable to do laundry or pay bills (Claim III.C.ii.b.ii); (vi) trial counsel failed to investigate and present evidence of Taylor's poor academic record, including receiving barely passing grades, having difficulty with homework, and showing inability to concentrate (Claim III.C.ii.b.iii); (vii) trial counsel failed to investigate and present evidence that Taylor developed mental illness because his mother was cold to him, he had delusions of grandeur, and he had negative feelings of self-worth because his older brother criticized him (Claim III.C.ii.b.iv); (viii) trial counsel failed to consult a mitigation expert who might have performed a professional analysis of social and environmental factors that may have influenced Taylor's behavior (Claim III.C.ii.c.i); (ix) trial counsel failed to investigate and present evidence about the hardships of living in Prichard, Alabama during Taylor's childhood,

---

Taylor from inadequacies in the manner in which his trial counsel conducted their cross-examination of Clark on rebuttal.

including the crack cocaine epidemic and underfunded schools (Claim III.C.ii.c.ii); (x) trial counsel failed to investigate and present evidence about Taylor's mother's difficult life, including that she was raised in a broken home with an emotionally abusive stepmother and that she was deeply suspicious of stepfathers (Claim III.C.ii.c.iii); (xi) trial counsel failed to investigate and present evidence that Taylor's father was one of 16 children and had fathered approximately 15 children of his own, that he rarely saw many of his children, and that he had a drinking problem (Claim III.C.ii.c.iv); (xii) trial counsel failed to elicit testimony about Taylor's seven-year old son, Kenny, the fact that Kenny's stepfather is a physically abusive drug dealer, and the likelihood that executing Taylor would have an enormous impact on Kenny (Claim III.C.ii.d.i); (xiii) trial counsel failed to elicit testimony that Glenda Washington viewed Taylor as kind, loyal, and generous, that Glenn Hockaday was a close friend of Taylor's in junior high school and early high school, and that Patricia Ramos had observed Taylor to be sweet and kind during a two-week hospital orderly training session at USA Medical Center because he had once captured a mouse while nurses and patients were scared (Claim III.C.ii.d.ii); (xiv) trial counsel elicited damaging testimony from Bishop James Finley that he did not know Taylor personally and that Taylor attended church only occasionally (Claim III.C.iii.a); (xv) trial counsel failed to elicit helpful testimony from Taylor's mother and sisters by not preparing them or asking the right questions that would have led to unspecified significant mitigation evidence (Claim III.C.iii.b); and (xvi) trial counsel failed to elicit helpful testimony from Taylor about the meaning of the term "misprision of a felony," an offense of which he had previously been convicted (Claim III.C.iii.c).[90]

Taylor never presented the overwhelming majority of these subclaims to the Alabama courts during Rule 32 proceedings prior to the disallowed Second Amended R32 Petition. In stark contrast to the 42-page, 92-paragraph claim of penalty-phase ineffective assistance of counsel presented in his § 2254 Petition, the corresponding claim in Taylor's Corrected First

---

[90]     In evaluating these claims, as well as Taylor's ineffective assistance claims generally, the Court bears in mind the Eleventh Circuit's astute observation that the fact that "other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (*en banc*).

Amended R32 Petition consisted of only six pages and 14 paragraphs. (R32 Claim IV.C.5 (vol. 22, R-56 at ¶¶ 162-175).) Taylor's Rule 32 penalty-phase ineffective-assistance claim asserted the following specific allegations: (i) trial counsel was ineffective in failing to call Taylor's older brother Jeff, who would have testified to his relationship with Taylor and his positive views of Taylor's character; (ii) trial counsel was ineffective in failing to elicit testimony about Taylor's son, Kenny, and the enormous impact Taylor's execution would have on Kenny; (iii) trial counsel was ineffective in failing to conduct an adequate mitigation investigation by not meeting with potential witnesses, interviewing family members or obtaining records; (iv) trial counsel was ineffective in failing to retain a mental health expert; (v) trial counsel was ineffective in failing to consult with a mitigation expert; and (vi) trial counsel was ineffective in failing to conduct re-direct examination of Taylor as to the meaning of the term "misprision of a felony." (*Id.*)[91]

Upon side-by-side comparison of the two pleadings, the Court finds that the only subclaims set forth in Claim III.C of Taylor's § 2254 Petition that were fairly presented to the Alabama courts in his Corrected First Amended R32 Petition were Claim III.C.ii.b.i (failure to consult a mental health expert), Claim III.C.ii.c.i (failure to consult a mitigation expert), Claim III.C.ii.d.i (failure to elicit testimony about Taylor's son), and Claim III.C.iii.c (failure to examine Taylor as to the meaning of "misprision of a felony"). All other subparts of Claim III.C were not exhausted in the Alabama courts in the Rule 32 proceedings because they are inadequately presented (if they were even presented at all) in the Corrected First Amended R32 Petition. Those unexhausted subparts (Claims III.C.i, III.C.ii.a.i, III.C.ii.a.ii, III.C.ii.b.ii, III.C.ii.b.iii, III.C.ii.b.iv, III.C.ii.c.ii, III.C.ii.c.iii, III.C.ii.c.iv, III.C.ii.d.ii, III.C.iii.a, and III.C.iii.b) are procedurally defaulted and will not be considered on the merits in these federal habeas proceedings.[92]

---

[91] In his Corrected First Amended R32 Petition, Taylor asserted that trial counsel were also ineffective in failing to object adequately to the penalty phase jury charge as not instructing the jury that they must find statutory aggravators outweighed mitigating evidence beyond a reasonable doubt. (Vol. 22, R-56 at ¶ 173.) No such subclaim appears in the penalty-phase ineffective-assistance claim set forth as Claim III.C of Taylor's § 2254 Petition; therefore, it will not be considered here.

[92] Four additional points are appropriate in bolstering that conclusion. First, the Court recognizes that Taylor has attempted to show cause and prejudice for not raising many of (Continued)

these subclaims to the state courts until the disallowed Second Amended R32 Petition by blaming trial counsel. However, this Court has already rejected that showing of cause and prejudice as legally inadequate because his post-conviction counsel had years to investigate and develop those claims prior to the 2005 judgment. (*See* III.D.8 of this Order, *supra*.) That analysis will not be reproduced here.

Second, some explanation may be helpful for the Court's conclusion that Claim III.C.i (lack of mitigation investigation generally) is not exhausted. It is true that paragraphs 167 and 168 of the Corrected First Amended R32 Petition generally track the portions of Claim III.C.i alleging that trial counsel failed in their responsibility to obtain "complete and accurate information relevant to Mr. Taylor's medical history, educational history, employment and training history, family and social history, correctional history, and any religious or cultural influences." (*Compare* vol. 22, R-56 at ¶ 167 *to* doc. 25 at ¶ 270.) The problem is that the Rule 32 iteration of this claim gives no inkling as to what trial counsel would have discovered had they performed such a mitigation investigation, what they would have learned via such investigation that they did not know already and how such additional information might have affected the outcome of the penalty phase of Taylor's trial. Taylor simply never presented this information or these allegations to the state courts in an allowed Rule 32 petition. In the general/ cursory form in which Claim III.C.i was presented in the Corrected First Amended R32 Petition, the state courts had no factual basis for evaluating *Strickland* prejudice. Petitioner failed to present this claim to the state courts in the manner required by the fair presentment doctrine by failing to furnish them with any factual predicate that might indicate prejudice under *Strickland*. *See, e.g., Gray v. Netherland*, 518 U.S. 152, 163, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) ("for purposes of exhausting state remedies, a claim for relief in habeas corpus must include … a statement of the facts that entitle the petitioner to relief"); *French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1270-71 (11th Cir. 2015) (for exhaustion purposes, petitioner must "present his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation").

Third, Taylor generically argues in his § 2254 reply brief that the various subclaims presented in Claim III.C that were never submitted to Alabama courts on post-conviction review "merely provide additional factual support" for the claims set forth in his Corrected First Amended R32 Petition. (Doc. 43, at 28-29.) The Court cannot agree. Again, it is black-letter law that a state petitioner must "fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Raleigh v. Secretary, Florida Dep't of Corrections*, 827 F.3d 938, 956 (11th Cir. 2016) (citation omitted). Alabama courts adjudicating the Corrected First Amended R32 Petition on the merits were not reasonably placed on notice of any of those subclaims and were not in a position to perform a *Strickland* analysis taking into consideration those omitted subclaims. The exhaustion doctrine forbids Taylor from raising those claims for the first time in his § 2254 Petition where he failed to give the state courts a fair chance to pass on such claims in any of his allowed Rule 32 petitions.

Fourth, Taylor insists in his § 2254 reply that subclaims III.C.ii.c.ii (difficulties of life in Prichard), II.C.ii.c.iii (Taylor's mother's difficult childhood), and II.C.ii.iv (Taylor's father's drinking problem and large number of children) were exhausted. (Doc. 43, at 37-38.) Taylor's
(Continued)

Of the four subparts to Claim III.C that Taylor did fairly present to Alabama courts in his Corrected First Amended R32 Petition, three of them are nonetheless procedurally defaulted. With respect to each of Claim III.C.ii.b.i (failure to consult a mental health expert), Claim III.C.ii.c.i (failure to consult a mitigation expert), and Claim III.C.ii.d.i (failure to elicit testimony about Taylor's son), the Alabama Court of Criminal Appeals declined to consider those issues on the merits because Taylor's appellate brief did not comply with the requirements of Rule 28(a)(10).[93] Because the state courts rejected these claims based on an adequate and independent state procedural ground, they are procedurally barred from being considered on the merits in these federal habeas proceedings.

The only subclaim in Claim III.C that is properly exhausted and available for § 2254 review on the merits is Claim III.C.iii.c, in which Taylor argues that trial counsel furnished ineffective assistance of counsel by failing to examine Taylor as to the term "misprision of a felony."[94] The context of this subclaim is that, on cross-examination during the penalty phase,

---

argument is that the vague references to "family and social history" and "cultural influences" in his Corrected First Amended R32 Petition were sufficient to exhaust Claims III.C.ii.c.ii, III.C.ii.c.iii, and III.C.ii.c.iv. (*Id.* at 38.) Based on the foregoing authorities and fundamental principles of the fair presentment doctrine, the Court finds this argument unpersuasive and concludes that those specific subclaims were not exhausted because Taylor never gave the Alabama courts a fair opportunity to pass on them in his Corrected First Amended R32 Petition. Name-checking buzzwords and catchphrases in their most vanilla and generic form, devoid of any factual predicate, does not suffice to constitute exhaustion. *See, e.g., French*, 790 F.3d at 1270-71 ("Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick.").

[93]     In his Corrected First Amended R32 Petition, Taylor included allegations of ineffective assistance of trial counsel in failing to consult a mental health expert, failure to consult a mitigation expert, and failure to elicit testimony about Taylor's son as part of R32 Claim IV.B.5. (Vol. 22, R-56 at ¶¶ 166, 169-71.) In his appellate brief in the Rule 32 proceedings, Taylor presented the sum total of his arguments pertaining to R32 Claim IV.B.5 in a single vague paragraph marked as section III.C.2.f of his brief. (Vol. 31, R-90 at 54.) The Alabama Court of Criminal Appeals concluded that Taylor's arguments in section III.C.2.f of his appellate brief were noncompliant with Rule 28(a)(10) and deemed them waived for purposes of appellate review. (Vol. 53, R-128 at *10-11.)

[94]     The reason this subclaim escapes the Rule 28(a)(10) procedural bar, whereas the remainder of R32 Claim IV.B.5 does not, is because the Alabama Court of Criminal Appeals expressly determined that "Claim IV.B.5, paragraphs 174-75" had not been dismissed by the trial (Continued)

the State asked Taylor whether he had been convicted in federal court for misprision of a felony, and Taylor acknowledged that he had.  (Vol. 9, R-30 at 1539.)  Defense counsel did not engage in redirect examination to ask Taylor to define the term "misprision of a felony."  (*Id.*)  In his § 2254 Petition, Taylor brands that omission ineffective assistance because "the jury had no basis on which to evaluate the nature of Mr. Taylor's conviction for this arcane and scary-sounding crime."  (Doc. 25, ¶ 354.)

In state post-conviction proceedings, the trial court concluded that Taylor had failed to carry his burden on that claim because, during the Rule 32 hearing, Taylor neglected to question trial counsel about the strategy underlying that decision.  In light of Taylor's failure to develop a record as to that particular subclaim, the trial court presumed that trial counsel's determination not to ask that follow-up question was reasonable.  After all, the trial court wrote, "[t]rial counsel would have been quite reasonable, for example, in preferring to quickly move past Taylor's prior conviction rather than lingering over it and allowing further details of the crime to be presented."  (Vol. 53, R-131 at 18.)  The Alabama Court of Criminal Appeals agreed with the trial court's reasoning, which it supplemented by accurately observing that "Taylor failed to allege or prove that he would have been able to provide the correct meaning of 'the arcane legal term' if he had been asked that question by trial counsel."  (Vol. 53, R-134 at 15.)  If counsel had asked the question, then, the record does not show that Taylor was capable of answering it correctly.  The appellate court also found no prejudice and rejected Taylor's speculative argument that "an explanation of the meaning of misprision of a felony would have prompted more of the jurors to recommend life without parole."  (*Id.*)  The Court finds nothing objectively unreasonable in the state courts' application of *Strickland* principles to this subclaim.  It was neither constitutionally deficient performance nor prejudicial under *Strickland* for trial counsel to refrain from asking

---

court's procedural rulings, and remanded for the trial court to consider same.  (Vol. 53, R-128 at *3-4.)  In other words, that subclaim was not within the scope of the trial court's dismissal orders, so the Alabama appellate court found it had never been ruled on and remanded it to Mobile County Circuit Court for that purpose.

Taylor to define the term "misprision of a felony" for the jury on re-direct examination during the penalty phase. No habeas relief is warranted on this subclaim.[95]

Because Subclaim III.C.iii.c fails on the merits, and all other subclaims are procedurally defaulted, Claim III.C is properly denied in its entirety.[96]

---

[95]     Taylor's stated concern that the jury might have been confused by this "scary-sounding crime" is greatly attenuated by the fact that defense counsel had already asked Taylor whether he had ever hurt anyone physically before this case, and whether he had ever been convicted of a violent crime before. Taylor had answered in the negative as to both. (Vol. 9, R-32 at 1538.) Thus, while jurors might not have known the precise meaning of the term "misprision of a felony" or what Taylor's offense conduct might have been, they knew from Taylor's own testimony that it was not a violent crime and that Taylor had not physically harmed anyone in connection with same. Such reassurances go a long way toward assuaging Taylor's presently expressed, purely speculative fear that the jury might have jumped to unwarranted conclusions about the actual meaning and import of this "scary-sounding crime" and that such unwarranted conclusions might have colored their penalty-phase recommendations.

[96]     Even if the numerous other subclaims were not procedurally barred (which they are), this Court would remain of the opinion that no relief is warranted on Claim III.C. During the penalty phase, trial counsel called five witnesses, to-wit: (i) Taylor himself, who testified that he loves his family very much, that his family loves him, that he is a religious person who prays and shares his faith with others, that he had never hurt anyone physically or been convicted of a violent crime before this case, and that he begged the jury to spare his life; (ii) Janet Jones, who testified that she was Taylor's sister, that their family is very close, that she loves Taylor and Taylor loves her, that Taylor was close with and a positive influence on his five year-old nephew, and that she did not believe in her heart that Taylor was capable of the crimes of which he had been convicted; (iii) Joyce Williams, who testified that she was Taylor's sister, that Taylor and his brother Jeffrey were very close, that Williams' four young children loved and had a close relationship with Taylor, that she loved Taylor and that she went to church with him; (iv) Bishop James Finley, who testified that Taylor's family (including Taylor himself) attended his church, that Taylor came to church with his mother, and that they were a very close family and appeared to be loving people; and (v) Eleanor Taylor, who testified that she was Taylor's mother, that they were a close family, that Taylor grew up without a father, that Taylor was a well-behaved child who had played football, been in the band and worked at Show Biz Pizza, that she attended church with Taylor, that he had been a normal healthy child, that he had a very close relationship with his nephews and nieces, that he had received a music award, that he had earned his GED in 1995, and that she begged the jury to spare his life. (Vol. 9, R-30.) On its face, this appears to be a sound, effective, prudent mitigation case. That assessment is reinforced by the fact that the jury recommended life, not death. *See, e.g., Parker v. Allen*, 565 F.3d 1258, 1275 (11th Cir. 2009) ("A petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life instead of death."); *Tarver v. Hopper*, 169 F.3d 710, 715 (11th Cir. 1999) ("Tarver's lawyer's effectiveness at the sentencing stage is strongly evidenced by the jury's decision to recommend not death, but life without parole."). Nor are trial counsel constitutionally deficient simply because they do not present all possible mitigation evidence (Continued)

during the penalty phase. *See, e.g., Rhode v. Hall*, 582 F.3d 1273, 1281 (11th Cir. 2009) (reaffirming that "counsel [is not] required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy") (citation omitted); *Chandler v. United States*, 218 F.3d 1305, 1319 n.25 (11th Cir. 2000) (federal law does "not support the proposition that, if counsel does not present all possible mitigation at sentencing, then defendant has been denied some constitutional right"). Certainly, whatever deficiencies may have afflicted trial counsel's mitigation investigation were not so egregious to give rise to a presumption of prejudice. *See Borden v. Allen*, 646 F.3d 785, 819 (11th Cir. 2011) ("a counsel's failure to satisfactorily investigate potential mitigating factors does *not* give rise to a presumption of prejudice").

Moreover, obscured by petitioner's labyrinthine presentation of Claim III.C is the inescapable fact that the additional mitigation evidence Taylor says trial counsel should have offered was weak, speculative, cumulative or inconsistent with the mitigation case counsel developed and presented on Taylor's behalf. Several examples illustrate the point. First, as to Taylor's childhood, evidence that he was raised in a poor household by a single mother in a rough neighborhood is neither remarkable nor helpful, particularly when his siblings (such as his brother Jeffrey, an Army veteran and South Carolina police officer) had grown up in the same environment and thrived as productive, law-abiding citizens. *See, e.g., Lee v. Commissioner, Alabama Dep't of Corrections*, 726 F.3d 1172, 1194 (11th Cir. 2013) ("[m]any people have grown up in socio-economic conditions far worse than those described by Lee and have not committed a double homicide"); *Sochor v. Secretary Dep't of Corrections*, 685 F.3d 1016, 1032-33 (11th Cir. 2012) ("[w]hen additional mitigating evidence … has the potential to highlight that a petitioner's sibling grew up in the same environment and still emerged as a successfully employed, law-abiding citizen, that evidence can pose as much harm as good"); *Land v. Allen*, 573 F.3d 1211, 1222 (11th Cir. 2009) (no prejudice in trial counsel's failure to introduce evidence of defendant's childhood that was "unremarkable because the degree of difficulty in [defendant]'s childhood was the same as that suffered by many"). Second, as to alleged abuse by his mother, Taylor's present allegations are vague and conclusory, and would in any event have been inconsistent with the chosen defense strategy of emphasizing defendant's loving family and close relationship with his mother, who testified to that effect in the penalty phase as she pleaded with the jury to spare her son's life. To demonize Taylor's mother, as Taylor now says his lawyers should have done, would have been to sabotage that effective mitigation strategy. Third, Taylor hypothesizes that he suffered from mental illness, delusions of grandeur, and intellectual deficits, but fails to identify the existence of any testimony from any medical professional or the existence of any medical records reflecting same, much less any expert who was available and would have testified to that effect in 1998. Besides, an argument that Taylor was functionally and cognitively impaired would have clashed with the defense mitigation strategy of emphasizing that Taylor had a normal healthy childhood, played in the high school band, earned his GED, and worked at a pizza place. Fourth, evidence that Taylor had other family members or friends who loved him or whom he loved would have been merely cumulative of the mitigation evidence counsel already presented at trial.

Despite representing Taylor for well over a decade, with access to large-firm investigative resources, habeas counsel have been able to develop only meager additional
(Continued)

## M.      Claim III.D (Ineffective Assistance as to Motion for New Trial).

Claim III.D of Taylor's § 2254 Petition is grounded in the premise that "Defense counsel provided constitutionally ineffective assistance by failing to competently litigate Mr. Taylor's motion for a new trial."  (Doc. 25, ¶ 355.)  As framed in the § 2254 Petition, this claim is subdivided into two subclaims.  First, in Claim III.D.i, Taylor argues that trial counsel failed to investigate a juror's statement on a radio show that the jury was aware of Taylor's criminal history, and specifically criticizes trial counsel for failing to examine exhibits admitted into evidence to discern how the jury could have had access to that information.  (*Id.*, ¶¶ 356-61.)  Second, in Claim III.D.ii, Taylor maintains that trial counsel failed to investigate the Clark recantation issue by interviewing or eliciting testimony from Sergeant Goode and Lieutenant York, who were alleged to have been present when Warden Gaston allegedly threatened Clark into recanting.  (*Id.*, ¶¶ 362-67.)

With respect to Claim III.D.i, the State posits that this subclaim was never raised in state post-conviction proceedings, such that it is not exhausted.  (Doc. 33, at 90.)  In response, Taylor makes a blanket argument that Claim III.D.i was exhausted because he "clearly alleged in the Corrected First Amended Petition that Trial Counsel provided ineffective assistance of counsel by failing to adequately pursue Mr. Taylor's motion for new trial" and that he "similarly alleged his claim regarding a new trial in the Second Amended Petition."  (Doc. 43, at 40.)  Taylor's assertions miss the point.  To be sure, both his Corrected First Amended R32 Petition and his disallowed Revised Second Amended R32 Petition included ineffective-assistance claims asserting that trial counsel failed adequately to pursue the motion for new trial.  (Vol. 22, R-56 at

---

mitigation evidence.  This showing supports neither a claim of *Strickland* deficient performance nor *Strickland* prejudice.  And again, "the fact that the jury recommended life imprisonment counsels against a determination that [Taylor] was prejudiced under *Strickland*."  *Lee*, 726 F.3d at 1196.  In sum, even taking all the alleged new mitigating evidence as true, and considering it with the evidence of mitigating and aggravating circumstances presented at trial, the undersigned concludes that Taylor has not shown a reasonable probability that the sentencing judge would have arrived at a different conclusion, as needed to show prejudice under *Strickland*.  *See Parker*, 565 F.3d at 1285 ("To show prejudice, Parker must prove that there is a reasonable probability that the sentencing judge would have arrived at a different conclusion after being presented with the additional evidence and reweighing the aggravating and mitigating circumstances.").  Accordingly, no relief would be warranted on Claim III.C even if it were properly considered on the merits in its entirety.

¶¶ 177-79; vol. 46. R-102 at ¶¶ 255-57.)  But nowhere in those claims did Taylor allege that trial counsel "[f]ailed to competently pursue the grounds that the jury considered improper evidence regarding Mr. Taylor's criminal record," which is the theory animating Claim III.D.i.  Indeed, nowhere in the Rule 32 petitions did Taylor even suggest that trial counsel had been ineffective as to the access-to-criminal-record portion of the motion for new trial.[97]  That subclaim was never fairly presented to the state courts, is not properly exhausted, and cannot form a cognizable basis for § 2254 relief.

As for Claim III.D.ii, it was presented in the Corrected First Amended R32 Petition; however, the Alabama Court of Appeals rejected it because Taylor's appellate brief as to this claim was not compliant with Rule 28(a)(10).[98]  For that reason, Claim III.D.ii is procedurally barred and no federal habeas relief is available to Taylor on that ground.[99]

---

[97]     In the Corrected First Amended R32 Petition, Taylor's only arguments in support of his ineffective-assistance claim pertaining to the motion for new trial were that trial counsel failed to interview Sergeant Goode and Lieutenant York in connection with the Clark recantation, and that they failed to object when Judge Johnstone told Warden Gaston that he was being called to the stand for the purpose of responding to Clark's allegation that Warden Gaston "brow beat him into recanting."  (Vol. 22, R-56 at ¶¶ 177-79.)  Nothing in those allegations would or could have put state courts on notice that Taylor sought to pursue an ineffective-assistance claim targeting defense counsel's handling on motion for new trial of the issue of the jury's knowledge of Taylor's criminal history; therefore, that claim is not exhausted.

[98]     Specifically, section III.D.2.p of Taylor's appellate brief in the Rule 32 proceedings set forth his arguments regarding ineffective assistance as to the Clark recantation aspect of the motion for new trial.  (Vol. 31, R-90 at 71.)  The Alabama Court of Criminal Appeals determined that all of Taylor's arguments in section "III.D.2(a)-(r)" of his appellate brief were waived for non-compliance with Rule 28(a)(10).  (Vol. 53, R-128 at *11.)

[99]     Even if Claim III.D.ii were not procedurally barred (which it is), it would fail on the merits.  To this day, Taylor has come forward with not a shred of evidence as to what Sergeant Goode and Lieutenant York would have said if trial counsel had interviewed them or called them to testify at the hearing on the motion for new trial.  There is nothing other than sheer conjecture to support the notion that either of them would have supported the latest iteration of Clark's testimony, which was that he had recanted his previous testimony because Warden Gaston had threatened him and had threatened his family.  On this nonexistent showing that either of these witnesses would have offered testimony favoring the relief requested in the motion for new trial, there is no prejudice under *Strickland*, even if the Court were to assume that it was constitutionally deficient performance for counsel not to interview those correctional officers or subpoena them to testify at the hearing.

### N.    Claim III.F (Cumulative Ineffective Assistance of Counsel).

In Claim III.F of his § 2254 Petition, Taylor seeks to aggregate his numerous claims of ineffective assistance of trial counsel into a separate claim of cumulative error, arguing that the cumulative effect of counsel's errors deprived him of effective assistance as guaranteed under the Sixth and Fourteenth Amendments.  During state post-conviction proceedings, the Alabama Court of Criminal Appeals rejected this claim because "upon consideration of the properly-pleaded claims of ineffective assistance of counsel, Taylor failed to prove even one instance of deficient performance, let alone several."  (Vol. 53, R-134 at 21.)  On that basis, the Alabama appellate court concluded that even if a claim of cumulative ineffective assistance could be viable, Taylor would not succeed, in that "we would find that [Taylor's] substantial rights had not been affected, because we have found no error in the instances argued in the petition."  (*Id.* (citation omitted).)

The state courts' rejection of Taylor's cumulative ineffective-assistance claim was not an objectively unreasonable application of *Strickland* principles for at least two distinct reasons.  First, it is far from certain that the cumulative error doctrine is even applicable to claims of ineffective assistance of counsel.  In an unpublished decision, the Eleventh Circuit made the following observations:

> "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim.  However, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'  *United States v. Cronic*, 466 U.S. 648, 659 n.26, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)."

*Forrest v. Florida Dep't of Corrections*, 342 Fed.Appx. 560, 564-65 (11th Cir. Aug. 21, 2009); *see also Borden v. Allen*, 646 F.3d 785, 823 (11th Cir. 2011) (declining request in COA that appellate court "determine whether a claim of ineffective assistance of counsel may be based on the 'cumulative effect' of multiple non-prejudicial errors by counsel" because petitioner had not "sufficiently pled facts that would establish prejudice – cumulative or otherwise").[100]  If the

---

[100]    In arguing otherwise, Taylor relies on a single line of unsupported *dicta* from a 2012 Eleventh Circuit decision.  *See Evans v. Secretary, Florida Dep't of Corrections*, 699 F.3d 1249, 1269 (11th Cir. 2012) (indicating that "the prejudice inquiry should be a cumulative one as to the effect of all the failures of counsel that meet the performance deficiency requirement").  (Continued)

application of cumulative error principles to ineffective assistance of counsel claims is unsettled and indeterminate as a matter of Supreme Court precedent, then the Alabama courts' rejection of Taylor's cumulative ineffective-assistance claim cannot logically be "contrary to or an unreasonable application of clearly established federal law," *Forrest*, 342 Fed.Appx. at 565, as necessary to give rise to a right to federal habeas relief.

Second, even if cumulative ineffective-assistance claims were available as a matter of clearly established federal law (which Taylor has not shown to be the case), Claim III.F would fail. Considering all of Taylor's ineffective-assistance claims that are exhausted, not procedurally defaulted, and for which he has shown or may have shown constitutionally deficient performance, Taylor has not established a reasonable probability that, but for those purported errors by trial counsel, the outcome at trial would have been different. Moreover, he has not shown that the state courts' resolution of this issue was objectively unreasonable or that no fairminded jurists could resolve Claim III.F as the state courts did. Accordingly, no relief is warranted on Taylor's claim of cumulative ineffective of assistance of counsel. *See, e.g., Hunt v. Commissioner, Alabama Dep't of Corrections*, 666 F.3d 708, 731-32 (11th Cir. 2012) ("Even if we were to determine that clearly established federal law mandates a cumulative-effect analysis of ineffective-assistance claims, Hunt would not be entitled to relief: he has not shown that in this case the cumulative effect of counsel's alleged errors amounted to ineffective assistance."); *see generally Masse v. Secretary, Florida Dep't of Corrections*, --- Fed.Appx. ----, 2017 WL 2703563, *4 (11th Cir. June 22, 2017) ("In support of his claim for cumulative error, Masse relies on the ineffective-assistance-of-counsel and due process claims we have already addressed. Because Masse's individual claims have no merit, Masse can show no cumulative error.").

### O.     *Claim V.A (Improper Jury Instructions During Guilt Phase).*

As Claim V.A of his § 2254 Petition, Taylor contends that the guilt-phase jury instructions violated his federal constitutional rights in three enumerated respects, to-wit: (i) the trial court refused to give an instruction on the lesser included offense of robbery (Claim V.A.i.a); (ii) the trial court gave an improper instruction on the lesser-included offense of felony

---

The *Evans* panel did not provide any reasoning or citations to authority to bolster that bald statement. Such an offhand remark does not render this principle "clearly established federal law" for purposes of a § 2254 analysis.

murder (Claim V.A.i.b); and (iii) the trial court's instructions enabled the jury to convict Taylor of capital murder without finding specific intent (Claim V.A.ii). Each of these subclaims was exhausted in the state courts on direct appeal, and will be addressed in turn.

With respect to Claim V.A.i.a, Taylor asserts that he was entitled to a lesser included offense instruction for robbery because "the evidence presented at trial was such that the jury rationally could have found him guilty of committing a robbery while also acquitting him of murder," yet based on the instructions given "[t]he jury … had no opportunity to convict Mr. Taylor of robbery without also convicting him of murder." (Doc. 25, ¶¶ 399-400.)[101] On direct appeal, the Alabama Court of Criminal Appeals rejected Taylor's claim that he was entitled to a jury instruction on the lesser included offense of robbery. In so doing, the appellate court observed that "[t]he record reflects that the trial court did give the jury the option of convicting Taylor of the lesser-included offenses of intentional murder and felony murder," and found that "the jury was given adequate instructions that would have allowed it return a verdict of felony murder based on the underlying offense of robbery." *Taylor v. State*, 808 So.2d, 1148, 1172 (Ala.Crim.App. 2000).

The state courts' denial of this claim was not an unreasonable application of clearly established federal law. In advancing Claim V.A.i.a here, Taylor relies on the line of decisions flowing from *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Such reliance is misplaced. Those cases do not stand for the proposition that a defendant has a constitutional right to every single lesser included offense jury instruction that might conceivably fit the evidence. To the contrary, *Beck* and its progeny expressly refute that proposition. In *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), the defendant argued – just as Taylor does here – that "the due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included noncapital offense supported by the evidence, and that robbery was such an offense in this case." *Id.* at 646. In rejecting this contention, the *Schad* Court explained as follows:

---

[101]    Taylor elaborates on this claim by postulating that "[t]he jury could have found the evidence supported a theory that Mr. Taylor stole the Mustang and fled the dealership, and that Mr. McMillan then, unbeknownst to Mr. Taylor, stayed at the dealership and himself killed the three victims in the course of trying to steal items other than the Mustang, such as the victims' personal effects." (Vol. 25, ¶ 399.)

"Petitioner misapprehends the conceptual underpinnings of *Beck*. Our fundamental concern in *Beck* was that a jury convinced the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. … This central concern of *Beck* simply is not implicated in the present case, for petitioner's jury was not faced with an all or nothing choice between the offense of conviction (capital murder) and innocence."

501 U.S. at 646-47. Unlike in the *Beck* line of decisions, Taylor's jury was not given an all-or-nothing choice of either convicting him of a capital crime or acquitting him altogether. As such, the rule announced in *Beck* is inapplicable here.[102] In light of these principles, the Alabama Court of Criminal Appeals' conclusion that the trial judge did not err in failing to instruct Taylor's jury on the lesser included offense of robbery was neither contrary to nor an unreasonable application of *Beck*. It is nothing short of irrational to believe that a jury unconvinced that Taylor was guilty of capital murder or intentional murder or felony murder, but unable to convict him of robbery because that option was not provided in the jury instructions, would select the capital murder option rather than the noncapital options as a means of keeping him off the streets.

Next, in Claim V.A.i.b, Taylor maintains that Judge Johnstone's felony murder instruction was unconstitutional because it "effectively deprived the jury of the opportunity to consider the lesser-included offense of felony murder … by suggesting that the jury could not reasonably find Mr. Taylor guilty of that charge." (Doc. 25, ¶ 404.) This claim hinges in its entirety on the trial judge's stray comment to the jury that intentional murder was "the only type of non-capital murder you could find because felony murder would require that the killing take place during the course of a robbery." (Vol. 9, R-23 at 1512.) Taylor is correct that Judge

---

[102]     *See, e.g., Powell v. Allen*, 602 F.3d 1263, 1271 (11th Cir. 2010) ("Because Powell's jury charge included not only capital murder but also intentional murder and manslaughter, neither of which permit the death penalty, Powell's jury did not face the choice of either convicting the defendant of the capital crime … or acquitting him …. Because the jury was not faced with the 'all-or-nothing' choice *Beck* is concerned with, Powell's claim cannot succeed.") (citations omitted); *Lee v. Thomas*, 2012 WL 1965608, *30 (S.D. Ala. May 30, 2012) ("In arguing a violation of *Beck*, … petitioner ignores both Supreme Court and Eleventh Circuit precedent making clear that *Beck* does not apply where, as here, a capital defendant does receive charges on certain lesser included offenses, just not on every single lesser included offense that the evidence might support or that the defendant might desire.").

Johnstone uttered those words while instructing the jury. But Taylor ignores (i) the context in which such comments were made, including a previous, detailed, correct instruction on felony murder (*id.* at 1473-78); (ii) Judge Johnstone's immediate self-correction prefaced by the phrase "I will have to back up" (*id.* at 1512); and (iii) his detailed, accurate instruction on felony murder thereafter.[103] The state courts properly gave short shrift to Taylor's attempt to conjure constitutional error by focusing on a single offhand misstatement, while disregarding the fact that the trial judge immediately, thoroughly, and clearly retracted and corrected that error via an accurate instruction on felony murder. *See Taylor*, 808 So.2d at 1208 ("The reinstruction on felony murder was a complete and correct instruction on felony murder, and, when combined with the trial court's original instructions on lesser-included offenses, it gave the jury the necessary information to consider felony murder as a lesser included offense for counts two, three, and four of the indictment."). The Court concurs with the Alabama Court of Criminal Appeals' assessment that the jury was properly instructed on the lesser included offense of felony murder and that there was no error. Taylor's assertion that "[t]he Trial Court's instruction effectively negated the availability of the felony murder charge" (doc. 25, ¶ 408) is conclusively rebutted by a fair reading of the trial transcript, as opposed to Taylor's selective cherry-picking of a single sentence fragment in isolation while ignoring everything else. Claim V.A.i.b is unfounded.

Taylor's Claim V.A.ii is predicated on the notion that Judge Johnstone's "capital murder instruction unconstitutionally relieved the State of its burden to prove Mr. Taylor's specific

---

[103] The trial transcript reveals the following remarks by Judge Johnstone immediately after instructing on the non-capital offense of intentional murder. "There is another type of murder which you could consider and that is suppose – I really think that is the only type of non-capital murder you could find because felony murder would require that the killing take place during the course of a robbery. Well, yes, -- ***I will have to back up. You could consider felony murder*** … with regard to one of these counts, either two, three or four. If you harbored a reasonable doubt that the defendant in his own brain intended the death of any person … but, nonetheless, you are convinced beyond a reasonable doubt that he did intend the robbery in his own brain and that he … committed the acts necessary for the robbery and that although he did not intend the death in his own head, he either in person or through an accomplice did shoot to death Steve Dyas, then that would be non-capital murder under the felony murder doctrine, which says even though he doesn't intend that someone dies, if someone be killed in the course of a robbery in any degree, then the killer is guilty of non-capital murder …." (Vol. 9, R-23 at 1512-13 (emphasis added).)

intent to kill." (Doc. 25, ¶ 415.) Once again, Taylor's argument focuses on a tiny excerpt of the trial judge's instructions to the jury, to-wit:

> "You cannot convict the defendant of the capital offense, if he did not kill, attempt to kill or intend that a killing take place in the capital offense alleged in the indictment. Stated otherwise, unless the state proves beyond a reasonable doubt that Jarrod Taylor either killed an alleged victim in this case, attempted to kill him or her or intended that he or she be killed, then you cannot find Jarrod Taylor guilty of the capital offense as to that particular victim."

(Vol. 9, R-23 at 1473.) Taken in isolation, these two sentences appear to state that Taylor could be found guilty of capital murder so long as he killed a victim, attempted to kill a victim, <u>or</u> intended that a victim be killed. That would not be a correct statement of law because it would allow the jury to convict Taylor of capital murder without the necessary finding that he had the specific intent to kill. But Claim V.A.ii disregards the context and glosses over the jury instructions as a whole. On direct appeal, the Alabama Court of Criminal Appeals rejected this argument, finding that "[a] review of the trial court's complete instructions on capital murder makes it clear that the trial court did not lower the State's burden of proof, nor did its instructions allow the jury to convict Taylor without finding that he had the specific intent to kill." *Taylor*, 808 So.2d at 1206.

After careful review of the transcript, the Court finds no error in the Alabama appellate court's reasoning or conclusion. Throughout his instructions, Judge Johnstone repeatedly emphasized that the jury could not return a verdict of capital murder against Taylor unless they found beyond a reasonable doubt that he had a specific intent to kill. (Vol. 9, R-23 at 1467-68 ("For purposes of proof of a capital murder charge murder is the intentional, unjustified killing of another human being."), 1468 ("A person commits the crime of murder if with intent to cause the death of another person, he causes the death of that person or of another person. … [T]hat is the type of murder that must be or that is an essential element of capital murder. It is an intentional killing."), 1468-69 ("If the state's evidence on count two, three or four convinces you beyond a reasonable doubt that … [d]uring the commission of the robbery … the defendant committed intentional murder … then that is evidence that will sustain a conviction of capital murder on counts two, three and four."), 1471 ("In order for you to convict this defendant under count one the evidence would have to convince you beyond a reasonable doubt that this defendant … intended in his own brain … that he would kill or that he and his accomplice would kill, two or more of these victims …."), 1471-72 ("If, however, you were to harbor a reasonable doubt that

this defendant intended to kill more than one of these three victims, then you could not find the defendant guilty of this type of capital murder."), 1472 ("a defendant may not be convicted of capital murder as an accomplice to that capital murder unless the evidence convinces you beyond a reasonable doubt that the defendant had the particularized intent to kill"), 1505 ("If you have a reasonable doubt … that the defendant intentionally killed two or more people as part of the same scheme or course of conduct, then you couldn't convict him of capital murder …."), 1507 ("if you don't find the requisite intent, you can't convict him"), 1508 ("In order for the state to get a capital conviction the state would have to prove that the defendant intended to kill somebody during the robbery …."), 1509 ("And while that activity was going on, … which would constitute a first degree robbery, … the defendant intended to kill one of the three people there"), 1510 ("That would constitute capital murder because it's the intentional murder during the course of a robbery.  That's capital murder.").[104]

Reviewing these instructions as a whole, rather than opportunistically parsing an isolated line or two out of context as Taylor has done, the Court readily finds that Judge Johnstone's instructions to the jury did not eliminate or reduce the State's burden to prove beyond a reasonable doubt that Taylor possessed the requisite specific intent to kill.  The Court finds no error in the Alabama courts' determination that the trial court gave a complete and correct instruction on the requirements to convict for capital murder.  Claim V.A.ii lacks merit.

**P.      Claim V.B (Improper Jury Instructions During Penalty Phase).**

---

[104]      Besides, the tiny extract of the jury instructions on which Count V.A.ii is focused was not a model of clarity, but taken in context it was not wrong.  At that moment, Judge Johnstone was not talking about the intent of the triggerman at all, but was instead explaining the accomplice liability doctrine.  His point, albeit inartfully stated, was that Taylor could be convicted of capital murder as an accomplice even if he did not do the killing himself, so long as he intended that an alleged victim be killed.  That is a correct statement of law, and in no way alters or eliminates the State's burden of proof as to the specific intent element.  The Alabama Court of Criminal Appeals correctly so found.  *See Taylor*, 808 So.2d at 1206 (observing that "the trial court was explaining that Taylor could not be convicted of capital murder as a 'non-killing accomplice' unless the jury found he shared the specific intent to kill of the 'trigger-man'").  Viewed in the proper context of the trial court's numerous clear and unambiguous statements emphasizing the necessity for a finding that Taylor harbored a specific intent to kill in order to convict him of capital murder, the language from the jury instruction as highlighted by Taylor in Claim V.A.ii was neither incorrect nor likely to confuse or mislead the jury.

Claim V.B of Taylor's § 2254 Petition asserts that the trial court violated his constitutional rights by "fail[ing] to clearly instruct the jury that each juror should individually consider the mitigation evidence presented." (Doc. 25, ¶ 425.) The legal foundation of this claim is Supreme Court precedent holding that "individualized consideration of mitigating factors … [is] required by the Eighth and Fourteenth Amendments in capital cases." *Lockett v. Ohio*, 438 U.S. 586, 606, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). On that basis, the Supreme Court has vacated death sentences where "there is a substantial probability that reasonable jurors … well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills v. Maryland*, 486 U.S. 367, 383, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *see also McKoy v. North Carolina*, 494 U.S. 433, 442-43, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) ("*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death," meaning that "each juror must be allowed to consider all mitigating evidence").[105]

Taylor's position is that there is *Mills* error here because the trial judge "failed to clearly instruct the jury that each juror should individually consider the mitigation evidence presented" (Doc. 25, ¶ 425). However, the Eleventh Circuit has expressly rejected the notion that clearly established federal law requires such an affirmative instruction where the trial court has not suggested that unanimity as to mitigating factors is necessary. *See Lucas v. Warden, Georgia Diagnostic and Classification Prison*, 771 F.3d 785, 807 (11th Cir. 2014) ("Lucas can point us to no Supreme Court precedent clearly establishing that an affirmative instruction must be given

---

[105]    It should be noted, however, that *Mills* has not been construed expansively by the Eleventh Circuit, but has instead been limited to its specific terms. *See Lucas v. Warden, Georgia Diagnostic and Classification Prison*, 771 F.3d 785, 807 (11th Cir. 2014) ("Here, the trial court's jury instructions and verdict form contained no statement that reasonably could be read by jurors to require unanimity on mitigating factors. … Unlike in *Mills* and *McKoy*, there was no danger that a reasonable juror would have felt compelled to vote for death if she were moved by a mitigating factor not found by another juror."); *Ward v. Hall*, 592 F.3d 1144, 1188 (11th Cir. 2010) (finding no *Mills* error where the trial court generally instructed that the jury's verdict must be unanimous and the petitioner argued that the general unanimity instruction conveyed to jurors the need to decide mitigating factors unanimously, but "[t]he jury was never instructed that it had to agree unanimously on the existence of a particular mitigating circumstance before it could be considered" and concluding that the petitioner's "construction of the trial court's instructions strains credulity and we cannot credit it").

when the trial court has not otherwise suggested that unanimity is mandatory."). Nothing in Judge Johnstone's penalty-phase instructions could be reasonably read by jurors to require unanimity on mitigating factors. To the contrary, he instructed them that "if you find one or more mitigating … circumstances to exist, it is then for you to weigh and consider;" that "[t]he existence or non-existence of these suggested mitigating circumstances … is for you to determine from the evidence;" that "you have to make a determination whether or not the evidence shows such a mitigating circumstance;" and the like. (Vol. 9, R-34 at 1586, 1588, 1589.) As such, the Alabama Court of Criminal Appeals did not contradict or unreasonably apply the *Mills* line of decisions in denying relief on this claim. *See Taylor*, 808 So.2d at 1211 ("We have reviewed the trial court's instructions and conclude that the charge was not contrary to the principles set out in *Mills v. Maryland*"). No § 2254 relief is available for Taylor on Claim V.B.[106]

## Q.    *Claim VI (Sufficiency of the Evidence).*

In Claim VI of his § 2254 Petition, Taylor raises a challenge to the sufficiency of the evidence to support his capital murder convictions. Petitioner's position is that the evidence presented by the State "fell far short of satisfying the State's burden to prove each element of the capital murder charge beyond a reasonable doubt." (Doc. 25, ¶ 434.) Expounding on this theory, Taylor argues that McMillan's testimony was the only evidence placing him at Steve Dyas Motors at the time of the murders, that McMillan's testimony was inherently

---

[106]    In so concluding, the undersigned has carefully considered Taylor's arguments. According to Taylor, an inference that unanimity was required may be drawn from the trial court's instruction that "if you find that the evidence shows a mitigating circumstance, … then you must weigh that circumstance or any such circumstance so proved in your deliberations in your determination of the sentence to be imposed." (Vol. 9, R-34 at 1590.) Likewise, Taylor maintains that the trial court's instruction that, to recommend a life sentence, "there must be concurrence of at least seven of your number" (*id.* at 1594) could have prompted the jury to believe that no mitigating factor could be credited unless at least seven of them found it to exist. And Taylor says that Judge Johnstone's failure to instruct "that the jurors need not be influenced by the views of the other jurors" (doc. 25, ¶ 428) could have caused jurors to believe they needed to agree on any mitigating factors considered. Such a strained, tortured construction of the penalty-phase instructions cannot withstand scrutiny. The trial judge's instructions contained no statement that could reasonably be construed as requiring unanimity (or even concurrence of at least seven jurors) before any mitigating factor could be considered by a juror for sentencing purposes. Alabama courts did not err in finding no *Mills* violation in these circumstances.

untrustworthy, and that all other "evidence presented at trial was circumstantial and did no more than give rise to inferences of suspicious conduct." (*Id.*, ¶ 436.)  Because "generalized inferences are constitutionally insufficient to sustain a conviction" (*id.*), Taylor contends that his capital murder convictions violate the Fourteenth Amendment.

When Taylor presented this claim on direct appeal, the Alabama Court of Criminal Appeals emphatically rejected it in the following terms:

> "The evidence … establishes that Taylor was the ringleader in a plot that involved the theft of the murder weapon, a day-long deception of the sales people and the owner at Steve Dyas Motors, the deliberate murder of three people in the course of the robbery of Steve Dyas Motors in order to steal what Taylor believed was a safe-full of money at the dealership and an automobile, the subsequent disposal of incriminating evidence, and a quick getaway to another city.
> "Whether McMillan was worthy of belief as an eyewitness accomplice … was a question properly before the factfinders.  It was the jurors' role to determine what weight should be assigned to his testimony.  We will not reweigh that evidence and substitute our judgment for that of the jury. …
> "The evidence was sufficient to establish a prima facie case against Taylor on each count.  There was no error here."

*Taylor*, 808 So.2d at 1202.

The Supreme Court has explained that sufficiency-of-the-evidence challenges "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."  *Coleman v. Johnson*, 566 U.S. 650, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012).  The first layer is the principle that, on direct appeal, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  *Id.* (citation omitted).  "The evidence is sufficient to support a conviction whenever, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Parker v. Matthews*, 567 U.S. 37, 43, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012).  The second layer of deference is that a federal court on § 2254 review may overturn a state court's sufficiency ruling "only if the state court decision was objectively unreasonable."  *Coleman*, 132 S.Ct. at 2062 (citation omitted).  In conducting such an inquiry, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court."  *Cavazos v. Smith*, 565 U.S. 1, 2, 132 S.Ct. 2, 181 L.Ed.2d 311

(2011). And of course, "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 132 S.Ct. at 2064.[107]

Taylor's attack on the sufficiency of the evidence to convict him of capital murder cannot overcome either of these layers of judicial deference, much less both of them. After careful examination of the trial record and the Alabama appellate court's ruling on direct appeal, the Court readily concludes that (i) viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of capital murder beyond a reasonable doubt as to each count of conviction; and (ii) it was not objectively unreasonable for the Alabama Court of Criminal appeals so to determine.[108]

---

[107] For example, Taylor cites Alabama authorities for the proposition that "corroboration of accomplice testimony is required." (Doc. 25, ¶ 436.) But the federal constitution has no such requirement; therefore, this line of argument is unavailing for § 2254 purposes (at least where, as here, the accomplice's testimony was not facially incredible). *See, e.g., Hallford v. Culliver*, 379 F. Supp.2d 1232, 1278 (M.D. Ala. 2004) ("The short legal answer to this claim is that there is no constitutional requirement that the testimony of an accomplice-witness be corroborated."); *see also United States v. Milkintas*, 470 F.3d 1339, 1344 (11th Cir. 2006) ("we have held the uncorroborated testimony of an accomplice is sufficient to support a conviction if it is not on its face incredible or otherwise insubstantial").

[108] Contrary to Taylor's argument, the evidence presented at trial, when taken in the light most favorable to the State, supports far more than mere "generalized inferences of suspicious conduct." The Due Process Clause does not require that McMillan's testimony be disregarded for a sufficiency-of-the-evidence analysis merely because he was an accomplice with a plea deal; rather, it was for the jury to decide whether to believe him and, if so, how much weight to give his testimony. *See United States v. Green*, 818 F.3d 1258, 1274 (11th Cir. 2016) ("To the extent the defendants' argument depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and we may not revisit the question.") (citation and internal quotation marks omitted); *Milkintas*, 470 F.3d at 1344 ("Even though the Government's proof … depends heavily on the testimony of a co-defendant with a prior criminal history testifying as part of a plea agreement, the jury was free to find [the co-defendant] credible and we will not intrude on that decision."). The Court therefore declines to blithely erase McMillan's testimony for purposes of a constitutional review of the sufficiency of the evidence, merely because Taylor thinks the jury should not have believed that witness. At any rate, in addition to McMillan's testimony, the jury received evidence supporting reasonable inferences that Taylor had stolen the murder weapon from Saafir's apartment earlier that day when Saafir loaned him his jacket containing his apartment keys; that Taylor and McMillan had been hanging around Steve Dyas Motors all day under false pretenses; that Taylor walked the last surviving Steve Dyas Motors employee out of the dealership minutes before the murders were committed; that Taylor handed the murder weapon to Carlton for safekeeping shortly after the murders were committed; that Taylor drove away from Steve Dyas Motors in a stolen Ford Mustang; and that
(Continued)

**R.    Claim VII (Consideration of Improper Evidence at Sentencing).**

As Claim VII of his § 2254 Petition, Taylor maintains that the trial court violated the Eighth and Fourteenth Amendments by considering "statements by the victims' family members regarding their views as to the appropriate sentence for Mr. Taylor" at the sentencing hearing. (Doc. 25, ¶ 440.)  In particular, two family members of the victims gave statements at the sentencing hearing in which they articulated their wishes that Taylor receive the death penalty. (Vol. 10, R-37 at 1614-16.)  Letters of a similar tenor from various additional family members were received by Judge Johnstone at the sentencing hearing and marked as a bench hearing exhibit.  (*Id.* at 1612, 1617-18.)  Defense counsel did not object to any of these items.  (*Id.* at 1612-18.)  Also, the presentence investigation report reflected that Steve Dyas's widow had expressed her opinion that death was the appropriate punishment for Taylor.  (Vol. 10, R-41 at 1773.)  The trial judge's sentencing order expressly states that he "considered" the presentence investigation report and the "evidence and materials submitted at the final sentencing hearing." (Vol. 1, R-2 at 154.)  In light of these record facts, Taylor contends that, in deciding to override the jury's recommendation of a life sentence, Judge Johnstone violated Taylor's Eighth and Fourteenth Amendment rights by considering the victims' family members' wishes that a death sentence be imposed.  (Doc. 25, ¶ 445.)

Federal law is clear that "the Eighth Amendment erects no *per se* bar against the introduction of victim impact evidence."  *United States v. Brown*, 441 F.3d 1330, 1351 (11ᵗʰ Cir. 2006) (citing *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).  It is equally clear, however, that consideration of a "victim's family members' characterizations and opinions about the … appropriate sentence violates the Eighth Amendment."  *Id.* (quoting

---

Taylor and McMillan fled Mobile that night and were apprehended in Selma, Alabama the following morning in that same stolen Ford Mustang.  Considered in the aggregate and in the light most favorable to the State, this evidence (along with the other evidence introduced at trial) could have allowed a rational trier of fact to find the essential elements of capital murder proved beyond a reasonable doubt.  Petitioner's attempt to wave aside this evidence as "circumstantial" is unavailing as a matter of law.  *See, e.g., United States v. Focia*, --- F.3d ----, 2017 WL 3880733, *5 (11ᵗʰ Cir. Sept. 6, 2017) ("we apply the same standard when we evaluate the sufficiency of the evidence, regardless of whether the evidence is direct or circumstantial").  Taylor's challenge to the sufficiency of the evidence embodied in Claim VI of his § 2254 Petition is without merit.

*Payne*, 501 U.S. at 830 n.2); *see also Lockett v. Trammel*, 711 F.3d 1218, 1236 n.10 (10th Cir. 2013) ("With the lone exception of Oklahoma, our research shows that no jurisdiction permits the admission of victim impact testimony that includes opinions about … the appropriate sentence."). The Alabama Supreme Court has reached the same conclusion. *See Ex Parte McWilliams*, 640 So.2d 1015, 1017 (Ala. 1993) ("McWilliams' Eighth Amendment rights were violated if the trial judge in this case considered the portions of the victim impact statements wherein the victim's family members offered their … opinions of … the appropriate punishment.").

On direct appeal, Taylor argued that Judge Johnstone improperly considered victim-impact statements containing recommendations as to the appropriate punishment. The Alabama Court of Criminal Appeals properly acknowledged *Payne v. Tennessee* and correctly observed that "the trial court could not consider that part of the victim-impact evidence regarding … recommendations of an appropriate punishment." *Taylor*, 808 So.2d at 1167. Nonetheless, the appellate court found no error, reasoning that "[w]e find absolutely no evidence that the family members' sentence recommendations were considered by the trial court at sentencing." *Id.* at 1168. In so concluding, the Alabama Court of Criminal Appeals relied on (i) "[o]ur review of the record and the trial court's sentencing order;" (ii) Judge Johnstone's clear statement that the victim-impact letters were "not evidence" but would simply be marked as a "bench hearing exhibit offered by the State;" (iii) Judge Johnstone's comment at the close of the sentencing hearing that "I am going to follow the law to the letter" in deliberating on Taylor's sentence; (iv) Judge Johnstone's remark immediately before pronouncing sentence that he had "considered all materials appropriate for consideration;" and (v) the legal presumption that "[t]rial judges are presumed to know the law and to follow it in making their decisions." *Id.*

After careful review of the parties' briefs, the record, and applicable law, the Court finds that Alabama courts' adjudication of this issue was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Nowhere in the sentencing hearing or sentencing order did Judge Johnstone suggest that he would take, or that he was taking, into account the victims' family members' sentencing recommendations in deciding whether to override the jury's 7-5 vote in favor of life imprisonment. It is well settled that "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Lambrix v. Singletary*, 520 U.S. 518, 532 n.4, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (citation omitted) (where there was a

question as to whether the trial judge appropriately narrowed an aggravating factor in sentencing deliberations, explaining that "there is *always* a 'reason to believe' that" he had done so because of this presumption, "which we consider fully adequate").[109]  Absent any showing to rebut it, that presumption yields a finding that Judge Johnstone was aware of, and abided by, the *Payne v. Tennessee* proscription against considering victim-impact statements that offered opinions as to the appropriate sentence.  Taylor has offered nothing other than speculation and unsupported leaps of logic to overcome that presumption here.  The Alabama Court of Criminal Appeals denied this claim for that very reason.  On federal habeas review, the Court perceives nothing in the Alabama courts' resolution of this assignment of error that is contrary to or an unreasonable application of clearly established federal law.  Accordingly, § 2254 relief is unavailable to Taylor on Claim VII.[110]

---

[109]    *See also Moreland v. Bradshaw*, 699 F.3d 908, 929 (6th Cir. 2012) (where petitioner argued that state court considered post-*Miranda* silence, rejecting claim because "Judges are presumed to know the law and apply it in making their decisions, and to base their judgment on relevant evidence"); *United States v. Bain*, 586 F.3d 634, 637-38 (8th Cir. 2009) (relying on presumption that trial judge knew the law to construe sentencing judge's remarks in a manner that harmonized them with Supreme Court's *Rita* case decided one month before sentencing took place); *United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1201 (10th Cir. 2007) ("We traditionally presume, absent some indication in the record suggesting otherwise, that trial judges are presumed to know the law and apply it in making their decisions.") (citations and internal marks omitted).

[110]    In so ruling, the Court finds unpersuasive petitioner's three arguments for relief on Claim VII.  (Doc. 25, ¶ 444.)  First, Taylor relies on two lines in the 12-page sentencing order wherein Judge Johnstone indicated that among the materials he considered were "the pre-sentence investigation report" and "the evidence and materials submitted at the final sentencing hearing."  (Vol. 1, R-2 at 154.)  Such generic statements are far too vague to support a reasonable inference that Judge Johnstone either did not know or chose not to abide by the Supreme Court's bar on trial judges considering victim-impact statements recommending the appropriate sentence.  This is particularly true where the 12-page sentencing order is devoid of any reference to the victims' family members' recommendations.  Second, Taylor argues that Judge Johnstone must have considered the presentence investigation report ("PSR") because he inquired about its contents.  During the sentencing hearing, the trial judge mentioned to defense counsel that the PSR contained a reference to Taylor's prior conviction of misprision of a felony.  (Vol. 10, R-37 at 1626.)  He said nothing at any time about the PSR's reference to Steve Dyas's wife stating that she believed Taylor deserved the electric chair.  Asking a question about criminal history information contained on one part of the PSR cannot logically be equated to proof that the trial judge improperly considered a victim's widow's sentencing recommendation set forth in another part of the PSR.  Third, Taylor maintains Judge Johnstone must have considered the improper (Continued)

**S.      *Claim X (Alleged Improprieties in Rule 32 Proceedings).***

Next, Taylor brings a series of subclaims under the heading, "The Alabama State Courts Deprived Jarrod Taylor of an Opportunity to Fully and Fairly Litigate His Claims" (doc. 25, at 211.)  In this Claim X, Taylor essentially rehashes the Alabama courts' refusal to allow him to file his Second Amended R32 Petition and his Revised Second Amended R32 Petition, although this time he frames these arguments in terms of due process, as opposed to the state-law theories advanced in his procedural objections previously addressed in section II.A.3 and elsewhere in this Order.  Specifically, in Claim X.A, Taylor asserts that it violated due process and fundamental fairness for the Alabama courts neither to allow him to amend his Rule 32 petition on limited remand nor to order a separate remand for the sole purpose of facilitating such amendments.  In Claims X.B.i, X.B.ii, X.B.iii and X.B.iv, Taylor identifies various claims and allegations he sought to add via his disallowed Second Amended R32 Petition and Revised Second Amended R32 Petition, characterizes them as "extraordinary" and says those claims and evidence involved "newly discovered meritorious claims and … greater specificity to claims he previously had asserted."  (Doc. 25, ¶ 472.)[111]  In Claim X.C, Taylor argues that he is entitled to an evidentiary hearing to present evidence supporting all of the claims described in Claim X.B and its constituent subparts.

If Claim X feels like déjà vu, it should.  At its core, Claim X is simply an avenue for Taylor to relitigate – more than 200 pages and 450 paragraphs into his § 2254 Petition – the

---

victim-impact statements offering opinions as to Taylor's sentence because he never expressly said he excluded them from his deliberations.  Such an argument would flip the *Lambrix* presumption on its head (*i.e.*, by effectively saying that trial judges will be presumed not to have followed the law and to have considered unconstitutional factors unless they expressly disavow having done so).  Taylor cites no authority for such a novel proposition.

[111]      Taylor's subclaims in Claim X.B invoke the following disallowed claims and allegations from the Rule 32 proceedings: (i) claims of misconduct by the State in pressuring McMillan to testify falsely and giving him "talking points" that were never produced (Claim X.B.i); (ii) claims of misconduct and ineffective assistance relating to the contents of the duffel bag, including evidence of Taylor's conviction for misprision of a felony and his prior arrests (Claim X.B.ii); (iii) claims relating to the purported written "confession" by McMillan, as produced by Bryann Clark many years after the fact (Claim X.B.iii); and (iv) claims and facts bearing on Taylor's allegations of ineffective assistance of trial counsel at the guilt and penalty phases (Claim X.B.iv).  (Doc. 25, ¶¶ 473-88.)

procedural issues relating to the disallowed Second Amended R32 Petition and Revised Second Amended R32 Petition, to which the undersigned has already devoted more than 30 pages of analysis in this Order. (*See* Sections III.A and III.D, *supra*.) The Court has already explained in extensive detail why it was not error for the Alabama courts to decline to allow Taylor to amend his Rule 32 petition following limited remand. The Court has further examined Taylor's numerous arguments that his procedural default should be excused and that he should be allowed to raise those claims now. As to each issue, the Court has already found that Taylor has failed to satisfy the cause-and-prejudice standard; that is, each one of the claims described in Claim X.B either could have been raised before but was not, or would not have had a reasonable probability of changing the result of the guilt or penalty phase of Taylor's trial. Little purpose would be served by engaging in a redundant reiteration of that analysis here.

Rather than re-plowing the same ground covered in great detail in sections III.A and III.D of this Order, the Court will simply incorporate it by reference here, and supplement it with additional findings and conclusions. The key conclusion is that Taylor's efforts to recast his attack on the Alabama courts' interpretation of the limited-remand rule in the procedural default analysis as a separate due process claim in his § 2254 Petition are unavailing. It is well settled that due process protections are limited in the state postconviction context, to-wit:

> "Postconviction relief proceedings do not require the full range of procedural rights that are available at trial …. The Supreme Court held that a State's process for postconviction relief is constitutionally adequate unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or ***transgresses any recognized principle of fundamental fairness in operation***. … Federal courts may not interfere unless the State's process is fundamentally inadequate to vindicate the substantive rights provided."

*Cunningham v. District Attorney's Office for Escambia County*, 592 F.3d 1237, 1260-61 (11th Cir. 2010) (emphasis added; citations and internal quotation marks omitted). "[I]t is [petitioner's] burden to demonstrate the inadequacy of state-law procedures available to him in state postconviction relief." *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009).

In Count X, Taylor apparently seeks to travel under a theory of fundamental fairness. But there was nothing fundamentally unfair about the manner in which the Alabama courts adjudicated his Rule 32 proceedings. Represented by substantially the same legal team that represents him today, Taylor filed his original Rule 32 Petition in Mobile County Circuit Court

on July 31, 2002, more than a year after the certificate of judgment was entered on his direct appeal. He was allowed to amend the Rule 32 Petition three times, once in August 2002 and twice more in May 2003 after motion practice and a hearing on the State's motion to dismiss. For 26 months after the third amendment (which Taylor styled his "Corrected First Amended Rule 32 Petition"), Taylor's Rule 32 petition was pending at the trial court level. His legal team was free to conduct an investigation, interview witnesses, review exhibits, and (if appropriate) move for further amendments of that Rule 32 petition to assert more or different claims if and as they saw fit.[112] In August 2005 (three full years after Taylor commenced Rule 32 proceedings), the Rule 32 judge summarily dismissed the Corrected First Amended R32 Petition in its entirety. Taylor could have sought further amendments at any time during that three-year period if he discovered new, previously unavailable evidence that warranted same. He did not.

After five years of appeals, in October 2010 the Alabama Court of Criminal Appeals issued a limited remand of the Rule 32 proceedings to Mobile County Circuit Court for the sole purpose of resolving those claims that the parties agreed had not been properly dismissed by the trial judge. Following that remand, Taylor repeatedly sought to amend his Rule 32 proceedings to assert brand new claims in the Mobile County Circuit Court. The Alabama courts' refusal to allow him to do so was not repugnant to principles of fundamental fairness. Alabama courts routinely disallow (for lack of jurisdiction) Rule 32 amendments that are beyond the scope of a limited appellate remand. What's more, the vast majority of the new claims and issues that Taylor sought to raise in his disallowed Second Amended R32 Petition and Revised Second Amended R32 Petition involved facts that were either previously known to him or could have been discovered by him with diligence prior to August 2005. As for any disallowed claims that may have been based on truly new, previously unavailable evidence, such claims were not

---

[112] The Court recognizes, of course, that the Rule 32 judge entered an Order on October 23, 2003, purporting to prohibit further amendment to Taylor's Corrected First Amended R32 Petition. (Vol. 53, R-121.) In so doing, the Rule 32 judge observed that "Taylor, through capable counsel, has clearly had ample opportunity to investigate, formulate, and plead his claims. There must be a point of finality." (*Id.* at 1548.) Even then, however, the Rule 32 judge left open the possibility for Taylor to seek further amendments of his Rule 32 petition upon a showing of "surprise, newly discovered evidence or changed circumstances." (*Id.*) Taylor never sought such further amendments until many years later.

reasonably likely to make any difference in the outcome of Taylor's trial. There was nothing fundamentally unfair about any of this.

Implicit in Count X is Taylor's apparent belief that the Due Process Clause entitled him to amend his Rule 32 petition whenever he wished, as frequently as he wished, and that the state courts were required to keep his postconviction proceedings open indefinitely to account for the possibility that he might desire amendments sometime in the distant future. Taylor cites no authority, much less clearly established federal law, for that proposition, and the undersigned is aware of none. Moreover, while Count X is laden with statements that Taylor was not allowed to pursue these claims in Alabama courts "[t]hrough no wrongdoing of his own" and "[d]espite Mr. Taylor's diligent efforts," such characterizations of the facts are inaccurate. As discussed in Section III.D of this Order, *supra*, Taylor had unfettered access to most of these witnesses and could readily have performed an investigation prior to 2005 that would have revealed the factual predicate of the vast majority of the new, disallowed claims in his Second Amended R32 Petition and Revised Second Amended R32 Petition.[113] Notwithstanding his protestations of unfairness and diligence, Taylor could have presented these claims to the state courts earlier. His failure to do so is not tantamount to a violation of his federal constitutional rights. Although Taylor has presented evidence to show that the purported written "confession" from McMillan was unavailable to him until March 2012 because Bryann Clark was unwilling to provide it, the Court has already explained why Taylor was not prejudiced by the inability to raise such a facially dubious and incredible claim earlier. In the absence of prejudice, Taylor's assertion that the state

---

[113]    Three examples will illustrate the point. First, Taylor says he did not know about alleged State misconduct relating to Kenyatta McMillan's testimony until McMillan provided that information to defense counsel in 2011. But he does not say that McMillan had refused to provide such information earlier or that counsel had conducted any sort of investigation prior to 2005 to ascertain whether McMillan's testimony (which was subject to inconsistencies from previous statements) might have been influenced by State tactics. Second, he says that Tiffany Carlton first divulged to his counsel years after the fact that she had testified falsely based on State pressure, but he was on notice of that pressure even at the time of trial, and could and should have followed up with the witness at that time (or certainly long before 2005) to investigate whether and how it impacted her testimony. Third, the mitigation claims that Taylor sought to raise for the first time in his disallowed Rule 32 amendments could and should have been raised before 2005 had petitioner's postconviction counsel performed a timely, diligent investigation into such matters.

courts' refusal to allow him to bring that claim in Rule 32 proceedings violated tenets of fundamental fairness is unpersuasive.

Simply put, the Alabama courts were under no constitutional obligation to allow Taylor to keep on amending his Rule 32 petition at will (as he had already done thrice) years after the fact, particularly after a limited remand from state appellate courts. It was entirely proper under state law for Alabama courts to disallow petitioner's Second Amended R32 Petition and Revised Second Amended R32 Petition. Those rulings did not infringe upon Taylor's due process rights or implicate principles of fundamental fairness. The new claims Taylor sought to raise via those disallowed Rule 32 amendments were not extraordinary. On the contrary, they were claims that he either (i) could and should have raised years earlier with reasonable diligence, or (ii) would not have made any difference in the outcome of the guilt or penalty phases of trial. Given these circumstances, no independent constitutional violation arises from the state courts' refusal to allow Taylor to amend his Rule 32 petition a fourth or a fifth time, roughly nine years after those Rule 32 proceedings commenced and six years after the Rule 32 petition was initially dismissed by the trial court. Nor does due process demand that an evidentiary hearing be convened to allow Taylor to present evidence supporting these procedurally barred, disallowed claims, none of which can withstand the requisite cause-and-prejudice analysis to excuse the default.

Claim X and all of its constituent subparts, which essentially repackage and reargue in constitutional guise the procedural default issue as to disallowed new claims in state postconviction proceedings, are properly denied in their entirety.

## T.    *Claim XI.A.i (Death Penalty is Cruel and Unusual Punishment).*

Taylor's § 2254 Petition also includes an array of claims challenging the constitutionality of the death penalty, both on its face and as applied to him. Beginning with Claim XI.A.i, Taylor posits that, generally speaking, "the death penalty is unconstitutional because it constitutes cruel and unusual punishment." (Doc. 25, at 230.) The State responds that this claim is unexhausted. Even if Taylor had exhausted such a claim in the Alabama courts, it would not matter. The Supreme Court has categorically rejected the notion that the death penalty itself violates the Eighth Amendment's prohibition on cruel and unusual punishment. *See, e.g., Baze v. Rees*, 553 U.S. 35, 47, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) ("We begin with the principle, settled by *Gregg*, that capital punishment is constitutional."); *Woodson v. North Carolina*, 428 U.S. 280, 285, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ("The petitioners argue that the imposition of the

death penalty under any circumstances is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.  We reject this argument ….”); *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (“We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it.”).[114] Claim XII.A.i is foreclosed by, and irreconcilable with, long-standing Supreme Court precedent.

## U.      Claim XI.A.iii (Death Penalty Does Not Further Penological Goals).

In Claim XI.A.iii, Taylor advances a theory that “[t]he modern death penalty violates the Eighth and Fourteenth Amendments because the systemic delay between sentencing and execution does not further either of the government’s penological goals of deterrence or retribution.”  (Doc. 25, ¶ 509.)  Taylor never presented this subclaim to the Alabama courts, either on direct appeal or in his state postconviction proceedings.  As such, this claim is not exhausted.  In an effort to show cause and prejudice for this procedural default, Taylor insists that Claim XI.A.iii is “based on newly emerging trends” and “it was long after Mr. Taylor filed the Corrected First Amended [R32] Petition that the delays in the death penalty system that gave rise to Mr. Taylor’s claim emerged.”  (Doc. 43, at 67.)  Taylor’s own citation to the *Capital Punishment Statistical Tables* found at the Bureau of Justice Statistics website belies his argument.  Indeed, Table 10 (on which Taylor expressly relies in his Reply (doc. 43, at 67)) of those statistical tables reflects that in 1999 (three years before Taylor filed his original Rule 32 petition) the average elapsed time from sentence to execution was 143 months, and that in 2001 it was 142 months.[115]  Taylor’s assertion that “the delays in the death penalty system” giving rise

---

[114]      *See also United States v. Lighty*, 616 F.3d 321, 370 (4th Cir. 2010) (“Lighty also argues that the death penalty is *per se* cruel and unusual punishment under the Eighth Amendment.  This argument is foreclosed by both Supreme Court and circuit precedent.”); *Cooey v. Strickland*, 589 F.3d 210, 220 (6th Cir. 2009) (“[c]apital punishment is constitutional”); *United States v. Jackson*, 549 F.3d 963, 972 n.7 (5th Cir. 2008) (“Supreme Court precedent … forecloses any argument that the death penalty violates the Constitution under all circumstances.”) (citation omitted).

[115]      *See* Tracy L. Snell, *Capital Punishment, 2013 – Statistical Tables*, U.S. Department of Justice, Bureau of Justice Statistics, Table 10 (December 2014), *available at* https://www.bjs.gov/content/pub/pdf/cp13st.pdf.

to Claim XI.A.iii emerged long after he filed his Rule 32 petition is demonstrably incorrect as a factual matter and is conclusively rebutted by his own data.[116]

In sum, Taylor has neither made a factual showing nor advanced a viable argument that thse "delays in the death penalty system" of which he complains in Claim XI.A.iii were inadequately established as of 2003, when he last successfully amended his Rule 32 petition in state court. Moreover, the table on which he relies reflects only the nationwide trend. Taylor makes no suggestion that similar trends have occurred in the State of Alabama, whose death penalty procedures are, of course, the only ones relevant to his case. In short, Claim XI.A.iii was plainly available to Taylor at the time he commenced state post-conviction proceedings. Because he has failed to establish cause and prejudice to excuse his failure to exhaust it, Claim XI.A.iii cannot and will not be considered on the merits.[117]

---

[116]     As Taylor observes in his Reply, the average elapsed time from sentence to execution in 1984 was 74 months. (Doc. 43, at 67). Surely the near-doubling of that period of delay between 1984 and 1999 was sufficient to place Taylor on notice of this "emerging trend" and enable him to raise the issue in his Rule 32 petition in 2002 had he been so inclined. To be sure, that elapsed time has continued to rise over the years, and reached 186 months in 2013 according to those Bureau of Justice Statistics tables. However, any suggestion by petitioner that the increase from 143 months in 1999 to 186 months in 2013 is a "newly emerging trend" placing him on notice of a constitutional deprivation, but that the much larger increase from 74 months in 1984 to 143 months in 1999 was not, strains credulity well beyond the borders of reason and common sense.

[117]     It also bears noting that the delays in Taylor's case are in large part the product of his own efforts to render his appellate, post-conviction, and habeas litigation as burdensome, time-consuming, complex and inefficient as possible. As noted *supra*, Taylor raised more than 60 separate issues on direct appeal in the Alabama courts. His Corrected First Amended R32 Petition was 124 pages long and included approximately 27 grounds for relief. He filed multiple petitions for writ of mandamus in state court. The operative iteration of his § 2254 petition numbers 283 pages and includes more than 600 paragraphs, and his Reply adds another 72 pages of mostly procedural arguments. On top of that, Taylor submitted 66 pages of additional briefing on discovery, evidentiary hearing and *Hurst v. Florida* issues, for a grand total of 421 pages of briefs in these § 2254 proceedings filed by petitioner alone. Taylor was of course acting within his legal rights in doing so. Nonetheless, given the sheer volume of non-meritorious claims, unhelpful distractions and dead-end detours that Taylor has crammed into his court filings at every step of the appellate, Rule 32 and § 2254 proceedings, and the concomitant delays that such overwhelming submissions engender by straining the already overtaxed resources of the State of Alabama, the Alabama courts, and this federal district court, it is incongruous at best and disingenuous at worst for Taylor now to complain about "systemic, excessive delays between sentencing and execution" in this case. After all, he has systematically crafted his court filings (Continued)

## V.     Claim XI.B.i (Constitutionality of Discretion Afforded Trial Judges in Alabama's Judicial Override Provision).

Taylor next moves from general attacks on the constitutionality of the death penalty to arguments that Alabama's death penalty statute is facially unconstitutional.  In Claim XI.B.i, Taylor maintains that "[t]he Alabama capital statute violates the Eighth and Fourteenth Amendments by vesting the trial judge with almost complete discretion to impose a death sentence. … Such 'unbridled discretion' creates a grave risk that the death penalty will be applied in an arbitrary and capricious manner."  (Doc. 25, ¶ 518.)  More than two decades ago, the Supreme Court rejected this argument, finding that the Alabama capital sentencing scheme "adequately channels the sentencer's discretion so as to prevent arbitrary results" because "[c]onsistent with established constitutional law, Alabama has chosen to guide the sentencing decision by requiring the jury and judge to weigh aggravating and mitigating circumstances." *Harris v. Alabama*, 513 U.S. 504, 511, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).  In so finding, the *Harris* Court expressly held that "the Eighth Amendment does not require the State to define the weight the sentencing judge must accord an advisory jury verdict." *Id.* at 512.[118]

Although Taylor acknowledges (as he must) that *Harris v. Alabama* conclusively defeats Claim XI.B.i, he nonetheless insists that this claim has merit because "'evolving standards of decency' necessitate reconsideration of the constitutionality of Alabama's capital statute."  (Doc. 25, ¶ 519.)  But he cites no authority suggesting that the U.S. Supreme Court has changed its mind about the *Harris* holding that the Alabama capital scheme adequately channels the sentencer's discretion to prevent arbitrary results.  In recent years, the Eleventh Circuit has continued to apply and accept *Harris* as settled law.  *See Madison v. Commissioner, Ala. Dep't*

_____

for nearly two decades in a manner calculated to maximize those delays for his own strategic benefit.

[118]     *See also Brownlee v. Haley*, 306 F.3d 1043, 1077 (11th Cir. 2002) (recognizing that "Alabama's capital sentencing system is consonant with the Eighth Amendment even though it does not specify the precise weight that a judge must give to the jury's verdict"); *Hays v. State of Ala.*, 85 F.3d 1492, 1501 (11th Cir. 1996) (rejecting petitioner's argument that "the Alabama sentencing scheme dividing the responsibilities of jury and trial judge at the time he was sentenced was standardless," and concluding that "there was adequate channeling of discretion" in the Alabama scheme).

*of Corrections*, 677 F.3d 1333, 1336 (11ᵗʰ Cir. 2012) ("we find that Madison's claim that Alabama's judicial override scheme violates the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment is foreclosed by precedent").  Moreover, nothing in his "evolving standards of decency" argument relates to the matter of cabining judicial discretion, which lies at the core of Claim XI.B.i.  That the judicial override system employed in Alabama has become "increasingly rare," in Taylor's words, says nothing about whether Alabama's capital statute sufficiently channels trial judges' discretion so as to avoid arbitrary and capricious imposition of the death penalty.  This claim is foreclosed by binding precedent.[119]

### W.    Claim XI.B.ii (Hurst, Ring, Apprendi *Issue*).

As his next challenge, in Claim XI.B.ii Taylor maintains that Alabama's death penalty scheme violates *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).  According to Taylor, the Alabama capital statute "violates *Ring* and *Apprendi* because its judicial override permits judges to displace the jury's responsibility to make the ultimate factual findings underlying the imposition of death sentences;" because it "permits judges to sentence a defendant to death without making the requisite factual finding, *i.e.*, that the aggravating circumstances outweigh the mitigating circumstances, by the requisite standard of proof, *i.e.*, beyond a reasonable doubt;" and because "it permits imposition of death sentences upon a less-than-unanimous jury recommendation of such a sentence."  (Doc. 25, ¶¶ 530, 534, 539.)

The Alabama courts rejected Taylor's *Ring* claim, both because (i) *Ring* "does not apply to Taylor whose conviction became final before *Ring* was decided;" and (ii) "Alabama's capital-sentencing scheme is not unconstitutional under *Ring* and *Apprendi*."  (R-128, at *11.)  For the

---

[119]    It bears mention that last year the Alabama legislature eliminated the judicial override system solely on a prospective basis.  *See* Ala. Code § 13A-5-47(a) ("Where a sentence of death is not returned by the jury, the court shall sentence the defendant to life imprisonment without parole."), 13A-5-47.1 (providing that § 13A-5-47 "shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to April 11, 2017").  This revision of the Alabama capital sentencing statute does not bolster Taylor's claim that the predecessor system – under which Taylor was tried, convicted and sentenced – was unconstitutional because it lacked sufficient safeguards to channel the sentencing judge's discretion.

reasons explained below, neither of these determinations was contrary to or an unreasonable application of clearly established federal law.

As a threshold matter, the Alabama courts correctly ruled that Taylor's reliance on *Ring v. Arizona* is misplaced because that decision is not applicable here. The Supreme Court has declared that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). The *Ring* opinion was handed down on June 24, 2002. By contrast, the U.S. Supreme Court denied Taylor's petition for writ of certiorari, effectively concluding his direct appeals and rendering his conviction and sentence final on direct review, some five and a half months earlier, on January 7, 2002. (Vol. 53, R-116.)[120] Thus, as a matter of law, the new procedural rule announced in *Ring* has no retroactive application to Taylor's case, which was already final on direct review when *Ring* was announced. *See, e.g., Battle v. United States*, 419 F.3d 1292, 1301 (11th Cir. 2005) ("*Ring* was decided after Battle's case was final on direct review. And *Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review. … Thus, *Ring* – even if it otherwise extends to the facts of a case like this one – could not invalidate Battle's conviction and sentence now."); *Sibley v. Culliver*, 377 F.3d 1196, 1208 (11th Cir. 2004) ("[A] petitioner may not … bring a habeas attack based on *Ring* violations that occurred before *Ring* was handed down."). The Court finds no error in the Alabama courts' rejection of Taylor's *Ring* claim on non-retroactivity grounds.

Additionally, Alabama courts properly concluded that even if *Ring* could be applied to Taylor, it would not advance his cause. The arguments presented by Taylor in Claim XI.B.ii venture far afield from the quite limited holding of that case. *Ring* explained that "[c]apital defendants, no less than noncapital defendants … are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589. The specific legal effect of *Ring* was to overrule prior Supreme Court jurisprudence that "allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for

---

[120]     For purposes of *Teague v. Lane* retroactivity, "[a] state conviction and sentence become final … when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Clock v. Singletary*, 65 F.3d 878, 883 (11th Cir. 1995) (citation omitted). For Taylor, that finality date was January 7, 2002, months <u>before</u> *Ring* was decided.

imposition of the death penalty." *Id.* at 609. "The holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury." *Lee v. Commissioner, Alabama Dep't of Corrections*, 726 F.3d 1172, 1198 (11th Cir 2013).[121] In Taylor's case, by its guilty verdicts, the jury unanimously found two aggravating circumstances beyond a reasonable doubt, to-wit: (i) "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of … rape, robbery, burglary or kidnapping," Ala. Code § 13A-5-49(4); and (ii) "[t]he defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct," Ala. Code § 13A-5-49(9). (Vol. 9, R-23 at 1470, 1479, 1505, 1507-08; R-25 at 1522.) Such a reading of the record is both entirely proper and required by applicable law. *See* Ala. Code § 13A-5-45(e) ("[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing."); *Lee*, 726 F.3d at 1198 ("Nothing in *Ring* – or any other Supreme Court decision – forbids the use of an aggravating circumstance implicit in a jury's verdict."). Because the Alabama capital-sentencing scheme requires the jury to find the existence of at least one aggravating circumstance as a prerequisite to a death sentence,[122] and because the jury in this case actually found two aggravating circumstances unanimously and beyond a reasonable doubt, the state courts did not err in finding that Taylor has no viable claim under *Ring* even if that decision applied to him (which it does not).

On January 12, 2016, at the close of briefing on Taylor's § 2254 Petition, the Supreme Court decided *Hurst v. Florida*, 136 S.Ct. 616, 193 L.Ed.3d 504 (2016). In *Hurst*, the Court applied *Ring* to Florida's capital sentencing scheme and found it to be unconstitutional. The

---

[121] In a footnote, the *Ring* Court made absolutely clear that it was not deciding whether the Sixth Amendment (i) required the jury to make findings as to mitigating circumstances; (ii) required the jury to make the ultimate determination as to whether to impose a death sentence; or (iii) forbade the state court from reweighing aggravating and mitigating circumstances. *Ring*, 536 U.S. at 597 n.4.

[122] *See* Ala. Code §§ 13A-5-45(e) ("the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances"), 13A-5-45(f) ("Unless at least one [statutory] aggravating circumstance … exists, the sentence shall be life imprisonment without parole.").

*Hurst* opinion stressed that "[l]ike Arizona at the time of *Ring*, Florida does not require the jury to make the critical findings necessary to impose the death penalty. Rather, Florida requires a judge to find these facts." 136 S.Ct. at 622. Therefore, "[i]n light of *Ring*, we hold that Hurst's sentence violates the Sixth Amendment." *Id.* The reasoning of *Hurst* is concisely summarized at the end of the opinion as follows:

> "The Sixth Amendment protects a defendant's right to an impartial jury. This right required Florida to base Timothy Hurst's death sentence on a jury's verdict, not a judge's factfinding. Florida's sentencing scheme, ***which required the judge alone to find the existence of an aggravating circumstance***, is therefore unconstitutional."

*Id.* at 624 (emphasis added). To allow the parties a full and fair opportunity to be heard on the impact (if any) of *Hurst v. Florida*, the undersigned entered an Order (doc. 42) on January 12, 2016 directing supplemental briefing on the ramifications of *Hurst* for Taylor's federal habeas petition. Petitioner filed a 46-page supplemental brief (doc. 46) confined to *Hurst*, and the State filed an 18-page response (doc. 47). After careful review of the parties' arguments, the undersigned concludes that *Hurst* does not alter the reasoning or result of Taylor's Claim XI.B.ii for two distinct reasons.

First, as both the Eleventh Circuit and multiple district court opinions in this Circuit have already found, *Hurst* is not retroactively applicable on collateral review. *See Lambrix v. Secretary, Florida Dep't of Corrections*, 851 F.3d 1158, 1165 n.2 (11th Cir. 2017) ("Lambrix's two capital convictions and death sentences became final in 1986, sixteen years before *Ring* was decided. … [T]here is no *Hurst* claim, much less a viable one, because under federal law *Hurst*, like *Ring*, is not retroactively applicable on collateral review."); *Miller v. Dunn*, 2017 WL 1164811, *72 (N.D. Ala. Mar. 29, 2017) ("*Hurst* does not apply retroactively to Miller, because his conviction was final before the decision in *Hurst* was announced. … *Hurst*, which applied *Ring* in Florida, is not retroactive."); *Smith v. Dunn*, 2017 WL 1150618, *69 (N.D. Ala. Mar. 28, 2017) ("*Hurst* did not articulate a new rule of law; rather, it applied *Ring*'s analysis to Florida's sentencing scheme," such that the retroactivity of *Hurst* tracks that of *Ring*).[123]

---

[123] One of the death penalty's most outspoken critics on the Supreme Court acknowledges the insuperable procedural obstacle that may be created by the retroactivity problem in the *Hurst* context, even if it would otherwise apply to the Alabama sentencing scheme. *See Brooks v. Alabama*, 136 S.Ct. 708, 193 L.Ed.2d 812 (2016) (Sotomayor, J., dissenting) (opining that *Hurst* overruled the decisional foundations of *Harris v. Alabama*, but (Continued)

To understand why *Hurst* cannot be applied retroactively in Taylor's case, we must utilize the framework set forth in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). In *Teague*, the Supreme Court "laid out the framework to be used in determining whether a rule announced in one of [its] opinions should be applied retroactively to judgments in criminal cases that are already final." *Whorton v. Bockting*, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). "Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review," with two narrow exceptions. *Id.* Those exceptions are that "[n]ew *substantive* rules generally apply retroactively" and that retroactive effect is given to a "small set of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Schriro v. Summerlin*, 542 U.S. 348, 351-52, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (citations and internal quotation marks omitted). *Hurst* did not announce a "new rule" at all, but simply applied *Ring v. Arizona* to Florida's capital sentencing statute.[124] Indeed, the *Hurst* Court explained that "[w]e granted certiorari to resolve whether Florida's capital sentencing scheme violates the Sixth Amendment in light of *Ring*." *Hurst*, 136 S.Ct. at 621. The *Hurst* opinion concluded, "In light of *Ring*, we hold that Hurst's sentence violates the Sixth Amendment." *Id.* at 622. Because *Hurst v. Florida* is simply a straightforward application of *Ring*, it does not announce a new rule of law; rather, its retroactivity is tethered to *Ring*.[125] And as discussed *supra*, the Supreme Court held in *Schriro v. Summerlin* that *Ring* is not retroactively applicable to cases (such as Taylor's) that were already final on direct review when the new rule in *Ring* was handed down. Thus, Taylor cannot obtain retroactive application of *Hurst* for the

_____

that she "nonetheless vote[s] to deny certiorari in this particular case because I believe procedural obstacles would have prevented us from granting relief" in a case where petitioner's direct appeals concluded and his conviction and sentence became final on direct review in 1997).

[124] "A new rule is defined as a rule that was not *dictated* by precedent existing at the time the defendant's conviction became final." *Whorton*, 549 U.S. at 416.

[125] Taylor agrees that *Hurst* did not announce a new rule of constitutional law. (Doc. 46, at 25 ("*Hurst* applied an old rule of constitutional law").)

same reason that he cannot obtain retroactive application of the new rule established in *Ring* after his convictions and sentences were final on direct review.[126]

Alternatively, *Hurst* would not alter the result of Claim XI.B.ii even if it were properly applied to Taylor's § 2254 Petition (which it is not). Sifting through petitioner's rhetoric, it is important to be clear about what *Hurst* said and what it did not say. *Hurst* did not declare that any capital scheme vesting the final sentencing decision in a judge, rather than a jury, is unconstitutional.[127] *Hurst* did not make sweeping pronouncements that any system of judicial override is *per se* unconstitutional, nor did it hold that advisory verdicts in the penalty phase of capital cases are impermissible. Instead, *Hurst* is properly viewed as striking down one narrow, idiosyncratic feature of the Florida capital sentencing scheme. The aspect of the Florida system that the *Hurst* Court found violative of the Sixth Amendment was confined to that which "required the judge alone to find the existence of an aggravating circumstance." *Hurst*, 136 S.Ct.

---

[126]     In his supplemental brief, Taylor argues that *Hurst* is an application of *Apprendi*, not *Ring*. Because *Apprendi* was decided in 2000, at which time Taylor's direct appeals were ongoing, he argues that he is entitled to the benefit of *Hurst* without any retroactivity analysis at all. (Doc. 46, at 25-31.) This argument proceeds from an unreasonable reading of *Hurst*, in which the Supreme Court took pains to explain that it was analyzing Florida's capital sentencing scheme "in light of *Ring*." *Hurst*, 136 S.Ct. at 621-22. And of course, *Ring* itself announced a new procedural rule. *See, e.g., Summerlin*, 542 U.S. at 358 ("*Ring* announced a new procedural rule"); *Battle*, 419 F.3d at 1301 ("*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review."); *Turner v. Crosby*, 339 F.3d 1247, 1284 (11th Cir. 2003) ("*Ring* meets the 'new rule' standard articulated in *Teague*"). *Hurst* flows directly from the new procedural rule announced in *Ring*, not from *Apprendi*; therefore, Taylor's argument that *Hurst* should apply to his case as an application of *Apprendi* (rather than *Ring*) is refuted by the plain language of the *Hurst* opinion itself. *Ring* may have been an outgrowth from *Apprendi*, but it announced a new rule. *Hurst* applied that new rule from *Ring* to Florida's capital sentencing statute. Therefore, Taylor cannot obtain the benefit of *Hurst* by opportunistically recasting it as an application of *Apprendi*, when the opinion itself is quite clear that it was an application of the new rule in *Ring*.

[127]     To do so, *Hurst* would have had to overrule the holding in *Harris v. Alabama* that "[t]he Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight." 513 U.S. at 515. No such overruling, express or implied, may be found in *Hurst*.

at 624.[128]  To the extent that Taylor would read *Hurst* as standing for a broader proposition or a more sweeping denunciation of judicial-override provisions in capital sentencing statutes, the Court finds such a construction to be unwarranted and unsupported by the clear language of the opinion.

The trouble for Taylor is that, on this point, the Alabama capital sentencing scheme under which he was sentenced to death is materially different from the Florida statute at issue in *Hurst*. In Alabama, unlike in Florida at the time of *Hurst*, a defendant is not death-eligible unless a jury unanimously finds beyond a reasonable doubt the existence of an aggravating circumstance.  *See In re Bohannon v. State*, 222 So.3d 525, 534 (Ala. 2016) ("the finding required by *Hurst* to be made by the jury, *i.e.*, the existence of the aggravating factor that makes a defendant death-eligible, is indeed made by the jury, not the judge, in Alabama").  Thus, the portion of the Florida capital sentencing scheme deemed constitutionally objectionable in *Hurst* is simply not present in Alabama.  Multiple federal and state courts applying *Hurst* to the Alabama scheme have so concluded.[129]

---

[128]    This interpretation is reinforced by the *Hurst* Court's overruling of its prior decisions in *Spaziano v. Florida*, 468 U.S. 447 (1984), and *Hildwin v. Florida*, 490 U.S. 638 (1989) – both of which upheld Florida's capital sentencing statute in the face of Sixth Amendment challenges – only "to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty." *Id.*

[129]    *See, e.g., Dallas v. Dunn*, 2017 WL 3015690, *28 (M.D. Ala. July 14, 2017) ("What distinguishes Petitioner's trial from the constitutionally defective capital murder trial[] in *Hurst* … is the fact Petitioner's capital sentencing *jury* made all the factual determinations at the guilt-innocence phase of Petitioner's trial (*unanimously* and *beyond a reasonable doubt*) necessary to render Petitioner eligible for the death penalty under Alabama law ….  The jury's factual findings at the guilt-innocence phase of Petitioner's capital murder trial rendered Petitioner *eligible* for the death penalty within the meaning of the Supreme Court's Eighth Amendment jurisprudence."); *Miller*, 2017 WL 1164811, at *72 ("even if *Hurst* were to apply retroactively to Miller, this claim lacks merit" because "Alabama's capital sentencing scheme complies with the Sixth Amendment"); *Smith*, 2017 WL 1150618, at *70 ("*Hurst* found fault with Florida's scheme specifically because Florida trial judges were tasked with independently finding the existence of aggravating circumstances. … However, consistent with *Ring*, Alabama juries must find an aggravating circumstance beyond a reasonable doubt before a defendant is eligible to receive the death penalty.  Alabama's capital sentencing scheme does not run afoul of *Ring* …."); *Bohannon*, 222 So.3d at 532 ("*Ring* and *Hurst* require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty – the plain language in those cases requires nothing more and nothing less. … [B]ecause in Alabama a (Continued)

In Taylor's case, the proof is in the pudding.  Taylor was charged with two different types of capital offenses, to-wit: (i) three violations of Alabama Code § 13A-5-40(a)(2), which covers "[m]urder by the defendant during a robbery in the first degree;" and (ii) one violation of Alabama Code § 13A-5-40(a)(10), which covers "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct."  Each of these capital offenses has a corresponding aggravating circumstance in the Alabama statutory scheme.  Indeed, the robbery-murder offense described at § 13A-5-40(a)(2) pairs with the statutory aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of … robbery."  Ala. Code § 13A-5-49(4).  And the multiple-murder offense described at § 13A-5-40(a)(10) pairs with the aggravating circumstance that "[t]he defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct."  Ala. Code § 13A-5-49(9).

By the terms of the Alabama statute, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."  Ala. Code § 13A-5-45(f).  What this means is that when Taylor's jury unanimously found beyond a reasonable doubt that he was guilty of robbery-murder under § 13A-5-40(a)(2), they also unanimously found beyond a reasonable doubt the aggravating circumstance set forth at § 13A-5-49(4).  And when Taylor's jury unanimously found beyond a reasonable doubt that he was guilty of murdering two or more persons pursuant to one scheme or course of conduct under § 13A-5-40(a)(10), they also unanimously found beyond a reasonable doubt the aggravating circumstance set forth at § 13A-5-49(9).  Those jury findings as to the existence of aggravating circumstances are what made Taylor death-eligible in the Alabama capital sentencing scheme.  Thus, there is no *Hurst v. Florida* problem here because Taylor's jury unanimously found multiple aggravating circumstances (each of which rendered him eligible for the death penalty)

---

jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment.").

beyond a reasonable doubt.  Taylor's *Hurst* argument thus fails on the merits, even if that decision could properly be retroactively applied to him (which it cannot).[130]

---

[130]    In so concluding, the Court has considered and rejected the numerous merits arguments presented in Taylor's supplemental brief on *Hurst*.  For example, Taylor argues that his "death sentences violate the Sixth Amendment because the judge, rather than the jury, found the fact necessary to impose the death penalty that an aggravating circumstance was proved for each charged count."  (Doc. 46, at 15.)  This statement is inaccurate.  As discussed above, the jury's guilty verdicts necessarily included findings beyond a reasonable doubt that an aggravating circumstance existed for each count of conviction; therefore, there is no Sixth Amendment violation.  *See, e.g., Lee*, 726 F.3d at 1197-98 ("[T]he jury's guilty verdict on the capital offense of robbery-murder established the existence of an aggravating circumstance sufficient to support a death sentence. … [T]he Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury.  That occurred in Lee's case by virtue of the jury's capital robbery-murder verdict.").  Similarly, Taylor argues that his death sentences violate the Sixth Amendment because the trial judge "found the fact necessary to impose death sentences that the aggravating circumstances outweighed the mitigating circumstances."  (Doc. 46, at 18.)  But Taylor points to no Supreme Court precedent classifying the weighing of aggravating and mitigating circumstances as a finding of fact, much less requiring that the jury finally and conclusively perform that weighing exercise.  Eleventh Circuit authority is directly to the contrary.  *See, e.g., Lee*, 726 F.3d at 1198 ("Lee points to no Supreme Court precedent that has extended *Ring*'s holding … to require that the jury weigh the aggravating and mitigating circumstances."); *Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir. 1983) (explaining that while the existence of an aggravating circumstance is a fact, "the relative *weight* is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party."); *see also United States v. Lawrence*, 735 F.3d 385, 428 (6th Cir. 2013) ("The weighing process … called on the jury to decide whether a sentence of death was 'just,' a moral judgment on which the jury did not need to be instructed as if it were making a finding of fact.") (citations omitted); *United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013) (joining the "broad consensus of authority" by holding that "the reasonable-doubt standard does not apply to the weighing of aggravating and mitigating factors, reasoning that that process constitutes not a factual determination, but a complex moral judgment"); *United States v. Sampson*, 487 F.3d 13, 32 (1st Cir. 2007) ("This argument founders, however, because it assumes … that the weighing of aggravating and mitigating factors is a *fact*.  This assumption is incorrect. … [T]he requisite weighing constitutes a process, not a fact to be found.").  Equally unavailing is Taylor's stance that "[w]hen a judge overrides a jury's life without parole advisory verdict and imposes a death sentence, it is irrefutable that the judge, rather than the jury, has found the fact(s) necessary to impose death."  (Doc. 46, at 20.)  To be clear, the *fact* necessary to impose death is the existence of an aggravating circumstance.  That fact was found by a unanimous jury beyond a reasonable doubt; therefore, this argument fails.  Finally, Taylor insists that his "death sentences violate the Eighth Amendment because the judge, rather than the jury, made the ultimate decision to sentence Mr. Taylor to death."  (Doc. 46, at 22.)  The Supreme Court has never so held, and *Hurst* cannot reasonably be read as supporting such a proposition.  To the contrary, two decades (Continued)

### X.    *Claim XI.C.ii (Override in this Case Violated* Ring *and* Apprendi).

As Claim XI.C.ii, Taylor essentially repackages various *Ring*-related objections to the judicial override that resulted in his death sentences.  In particular, in subclaim XI.C.ii.a, he argues that the trial judge violated *Ring* and *Apprendi* because he "necessarily made the factual finding that the aggravating circumstances of the crimes outweighed any mitigating circumstances."  (Doc. 25, ¶ 553.)  This claim fails because, as discussed *supra*, (i) *Ring* does not apply here, (ii) the weighing of aggravating and mitigating circumstances is not a factual finding, (iii) *Ring* does not support the proposition that the trial judge must perform that weighing, and (iv) the Supreme Court has never extended *Ring*'s holding to require that the jury weigh aggravating and mitigating circumstances.  Taylor insinuates that Judge Johnstone found that the jury "was not functioning 'properly'" and therefore failed to "afford[] proper weight to the jury's verdict."  (Doc. 25, ¶ 555.)  On direct appeal, the Alabama Court of Criminal Appeals rejected this assertion, explaining that "[w]e do not find that the trial court made a legal determination that the jury was not properly functioning during the sentencing phase of trial.  Our plain-error review of the record reveals a properly functioning jury during sentencing."  *Taylor*, 808 So.3d at 1170.  There was nothing objectively unreasonable about the state courts' determination and resolution of this issue.  Taylor is due no relief on his theory that the trial court failed to give "proper weight" to the jury's sentencing recommendation because there is no evidence to support such a conclusion.[131]

---

ago the Supreme Court observed that "[t]he Constitution permits the trial judge, acting alone, to impose a capital sentence."  *Harris*, 513 U.S. at 515.  Taylor's argument would have this Court disregard such unambiguous Supreme Court guidance, with no indication whatsoever that the Supreme Court has shied away from *Harris* or would do so today if given the opportunity.  The undersigned declines to do so.

[131]    Equally unpersuasive is Taylor's inclusion in subclaim XI.C.II.a of an argument that his death sentence on Count I was unconstitutional because "the Trial Court relied upon an aggravating circumstance that the jury did not find."  (Doc. 25, ¶ 556.)  Count I charged Taylor with violating Alabama Code § 13A-5-40(a)(10), which specifies as a capital offense "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct."  As discussed *supra*, the jury's unanimous finding that Taylor was guilty of Count I necessarily included a finding that the aggravating circumstance found at Alabama Code § 13A-5-49(9) ("[t]he defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct") had been proved beyond a (Continued)

-137-

In subclaim XI.C.ii.b, Taylor asserts that the judicial override in this case violates *Ring* and *Apprendi* because "the factual findings upon which Mr. Taylor was sentenced to death, *i.e.*, that the aggravating circumstance outweighed the mitigating circumstances" were not made "by the requisite standard of proof, *i.e.*, beyond a reasonable doubt." (Doc. 25, ¶ 557.) This claim lacks merit for multiple reasons. As discussed *supra*, the weighing of aggravating and mitigating circumstances is not a "factual finding" at all. Neither *Ring* nor *Apprendi* says otherwise. Nor does Taylor identify any authority whatsoever supporting the proposition that the weighing of aggravating and mitigating circumstances must be performed using a "beyond a reasonable doubt" standard. The Alabama courts did not err in declining to embrace these principles for which Taylor has identified no clearly established federal law that is on-point.

Finally, in subclaim XI.C.ii.c, Taylor argues that the "imposition of death sentences where there was no unanimous jury verdict recommending death sentences violates the requirements of *Ring* and *Apprendi* that any increased penalty be based on a unanimous jury verdict." (Doc. 25, ¶ 561.) Insofar as Taylor argues that a death sentence is unconstitutional unless the jury has imposed it, the law of the land is to the contrary. *See Harris*, 513 U.S. at 515 ("The Constitution permits the trial judge, acting alone, to impose a capital sentence."). More broadly, Taylor improperly conflates the finding of fact that is necessary to make a defendant death-eligible (*i.e.*, the existence of an aggravating circumstance, which was found by a unanimous jury verdict) with the decision of whether to impose a death sentence on an eligible defendant (*i.e.*, the weighing of aggravating and mitigating circumstances, which is not a fact-finding exercise and which the Supreme Court has never held that a jury must do, much less reach a unanimous decision as to the proper weighing). This subclaim is meritless.

---

reasonable doubt. That unanimous jury finding beyond a reasonable doubt made Taylor death-eligible on Count I, and therefore satisfies *Ring* and *Hurst* (even if those decisions were retroactively applicable to Taylor, which they are not). The jury having made the finding of fact that unlocked death eligibility for Taylor on Count I, nothing in *Ring* or *Hurst* or any other case cited by Taylor would bar the trial court from considering other or additional aggravating circumstances in the process of weighing aggravating and mitigating circumstances. Stated differently, Taylor cites no authority for the proposition that a trial court weighing aggravating and mitigating circumstances is limited to only those aggravating circumstances found by a jury beyond a reasonable doubt. Thus, it was not objectively unreasonable for the Alabama courts not to find a constitutional violation.

For all of these reasons, no federal habeas relief is available to Taylor on Claim XI.C.ii, or any of its constituent subparts.

**Y.      Claim XI.D (Constitutionality of Alabama's Methods of Execution).**

Lastly, in Claim XI.D, Taylor raises three constitutional objections to the method of execution that the State of Alabama intends to employ to carry out his death sentence. (Doc. 25, ¶¶ 577-601.) Petitioner concedes that he brought these claims in this § 2254 Petition rather than pursuing a separate § 1983 action only "in an abundance of caution." (Doc. 43, at 47 n.12.) It is well-settled, however, that "a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." *Glossip v. Gross*, --- U.S. ----, 135 S.Ct. 2726, 2738, 192 L.Ed.2d 761 (2015); *see also Boyd v. Warden, Holman Correctional Facility*, 856 F.3d 853, 877 (11th Cir. 2017) ("Habeas and § 1983 are 'mutually exclusive' avenues for relief"); *McNabb v. Commissioner Alabama Dep't of Corrections*, 727 F.3d 1334, 1344 (11th Cir. 2013) ("[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures") (citation omitted); *Tompkins v. Secretary, Dep't of Corrections*, 557 F.3d 1257, 1261 (11th Cir. 2009) (same).

The Eleventh Circuit has explained that "[t]he line of demarcation between a § 1983 civil rights action and a § 2254 habeas claim is based on the effect of the claim on the inmate's conviction and/or sentence." *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006). "When an inmate challenges the 'circumstances of his confinement' but not the validity of his conviction and/or sentence, then the claim is properly raised … under § 1983." *Id.* By contrast, "[f]ederal habeas corpus law exists to provide a prisoner an avenue to attack the fact or duration of physical imprisonment and to obtain immediate or speedier release." *Valle v. Secretary, Florida Dep't of Corrections*, 654 F.3d 1266, 1267 (11th Cir. 2011). Taylor's method-of-execution claims are not attacking the validity of his conviction or death sentence. He is not challenging the fact or duration of his physical imprisonment by the State of Alabama, and is not requesting immediate or speedier release. Rather, Taylor is challenging the manner in which the State of Alabama intends to carry out that sentence, which is plainly a circumstance of his confinement. For this

reason, Claim XI.D is denied because it is properly raised not in a § 2254 petition, but via the mutually-exclusive avenue of a § 1983 complaint.[132]

## V.    Petitioner's Motion for Discovery / Evidentiary Hearing.

In December 2015, more than a year after initiating these federal habeas corpus proceedings, Taylor filed a 20-page Motion for Discovery and Evidentiary Hearing (doc. 38). Each aspect of this Motion will be addressed separately.

### A.    Request for Discovery.

Taylor seeks discovery on three specific topics.  First, he requests discovery of any and all "materials in the State's files relating to the State's interactions with [Kenyatta] McMillan," including materials relating to McMillan's trial testimony, discussions between the State and McMillan about McMillan's trial testimony and the underlying offenses, interviews of McMillan, and documents given to McMillan by the State.  (Doc. 38, at 2-3.)  Taylor says these materials are necessary to help him develop *Brady / Giglio* claims relating to the "talking points"

---

[132]    Two additional points bear noting as to Claim XI.D.  First, in the subclaim found at XI.D.i, Taylor objects that executing him by electrocution would violate his Eighth and Fourteenth Amendment rights.  (Doc. 25, ¶¶ 579, 583.)  It is undisputed, however, that the State of Alabama has no intention of using electrocution to carry out Taylor's sentence.  By Alabama statute, "[a] death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution."  Ala. Code § 15-18-82.1(a).  Taylor had a 30-day window in July 2002 during which he could have elected a death sentence by electrocution.  Ala. Code § 15-18-82.1(b).  Everyone agrees that "Mr. Taylor did not elect execution by electrocution."  (Doc. 25, ¶ 586.)  Because Alabama law requires that Taylor's execution must be carried out by lethal injection, his efforts to litigate the constitutionality of execution by electrocution are futile and unnecessary because they involve a hypothetical scenario that is not in play here.  Claim XI.D.i is moot.  Second, as for Claim XI.D.ii.a, Taylor argues that it violates the principle of separation of powers for the Alabama legislature to fix lethal injection as the method of execution when Judge Johnstone had ordered that Taylor's execution be carried out by electrocution in the Judgment and Sentence dated August 25, 1998.  (Doc. 53, R-113 at 165.)  But this claim is procedurally defaulted because the Alabama Court of Criminal Appeals found that Taylor had waived it via his noncompliance with Rule 28(a)(10).  Even if it were not, Taylor identifies no authority lending the slightest support to the proposition that a defendant's constitutional rights are implicated if the trial court's judgment imposing a death sentence specifies a particular method of execution, the state legislature later modifies the law to provide for a different method of execution, and the defendant declines an opportunity to elect the method of execution originally specified by the sentencing judge.  Given those circumstances, it defies logic and common sense to suggest that Alabama Code § 15-18-82.1(a) – (b) somehow impair Taylor's constitutional rights on a separation-of-powers theory.

given to McMillan. Second, Taylor requests discovery of various materials relating to the State's exercise of peremptory strikes at Taylor's trial, as well as materials spanning a 17-year period relating to allegations or investigations of race- or gender-based jury selection by the Mobile County District Attorney's Office or the specific prosecutors involved in Taylor's trial. According to Taylor, these materials are needed for his *Batson* claims because "the State is required to provide a race- or gender-neutral explanation" for its peremptory challenges and because he wants to show "a pattern and practice of *Batson* violations in the Mobile County District Attorney's Office." (*Id.* at 6.) Third, Taylor requests discovery concerning the blue duffel bag marked at trial as State's Exhibit 58. In particular, Taylor seeks documents relating to the contents of that duffel bag "at any time," the custodial history of the duffel bag from December 1997 through the present day, any investigation by the State concerning the duffel bag's contents, the identities of all persons who examined the duffel bag at any time from December 1997 through the present day, and discussions between the State and any juror regarding the duffel bag. (*Id.* at 8.)

These requests are governed by Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts, which provides that "a judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." *Id.* In accordance with Rule 6(a), the Eleventh Circuit has observed that "habeas petitioners are not entitled to discovery as a matter of ordinary course," but that "[i]t is within the discretion of the district court to grant discovery upon a showing of good cause." *Bowers v. U.S. Parole Com'n, Warden*, 760 F.3d 1177, 1183 (11th Cir. 2014) (citations and internal quotation marks omitted). "Good cause is demonstrated where specific allegations show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Id.* (citation omitted). "Rule 6(a) makes it clear that the scope and extent of such discovery is a matter confided to the discretion of the District Court." *Daniel v. Commissioner, Alabama Dep't of Corrections*, 822 F.3d 1248, 1281 (11th Cir. 2016) (citation omitted).

In the exercise of this discretion under Rule 6(a), the Court finds that Taylor has not established good cause and that no discovery on the enumerated subjects is appropriate in this case. Taylor seeks discovery to show misconduct by the State in the areas of witness tampering, evidence tampering and *Batson* violations, but he is attempting to embark on a fishing expedition nearly two decades after the fact, despite having enjoyed the benefit of multiple evidentiary

hearings in state court (both on the motion for new trial and during Rule 32 proceedings) to attempt to ferret out evidence supporting his claims. This is not a proper use of the Rule 6(a) discovery mechanism. *See Borden v. Allen*, 646 F.3d 785, 810 n.31 (11th Cir. 2011) ("a habeas case is not a vehicle for a so-called fishing expedition via discovery, an effort to find evidence to support a claim").

Turning to the particular discovery requests outlined in the Motion, Taylor's claims of prosecutorial misconduct relating to alleged pressure on Kenyatta McMillan and failure to disclose evidence relating to same are found at Claims II.A.i and II.B.i of the § 2254 Petition. As set forth in section III.A. of this Order, however, these claims are procedurally defaulted from federal habeas review because Taylor failed to present them to the state courts until his disallowed Second Amended R32 Petition. Furthermore, in section III.D.2 of this Order, the undersigned found that Taylor has not shown cause and prejudice to excuse his procedural default of Claims II.A.i and II.B.i. Even if Taylor were to obtain discovery showing that the State gave McMillan written "talking points" to testify at trial that Steve Dyas was in a "praying-like" position when Taylor shot him in the head or that Sherry Gaston voiced fear about her two children when Taylor shot her in the head, the procedural default and cause-and-prejudice analyses would be unchanged. Taylor has shown no good cause to believe that discovery would develop facts showing that he is entitled to relief on Claims II.A.i and II.B.i; therefore, the Court in its discretion denies petitioner's request for discovery on the subject of McMillan's testimony.[133]

Next, Taylor requests discovery concerning the State's exercise of peremptory challenges, as raised in Count I of his § 2254 Petition. Taylor's *Batson* issues were exhausted before the state courts; however, he points to nothing in the record suggesting that the Alabama courts ever denied any requests for discovery he may have made relating to his *Batson* claims, or any efforts to develop such evidence via evidentiary hearing. The obvious, unanswered question presented by Taylor's Motion for Discovery as to Count I is why he did not develop the record

---

[133] Also, it bears emphasis that Taylor's attorneys have had unfettered access to Kenyatta McMillan for many years, and that they obtained detailed testimony from McMillan at the Rule 32 hearing concerning the subject of these claims. Taylor identifies no reason to believe that the discovery he seeks as to Counts II.A.i and II.B.i would lead to any more or different information than McMillan has already provided.

he now requests during the state-court proceedings.  More fundamentally, however, the undersigned has written to the merits of Claim I in section IV.A. of this Order.  For the reasons stated in section IV.A., *supra*, none of the discovery he seeks concerning Claim I appears likely to assist Taylor in establishing a viable *Batson* claim.  Contrary to his Motion for Discovery, Taylor never made a *prima facie* case of race discrimination, and his gender discrimination claim is procedurally defaulted for noncompliance with Rule 28(a)(10); therefore, inspecting the State's notes to look for race- or gender-neutral explanations to rebut a nonexistent *prima facie* case is unnecessary and unhelpful.  None of the requested materials would change the fact that no pattern of racially discriminatory strikes appears in this case, or that the state courts' resolution of his *Batson* claim was not contrary to clearly established federal law.  And his requests for 17 years of records about jury selection procedures utilized by the Mobile County District Attorney's Office are a classic example of an improper fishing expedition, particularly given that he has identified no specific allegations (and cited no Alabama or federal authorities finding fault with that office's jury selection procedures) giving rise to any reason to believe that any pattern or practice of *Batson* violations existed during that time period.  Speculation does not equate to good cause warranting habeas discovery.  In its discretion, the Court finds that Taylor's discovery requests relating to Count I are not supported by good cause within the meaning of Rule 6(a), and denies them on that basis.

Finally, Taylor requests discovery relating to the contents and chain of custody of the blue duffel bag marked as State's Exhibit 58 for a nearly 20-year period.  Taylor's claims about Exhibit 58 were presented as Claims II.C (prosecutorial misconduct in admitting those materials into evidence) and III.B.ii.a (ineffective assistance of trial counsel in failing to object to the admission of the duffel bag) of his § 2254 Petition.  As discussed *supra*, however, Claims II.C and III.B.ii.a are procedurally defaulted because Taylor did not raise them in Alabama courts until his disallowed Second Amended R32 Petition; moreover, as addressed in sections III.D.6 and 7 of this Order, Taylor has failed to establish cause and prejudice to excuse the procedural default.  No discovery is appropriate on procedurally defaulted claims that are not properly presented on federal habeas review.  Because none of the discovery requested by Taylor would affect that analysis in any way, the Court in its discretion finds that he has not shown good cause to warrant discovery on this topic pursuant to Rule 6(a).

For all of the foregoing reasons, Taylor's Motion for Discovery is **denied** in its entirety.

### B.    *Request for an Evidentiary Hearing.*

In the same Motion, Taylor argues that he should be granted an evidentiary hearing to allow him to present evidence on the following specific topics: (i) the existence *vel non* of the written "talking points" that purportedly influenced Kenyetta McMillan's trial testimony; (ii) the contents of the blue duffel bag admitted into evidence as State's Exhibit 58; (iii) the existence *vel non* of the purported written confession by McMillan that Bryann Clark produced to Taylor's counsel for the first time in March 2012; and (iv) evidence of mitigating circumstances, such as Taylor's upbringing, family relationships, cognitive and functional impairments, mental illness and environmental/social background.  (Doc. 38, at 9-19.)

Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts instructs the district court to "determine whether an evidentiary hearing is warranted." *Id.*[134]  As a general proposition, the Supreme Court has observed that "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).  That said, "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a petitioner made insufficient effort to pursue in state proceedings." *Ward v. Hall*, 592 F.3d 1144, 1159 (11th Cir. 2010) (citation omitted).  By statute, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim" unless the petitioner meets certain demanding requirements.  28 U.S.C. § 2254(e)(2).[135]  What this means is that "[f]or state courts to have their

---

[134]    An evidentiary hearing may be required where, for example, "(1) the federal claim was adjudicated on the merits in state court; (2) there is a determination based only on the state court record that the petitioner has cleared the § 2254(d) hurdle; and (3) the habeas petitioner tried, but was not given the opportunity to develop the factual bases of the claim in state court within the meaning of 28 U.S.C. § 2254(e)(2)." *Madison v. Commissioner, Alabama Dep't of Corrections*, 761 F.3d 1240, 1250 (11th Cir. 2014).

[135]    Those requirements are that (i) the claim relies on either "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable" or "a factual predicate that could not have been previously discovered through the exercise of due diligence," and (ii) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no (Continued)

rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record …. If the prisoner fails to do so, … § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met." *Ward*, 592 F.3d at 1158-59 (citation omitted). To constitute diligence for purposes of a § 2254(e)(2) analysis, the prisoner must have "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court …. [D]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams v. Alabama*, 791 F.3d 1267, 1277 (11th Cir. 2015) (citations and emphasis omitted).

No hearing is warranted on any of the four grounds identified by Taylor's Motion for Evidentiary Hearing. First, as to the McMillan "talking points," the habeas claims to which that evidence relates (Claims II.A.i and II.B.i) are procedurally defaulted and petitioner has not shown cause and prejudice to excuse the default. Moreover, even if Taylor could prove the written "talking points" existed, they would not establish any reasonable likelihood that the outcome of the proceedings would have been different had those "talking points" been disclosed before trial. The differences in McMillan's allegedly "coached" and "uncoached" statements were too minor to make any meaningful difference; therefore, an evidentiary hearing on this topic would be unhelpful. Second, as to the contents of the blue duffel bag, the habeas claims to which that evidence relates (Claims II.C and III.B.ii.a) are likewise procedurally defaulted, and Taylor has not shown cause and prejudice. For that reason, it is unnecessary to resolve any factual disputes as to what the duffel bag did or did not contain at the time of Taylor's trial in order to resolve the § 2254 Petition completely. Moreover, Taylor was not diligent in developing a record in state court as to the contents of the duffel bag. Third, as to the purported written "confession" by McMillan produced by Bryann Clark some 14 years after the fact, the habeas claim to which that evidence relates (Claim IX) is procedurally defaulted, and Taylor has not shown cause and prejudice. At any rate, the Court assumes that, if an evidentiary hearing were conducted on this issue, Clark's testimony would correspond to his statements in the

---

reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(A)-(B).

affidavit dated March 27, 2012 and contained in the habeas record. (Vol. 44, R-98.) As discussed in section III.D.5 of this Order, such testimony would not lead to the granting of habeas relief on Claim IX even if that claim were not procedurally barred. As state courts have observed, Clark effectively destroyed his own credibility by telling multiple flip-flopping, mutually inconsistent stories. Clark's present version – that he received McMillan's written confession in 1998 and held onto it for 14 years without identifying its existence of furnishing it to anyone, despite cooperating with Taylor's attorneys throughout that time period – is so implausible on its face that it strains credulity. And nothing in that purported written confession would exonerate Taylor from guilt on four counts of capital murder or raise a reasonable likelihood that he would not have been sentenced to death for his role in the triple homicide at Steve Dyas Motors even if he did not pull the trigger. Accordingly, Taylor is not entitled to an evidentiary hearing to present evidence relating to Count IX.

Finally, Taylor seeks an evidentiary hearing to present mitigation evidence in support of various ineffective assistance claims presented at Claim III.C of the § 2254 Petition. As discussed in sections III.D.8 and IV.L of this Order, the overwhelming majority of the subclaims presented in Claim III.C are procedurally defaulted, and Taylor has not shown cause and prejudice to excuse the default. Taylor did not present evidence in support of these claims to the state courts because he was not diligent in developing that previously available factual record in Rule 32 proceedings; therefore, § 2254(e)(2) forecloses any evidentiary hearing on Claim III.C at this time unless the stringent requirements of § 2254(e)(2)(A) and (B) are satisfied, which Taylor has not done and cannot do. No evidentiary hearing is warranted to enable Taylor to present unspecified (and, by all appearances, weak or otherwise unremarkable) mitigation evidence that he could and should have developed before the state courts many years ago.

In light of the foregoing, Taylor's Motion for Evidentiary Hearing is **denied**.

## VI.    Conclusion.

For all of the foregoing reasons, Jarrod Taylor's Amended Petition for Writ of Habeas Corpus by Prisoner in State Custody under Death Sentence (doc. 25) is **denied** in its entirety. Petitioner's Motion for Discovery and an Evidentiary Hearing (doc. 38) is likewise **denied** in its entirety. A separate judgment will enter.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts,[136] the Court denies a Certificate of Appealability to Taylor on all claims, grounds and issues presented because Taylor has failed to make a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253(c)(2).

DONE and ORDERED this 25th day of January, 2018.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[136] That Rule provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *Id.*